FILED
CLERK, U.S. DISTRICT COURT
03/24/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: TF DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING (1) THE INTERCEPTION OF WIRE COMMUNICATIONS; (2) THE INSTALLATION AND USE OF A PEN REGISTER AND A TRAP AND TRACE DEVICE AND (3) THE RELEASE OF SUBSCRIBER INFORMATION

Case No. 2:22-cm-00221-FLA(C)

ORDER

**(UNDER SEAL PURSUANT TO 18 U.S.C. § 2518(8))**

Application under oath has been made before this court by Kevin J. Butler, Assistant United States Attorney for the Central District of California, an "investigative or law enforcement officer" as defined in 18 U.S.C. § 2510(7) and an attorney for the government as defined in Federal Rule of Criminal Procedure 1, for an order pursuant to 18 U.S.C. § 2518 authorizing the following:

a. the renewed interception of wire communications for 323-251-9267, a cellular telephone issued by AT&T with international mobile subscriber identity ("IMSI") number 310410330237469, subscribed to Uneek Music at 512 Bay St., Santa Monica, CA 90405 and believed to be used by EUGENE HENLEY, JR., ("HENLEY") ("**Target Telephone #1**"), including any: (a) contemporaneously received or retrieved voice mail messages and (b) any background conversations intercepted in the vicinity of, occurring to and from **Target Telephone #1**;

b. the renewed interception of wire communications for 657-966-8517, a cellular telephone issued by T-Mobile with IMSI number 310260563780967, subscribed to an unknown subscriber with an unknown subscriber address, and believed to be used by SYLVESTER ROBINSON ("ROBINSON") ("**Target Telephone #2**") including any: (a) contemporaneously received or retrieved voice mail messages and (b) any background conversations intercepted in the vicinity of, occurring to and from **Target Telephone #2**; and

c. the renewed interception of wire communications for 470-620-8336, a cellular telephone issued by Verizon with IMSI number 311480747310562, subscribed to Kierston Chandler, 704 Venice Way, Apartment 18, Inglewood, California 90302 and believed to be used by ZIHIRR MITCHELL ("MITCHELL") ("**Target Telephone #3**"), including any:

(a) contemporaneously received or retrieved voice mail messages and (b) any background conversations intercepted in the vicinity of, occurring to and from **Target Telephone #3**; and

d. the initial interception of wire communications for 323-703-7362, a cellular telephone issued by Sprint with IMSI number 310260548509701, subscribed to MARK MARTIN ("MARTIN"), 5705 5th Ave., Los Angeles, California 90043 and believed to be used by MARTIN ("**Target Telephone #4**")(collectively, the "**Target Telephones**"), including any: (a) contemporaneously received or retrieved voice mail messages and (b) any background conversations intercepted in the vicinity of, occurring to and from **Target Telephone #4**.

The court has reviewed the application and exhibits thereto, and following full consideration of the matters set forth therein and in supporting documents, FINDS AS FOLLOWS:

1. The application for interception of wire communications has been made pursuant to the authorization by a specially designated representative of the Attorney General of the United States, specifically in this case, Kevin Driscoll, Deputy Assistant Attorney General, Criminal Division, having been specially designated by the Attorney General pursuant to Order Number 5000-2021, dated March 12, 2021. The application therefore satisfies the dictates of 18 U.S.C. § 2516(1). Attached to the Government's application for this Order, and incorporated into this Order, are copies of the Attorney General's Order of special designation and the Memorandum of Authorization approving this application.

2. The application with incorporated affidavit alleges a full and complete statement of facts within the meaning of 18 U.S.C. § 2518(b) which demonstrates that the Federal Bureau of

Investigations ("FBI") is conducting an investigation into possible violations of offenses enumerated in 18 U.S.C. § 2516, to include the following: interference in commerce by threats or violence, in violation of 18 U.S.C. § 1951; felon in possession of a firearm, in violation of 18 U.S.C. § 922(g); use of a firearm in furtherance of a crime of violence or drug trafficking crime, in violation of 18 U.S.C. § 924(c); wire fraud, in violation of 18 U.S.C. § 1343; mail fraud, in violation of 18 U.S.C. § 1341; conducting an illegal gambling business, in violation of 18 U.S.C. § 1955[1]; bank fraud, in violation of 18 U.S.C. § 1344; false statements in loan applications, in violation of 18 U.S.C. § 1014; providing contraband in prison, in violation of 18 U.S.C. § 1791[2]; and conspiracy to distribute and distribution of controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1), (the "Target Offenses") by persons including HENLEY, also known as ("aka") "BIG U," aka "DRAWS," aka "UNC"; ROBINSON, aka "VEY," aka "V"; MARTIN, aka "BEAR CLAW"; DEVONNE DOUGLAS, aka "DBO" ("DOUGLAS"); TERMAINE ASHLEY WILLIAMS, aka "LUCE CANNON" ("WILLIAMS"); DEVAUGHN JERMAINE HILL, aka "NEWPORT" ("HILL"); MITCHELL, aka "BRICC," aka "BIG SHITTY"; BERNARD DORY ("DORY"); FEDERICK BLANTON, JR. ("BLANTON"); SHAMANICKA BOYKINS ("BOYKINS"); FNU LNU, aka "WEIGE" ("WEIGE"); UNIDENTIFIED MALE 1 ("UM-1"); STACEY

---

[1] 18 U.S.C. § 1955 defines "illegal gambling business" as a business which, among other things, is "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i). Here, there is probable cause to believe that the illegal gambling business contemplated by HENLEY and his associates will be in violation of Cal. Penal Code § 330 (prohibited games including "any banking or percentage game played with cards [or] dice…") and Cal. Penal Code § 332 (fraudulently obtaining money or property from another person).

[2] 18 U.S.C. § 1791 is not a predicate offense for the interception of wire communications under 18 U.S.C. § 2516.

HENLEY ("S. HENLEY"); LONNIE LOVE, aka "L" ("LOVE"); TIFFANY HINES ("HINES"); UNIDENTIFIED MALE 2 ("UM-2"); VERNON GRADY PETTAWAY ("PETTAWAY"); SABRINA KA-REN JOY LOPES ("LOPES"); CHRISTOPHER CAMPBELL ("CAMPBELL"); JAMIUS RAINEY ("RAINEY"); MELVIN CARTER ("CARTER"); LAMARC SAUNDERS, aka "TINY DRAWS" ("SAUNDERS"); GIOVANNI JONES, aka "FLOSS," aka "LEE MACK" ("JONES"); JOHN DANIELS ("DANIELS"); UNIDENTIFIED MALE 3 ("UM-3"); FNU LNU, aka "KENT" ("KENT"); FNU LNU, aka "BULL" ("BULL"); UNIDENTIFIED FEMALE 1 ("UF-1"); FNU LNU, aka "RAMBO" ("RAMBO"); SYTRICE OLDHAM ("OLDHAM"); and others yet unknown (the "Targeted Communicators").

3. There is probable cause to believe that:

a. The Targeted Communicators have committed, are committing, and will continue to commit the Target Offenses.

b. Investigators will obtain wire communications of the Targeted Communicators concerning the Target Offenses through the interception over the **Target Telephones**, which the Targeted Communicators are using or about to use in connection with the commission of the Target Offenses. In particular, the communications to be intercepted will concern, and will provide evidence pertaining to, the goals of this investigation, including identifying and providing admissible evidence of the following: (a) the Target Offenses; (b) the knowledge and intent of the Target Communicators; (c) the identities and roles of Target Communicators' aiders and abettors and co-conspirators in the Target Offenses; (d) acts taken in furtherance of the Target Offenses, including acts taken by co-conspirators of the Target Communicators involving extortion, robbery, and drug trafficking; (e) the manner in which the Target Communicators are committing the Target Offenses, including the

nature, scope, dates, times, places, methods of operation, source of monies, and the methods by which the Target Communicators conceal such sources; (f) the administration, control, management and disposition of proceeds of the Target Offenses, including the manner which any proceeds are laundered; (g) the identification of shell companies and financial institutions used by the Target Communicators; (h) the existence of potential victims of the Target Offenses; (i) the existence and location of records concerning the Target Offenses; (j) the existence, location, and source of resources used to finance the illegal activities; and (k) attempts to conceal the Target Offenses (collectively, the "goals of the investigation").

c. The **Target Phone** are being used, or is about to be used in connection with the commission of the Target Offenses or is leased to, listed in the name of, or commonly used by HENLEY, ROBINSON, and MITCHELL.

d. Because of the nature of the investigation, additional communications concerning the Target Offenses will occur after the first has been intercepted.

e. Cell-site information, as well as GPS information, likely to be received concerning the approximate location of the **Target Telephones**, currently within, or being monitored or investigated within the Central District of California, at times determined by investigators during the authorized period of interception, and information regarding the location of the **Target Telephones** during the 60 days preceding the date that the order is entered, will constitute evidence of violations of the Target Offenses being committed by the Target Communicators.

/ / /

4. It has been adequately demonstrated that normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous.

5. Pursuant to 18 U.S.C. §§ 3122 and 3123, it has been certified that the information likely to be obtained from the pen register (defined in 18 U.S.C. § 3127(3)) and trap and trace device (defined in 18 U.S.C. § 3127(4)) on the **Target Telephones** is relevant to the ongoing criminal investigation being conducted by the FBI in connection with possible violations of the Target Offenses.

6. Pursuant to 18 U.S.C. §§ 3122 and 3123, it has been certified that the information likely to be obtained from the pen register (defined in 18 U.S.C. § 3127(3)) and trap and trace device (defined in 18 U.S.C. § 3127(4)) on the **Target Telephones** is relevant to the ongoing criminal investigation being conducted by the FBI in connection with possible violations of the Target Offenses.

7. Pursuant to 18 U.S.C. §§ 2703(d) and 3123, specific and articulable facts have been set forth to show that there are reasonable grounds to believe that the information likely to be obtained from the **Target Telephones**, including cell site information and any other requested records or other information pertaining to a telephone customer, are relevant and material to the ongoing criminal investigation of the Target Communicators that is being conducted by the FBI.

WHEREFORE, it is hereby ordered that:

**Interception and Pen Register/Trap and Trace**

8. The FBI and all other law enforcement agencies investigating this matter, and individuals operating under a contract

with the government and acting under the supervision of these law enforcement agencies are authorized to intercept wire communications of the Targeted Communicators and others yet unknown, including any: (a) contemporaneously received or retrieved voice mail messages, and (b) any background conversations intercepted in the vicinity of, occurring to and from the **Target Telephones** listed above.

9. Such interception shall not automatically terminate upon the first interception concerning the Target Offenses, but shall continue until communications are intercepted which fully achieve the goals of the investigation or for a period of 30 days (defined as 24-hour periods), whichever occurs first (the "Interception Period").

10. Pursuant to 18 U.S.C. § 2518(5), such Interception Period is authorized to begin on the earlier of the day on which the investigative or law enforcement officers first begin to conduct an interception under this court's Order or 10 days after the date this Order is filed by the court.

a. The authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty (30) day interception period. The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

11. Pursuant to 18 U.S.C. § 2518(3), in the event the **Target Telephones** are used outside the territorial jurisdiction of this

court, interceptions may continue within the Central District of California, where interceptions will first be heard and minimized.

12. Pursuant to 18 U.S.C. §§ 3122 and 3123, agents of the FBI: (1) may install, or cause to be installed, and use a pen register anywhere in the United States to record or decode dialing, routing, addressing, or signaling information for the **Target Telephones**, and dialing, routing, addressing, or signaling information transmitted over the Service Provider's (defined below) network by a two-way radio feature transmitted from the **Target Telephones**, to record the date and time of such dialings or transmissions, and to record the length of time the telephone receiver in question is "off the hook" for incoming or outgoing calls; and (2) may install, or cause to be installed, and use a trap and trace device anywhere in the United States to capture and record the incoming electronic or other impulses for the **Target Telephones** which identify the originating numbers or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire, oral, or electronic communication, and to record the date, time, and duration of calls created by such incoming impulses; both for a period of 60 days from the date this order is filed by the court. The tracing operations and use of the caller identification feature shall be without geographical limits.

**Service Providers**

13. Pursuant to 18 U.S.C. §§ 2518(4), 2703, 3122, and 3123, and Federal Rule of Criminal Procedure 41, SBC Communications, Inc. or any subsidiary thereof, Ameritech, Southern New England Telephone Company, Verizon California, Inc., XO Communications, Comcast Cable Communications Inc./AT&T Corporation, Verizon, Verizon New York,

Inc., Verizon California, Inc., General Telephone Company, MPower Communications, Verizon New Jersey Inc., Bell South Telephone Company, Allegiance Telecom, Cox Communications and Qwest Communications, AT&T, U.S. Sprint, WorldCom, Pacific Bell Telephone Company, Pacific Bell Wireless, Cellco Partnership, dba Verizon Wireless, AT&T Wireless Services, AirTouch Cellular Telephone Company, U.S. Cellular, MetroPCS, Cingular Wireless, Nextel of California, Inc., Boost Mobile LLC, Cricket Communications, Sprint Communications, T-Mobile USA, Inc., Virgin Mobile USA, AT&T Broadband, Nextel Communications and Western Wireless Corp., and any other telephone companies, and local long distance or wireless carriers who are providers of wire, oral and electronic communications services as defined in 18 U.S.C. § 2510(15), including any subsequent service provider which provides such defined service to the **Target Telephones**, (the "Service Providers") are ordered to do the following:

a. Provide the FBI and other law enforcement agencies involved in this investigation with 24-hour-a-day, seven-days-a-week information, facilities, and technical assistance necessary to accomplish the interception over the **Target Telephones** unobtrusively, expeditiously, and with a minimum of interference to the services that the Service Providers are providing to the persons whose communications are to be intercepted. The switch mechanisms that allow law enforcement to receive audio shall be programmed within four business hours of receipt of the court's Order.

b. Provide the FBI with such 24-hour-a-day information and services for the **Target Telephones** as the following: rotary numbers associated with the **Target Telephones**, call forwarding, speed

Case 2:22-cr-00021-FLA Document 174-1 Filed 01/13/26 Page 11 of 101 Page ID #:892

dialing, call waiting, pen register data, toll data, trap and trace extended digit dialed data, Direct Connect/Digital Dispatch services ("Push-to-Talk"), three-way calling, and all other services.

c. Within 48 hours of an oral or written demand of the FBI or other law enforcement agencies involved in the investigation, disclose to same: all account information and records in their files for the **Target Telephones** and the telephones that place or send wire communications to, or receive wire communications from the **Target Telephones** (based on the FBI's written representation of same), including but not limited to subscriber names and addresses whether published or unpublished, listed or unlisted, and any changes (defined here to include additions, deletions, and transfers) thereto; MEIDs, ESNs, IMSIs, IMEIs, or other identifying information and any changes thereto; subscriber date of birth, driver's licenses (state and number), social security number, contact names and numbers, and employment information and any changes thereto; all telephone numbers listed to subscribers under the same or different account; method of payment; length of service, periods of telephone activation, and type of service utilized; applications, account and billing information; and historical toll information, including Direct Connect/Digital Dispatch ("Push-to-Talk") services and call detail.

d. Disclose at such intervals and times as directed by the FBI information concerning the location (physical address) of the cell-site at call origination (for outbound calling), call termination (for incoming calls), and, if reasonably available, during the progress of a call, for the **Target Telephones**, as well as such other information, apart from the content of any communication,

that is reasonably available to the Service Provider and that is requested by the FBI or any law enforcement agency working with the FBI, concerning the cell-sites/sectors receiving and transmitting signals to and from the **Target Telephones** whether or not a call is in progress.

e. Disclose at such intervals and times as directed by the FBI the approximate physical location of the **Target Telephones**, to include E-911 Phase II data and latitude and longitude data gathered for the **Target Telephones**, including Global Positioning Satellite ("GPS") and/or network timing information, and including information from such programs as Nextel Mobile Locator, Boost Mobile Loopt, Sprint/Nextel Findum Wireless, or a similar program, which will establish the approximate location of the **Target Telephones**, and which information is acquired in the first instance by the Service Provider, which will establish the approximate location of the **Target Telephones** (referred to herein as "GPS information"), and shall furnish all information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively.

f. Enter the telephone numbers of the **Target Telephones** into the pen register system during the Interception Period.

g. Authorize the installation and/or use of "dialed number recorders" to detect and record all numbers dialed or pulsed by the **Target Telephones**.

h. Execute the court's Order as soon as practicable after it is signed. If a copy of the order is given to any Service Provider, the copy may be redacted to exclude the Targeted Communicators and a description of the Target Offenses under investigation.

Case 2:22-cr-00021-FLA Document 174-1 Filed 03/24/23 Page 13 of 101 Page ID #:894

i. To avoid prejudice to this criminal investigation, the Service Providers and their agents and employees shall not disclose to or cause a disclosure of this court's Order or the request for information, assistance, and facilities by the FBI or other law enforcement agencies involved in the investigation or the existence of this investigation to any person other than those of their agents and employees who require said information to accomplish the services herein requested. In particular, the Service Providers and their agents and employees are ordered not to make such disclosure to the lessee, telephone subscribers or any interceptee or participant in the intercepted communications.

j. In the event the Service Provider (currently AT&T) changes during the course of the Interception Period, interception may continue with the new Service Provider without further order of this court. Both the previous and the new Service Provider shall inform the FBI immediately if the Service Provider changes during the Interception Period, or if the IMSI or telephone number for the **Target Telephones** is supplied to another Service Provider.

k. The Service Providers furnishing such facilities, service, or technical assistance shall be compensated for reasonable expenses incurred in doing so.

**Delayed Notice of Acquisition of GPS Information**

14. Pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), service of notice of the acquisition of GPS Information may be delayed for a period not to exceed 120 days from the date this Order is entered. There is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice

to the subscribers or users of the **Target Telephones** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. The period of delay may thereafter be extended by the court for good cause shown.

**Progress Reports, Monitoring, and Sealing**

15. Pursuant to 18 U.S.C. § 2518(6), an Assistant United States Attorney familiar with the facts of this case shall provide the court with a report after about the fifteenth day of the Interception Period showing what progress has been made toward achievement of the authorized objectives of the investigation and the need for continued interception. In the event the FBI is made aware that the Service Provider has changed during the course of the interception, the periodic progress report will include that information.

16. Pursuant to 18 U.S.C. § 2518(5), the interception may be conducted in whole or in part by government personnel (full or part-time), or by an individual operating under a contract with the government, acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

17. All monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of communications not relevant to the investigation, or otherwise criminal in nature. Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18 of the United States Code. Interception must be suspended immediately when it is determined through voice identification,

physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during a portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent may spot-check to ensure that the conversation has not turned to criminal matters. Special attention shall be given to minimize all privileged communications.

18. In the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the Government, will be under the direct supervision of a federal agent.

19. A memorandum outlining all of the guidelines for minimization and application of privileges, as well as a copy of the application and Order, will be provided to all monitors.

IT IS FURTHER ORDERED that the providers shall disclose the Requested Location Information concerning the **Target Telephones** during the authorized period of interception, and shall initiate a signal to determine the location of the **Target Telephones** on the service providers' network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and shall furnish the information, facilities, and technical assistance necessary to accomplish the acquisition unobtrusively and with a

minimum of interference with such services as that provider accords the user(s) of the **Target Telephones**, at any time of day or night, owing to the potential need to locate the **Target Telephones** outside of daytime hours.

IT IS FURTHER ORDERED that no inventory or return of the results of the foregoing interception need be made, other than the above-required reports, before 90 days from the date of the expiration of this Order, or any extension of the Order, or at such time as the court in its discretion may require.

IT IS FURTHER ORDERED that, upon an ex parte showing of good cause to a judge of competent jurisdiction, the service of the above inventory or return may be postponed for a further reasonable period of time. Pursuant to 18 U.S.C. § 2518(8)(b), this Order, the accompanying application and all interim reports filed with the court shall be sealed until further order of this court. Copies of the Order may be given by the FBI to any other law enforcement officer involved in the investigation and to the Service Providers as is necessary to implement the Order.

March 24, 2023
DATE

FERNANDO L. AENLLE-ROCHA
United States District Judge

FILED
CLERK, U.S. DISTRICT COURT
03/24/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: TF DEPUTY

E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
AMY E. POMERANTZ (Cal. Bar No. 275691)
KEVIN J. BUTLER (Cal. Bar No. 329129)
Assistant United States Attorneys
Violent and Organized Crime Section
1300 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-0730/6495
Facsimile: (213) 894-3713
E-mail: amy.pomerantz@usdoj.gov
kevin.butler2@usdoj.gov

Attorneys for Applicant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING (1) THE INTERCEPTION OF WIRE COMMUNICATIONS; (2) THE INSTALLATION AND USE OF A PEN REGISTER AND A TRAP AND TRACE DEVICE AND (3) THE RELEASE OF SUBSCRIBER INFORMATION | CR Misc. No. 2:22-cm-00221-FLA(C)<br><br>APPLICATION<br><br>**(UNDER SEAL PURSUANT TO 18 U.S.C. § 2518(8))** |

I, Kevin J. Butler, an attorney for the United States Department of Justice, declare and state:

**Authority to Make Application**

I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an attorney authorized by law to prosecute or participate in the prosecution of offenses enumerated in Section 2516 of Title 18, United States Code. I am also an attorney for the government as defined in Rule 1 of the Federal Rules of Criminal

Procedure, and, therefore, pursuant to 18 U.S.C. § 2516(3), I may apply to a federal judge of competent jurisdiction for an order authorizing and approving the renewed and initial interception of wire communications and for orders authorizing the installation and use of pen registers and trap and trace devices, and disclosure of subscriber information.

Pursuant to Section 2516(1) of Title 18, United States Code, an appropriate official of the Criminal Division, United States Department of Justice, specifically, Kevin Driscoll, Deputy Assistant Attorney General, Criminal Division, having been specially designated by the Attorney General pursuant to Order Number 5000-2021, dated March 12, 2021, has authorized this application for an order approving the interception of wire communications. Attached to this application as Exhibit A, and incorporated by reference herein, is a copy of that order and the memorandum of authorization approving this application.

## Identification of Target Telephones

This application seeks an Order pursuant to 18 U.S.C. § 2518 authorizing the renewed interception of wire communications over the following cellular telephones, including any contemporaneously received or retrieved voice mail messages and any background conversations intercepted in the vicinity of, occurring to and from the telephone:

a. 323-251-9267, a cellular telephone issued by AT&T with international mobile subscriber identity ("IMSI") number 310410330237469, subscribed to Uneek Music at 512 Bay St., Santa

Case 2:25-cr-00021-FLA Document 25 Filed 03/24/23 Page 19 of 101 Page ID #:900

Monica, CA 90405 and believed to be used by EUGENE HENLEY, JR. ("HENLEY")("**Target Telephone #1**");

b. 657-966-8517, a cellular telephone issued by T-Mobile with IMSI number 310260563780967, subscribed to an unknown subscriber with an unknown subscriber address, and believed to be used by SYLVESTER ROBINSON ("**Target Telephone #2**"); and

c. 470-620-8336, a cellular telephone issued by Verizon with IMSI number 311480747310562, subscribed to Kierston Chandler, 704 Venice Way, Apartment 18, Inglewood, California 90302 and believed to be used by ZIHIRR MITCHELL ("**Target Telephone #3**").

This application further seeks an Order pursuant to 18 U.S.C. § 2518 authorizing the initial interception of wire communications, including any contemporaneously received or retrieved voice mail messages, and any background conversations intercepted in the vicinity of, to and from, the following telephone number: 323-703-7362, a cellular telephone issued by Sprint with IMSI number 310260548509701, subscribed to MARK MARTIN, 5705 5th Ave., Los Angeles, California 90043 and believed to be used by MARTIN (**Target Telephone #4**)(collectively, the "**Target Telephones**").

**Statement of Application**

I have discussed the circumstances of the current investigation and this application with Federal Bureau of Investigation ("FBI") Special Agent Andrew J. Roosa, who has assisted in conducting that investigation. I have examined the affidavit of Special Agent Andrew J. Roosa, attached to the application as Exhibit B and incorporated by reference herein, and determined that it alleges a full and complete statement of facts within the meaning of 18 U.S.C. § 2518

which (i) justifies our belief that the orders requested below should be issued and (ii) states the following:

a. The FBI is conducting an investigation into possible violations of offenses enumerated in 18 U.S.C. § 2516, to include the following: interference with commerce by threats or violence, in violation of 18 U.S.C. § 1951; felon in possession of a firearm, in violation of 18 U.S.C. § 922(g); use of a firearm in furtherance of a crime of violence or drug trafficking crime, in violation of 18 U.S.C. § 924(c); wire fraud, in violation of 18 U.S.C. § 1343; mail fraud, in violation of 18 U.S.C. § 1341; conducting an illegal gambling business, in violation of 18 U.S.C. § 1955[1]; bank fraud, in violation of 18 U.S.C. § 1344, false statements in loan applications, in violation of 18 U.S.C. § 1014, providing contraband in prison, in violation of 18 U.S.C. § 1791[2]; and conspiracy to distribute and distribution of controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1) (the "Target Offenses") by persons including HENLEY, also known as ("aka") "BIG U," aka "DRAWS," aka "UNC;" SYLVESTER ROBINSON, aka "VEY," aka "V;" MARK MARTIN, aka "BEAR CLAW" ("MARTIN"); DEVONNE DOUGLAS, aka "DBO" ("DOUGLAS"); TERMAINE ASHLEY WILLIAMS, aka "LUCE CANNON" ("WILLIAMS"); DEVAUGHN JERMAINE HILL, aka "NEWPORT" ("HILL"); ZIHIRR

---

[1] 18 U.S.C. § 1955 defines "illegal gambling business" as a business which, among other things, is "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i). Here, there is probable cause to believe that the illegal gambling business contemplated by HENLEY and his associates will be in violation of Cal. Penal Code § 330 (prohibited games including "any banking or percentage game played with cards [or] dice…") and Cal. Penal Code § 332 (fraudulently obtaining money or property from another person).

[2] 18 U.S.C. § 1791 is not a predicate offense for the interception of wire communications under 18 U.S.C. § 2516.

MITCHELL, aka "BRICC," aka "BIG SHITTY" ("MITCHELL"); BERNARD DORY ("DORY"); FEDERICK BLANTON, JR. ("BLANTON"); SHAMANICKA BOYKINS ("BOYKINS"), FNU LNU, aka "WEIGE" ("WEIGE"); UNIDENTIFIED MALE 1 (UM-1); STACEY HENLEY ("S. HENLEY"); LONNIE LOVE, aka "L" ("LOVE"); TIFFANY HINES ("HINES"); UNIDENTIFIED MALE 2 ("UM-2"); VERNON GRADY PETTAWAY ("PETTAWAY"); SABRINA KA-REN JOY LOPES ("LOPES"); CHRISTOPHER CAMPBELL ("CAMPBELL"); JAMIUS RAINEY ("RAINEY"); MELVIN CARTER ("CARTER"); LAMARC SAUNDERS, aka "TINY DRAWS" ("SAUNDERS"); GIOVANNI JONES, aka "FLOSS," aka "LEE MACK" ("JONES"); JOHN DANIELS ("DANIELS"); UNIDENTIFIED MALE 3 ("UM-3"); FNU LNU, aka "KENT" ("KENT"); FNU LNU, aka "BULL" ("BULL"); UNIDENTIFIED FEMALE 1 ("UF-1"); FNU LNU, aka "RAMBO" ("RAMBO") SYTRICE OLDHAM ("OLDHAM"); and others yet unknown (the "Targeted Communicators").

b. There is probable cause to believe that:

i. The Targeted Communicators have committed, are committing, and will continue to commit one of more of the Target Offenses;

ii. Wire communications concerning the Target Offenses will be obtained through the interceptions over the **Target Telephones**, which Targeted Communicators are using in connection with commission of the Target Offenses. In particular, the communications to be intercepted will concern, and will provide evidence pertaining to, the goals of this investigation, including identifying and providing admissible evidence of the following: (a) the Target Offenses; (b) the knowledge and intent of the Target Communicators; (c) the identities and roles of Target Communicators' aiders and abettors and co-conspirators in the Target Offenses; (d) acts taken

in furtherance of the Target Offenses, including acts taken by co-conspirators of the Target Communicators involving extortion, robbery, and drug trafficking; (e) the manner in which the Target Communicators are committing the Target Offenses, including the nature, scope, dates, times, places, methods of operation, source of monies, and the methods by which the Target Communicators conceal such sources; (f) the administration, control, management and disposition of proceeds of the Target Offenses, including the manner which any proceeds are laundered; (g) the identification of shell companies and financial institutions used by the Target Communicators; (h) the existence of potential victims of the Target Offenses; (i) the existence and location of records concerning the Target Offenses; (j) the existence, location, and source of resources used to finance the illegal activities; and (k) attempts to conceal the Target Offenses (collectively, the "goals of the investigation").

iii. The **Target Telephones** are being used, or is about to be used in connection with the commission of one or more of the Target Offenses as detailed in Exhibit B or is leased to, listed in the name of, or commonly used by HENLEY, ROBINSON, MITCHELL, and MARTIN; and

iv. Because of the nature of the investigation, additional communications concerning the Target Offenses will occur after the first has been intercepted. Therefore, the authorization for interception should not automatically terminate after the first interception but should continue until communications are intercepted which fully achieve the goals of the investigation or for a period of 30 days (defined as 24-hour periods), whichever occurs first.

c. Normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous.

d. The relevant facts concerning all previous applications known to me and Special Agent Roosa which were made to any judge for authorization to intercept wire or oral communications involving any of the Targeted Communicators or facilities or places specified in the affidavit, and the action taken by the judge on each such application.

e. Pursuant to 18 U.S.C. §§ 3122 and 3123, I certify that the information likely to be obtained from the pen register (defined in 18 U.S.C. § 3127(3)) and trap and trace device (defined in 18 U.S.C. § 3127(4)) on the **Target Telephones** is relevant to the ongoing criminal investigation being conducted by the agency in connection with possible violations of the Target Offenses, as detailed in Exhibit B.[3]

f. Because this application is in part for a renewal of an order, Exhibit B states a summary of the results so far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

g. Pursuant to Federal Rule of Criminal Procedure 41, and 18 U.S.C. §§ 2703(d) and 3123, the attached affidavit demonstrates

---

[3] See, e.g., Brown v. Waddell, 50 F.3d 285, 290 (4th Cir. 1995) (Section 3122 does not require the government to establish probable cause to obtain a pen register or trap and trace device); United States v. Fregoso, 60 F.3d 1314, 1320 (8th Cir. 1995) (holding that the judicial role under Section 3123(a) is ministerial in nature because a proper application under Section 3122 mandates entry of the order); see also Smith v. Maryland, 442 U.S. 735, 742-44 (1979) ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.").

that: (1) specific and articulable facts exist to show that there are reasonable grounds to believe that the information likely to be obtained from the **Target Telephones** cell-site information and any other requested records or other information pertaining to a telephone customer, are relevant and material to the ongoing criminal investigation of the Target Subjects that is being conducted by the FBI; and (2) there is probable cause that cell-site information, as well as GPS information, likely to be received concerning the approximate location of the **Target Telephones**, currently within, or being monitored or investigated within, the Central District of California, at times determined by investigators during the authorized period of interception, and information regarding the location of the **Target Telephones** during the 60 days preceding the date that the order is entered, will constitute evidence of violations of the Target Offenses being committed by the Target Subjects.

**Requested Orders: Interception and Pen Register/Trap and Trace**

On the basis of the allegations contained in this application, on the basis of the affidavit of Special Agent Roosa, and pursuant to the power conferred on this Court by 18 U.S.C. §§ 2518(4), 2703, 3122, and 3123, I request this Court issue the following orders:

a. the agency and all other law enforcement agencies investigating this matter, and individuals operating under a contract with the government and acting under the supervision of these law enforcement agencies are authorized to intercept wire communications of the Targeted Communicators and others yet unknown, including any: (a) contemporaneously received or retrieved voice mail messages, and

(b) any background conversations intercepted in the vicinity of, occurring to and from the **Target Telephones** listed above.

b. Such interception shall not automatically terminate upon the first interception of the described types of communication, but shall continue until communications are intercepted which fully achieve the goals of the investigation or for a period of 30 days (defined as 24-hour periods), whichever occurs first (the "Interception Period").

c. Pursuant to 18 U.S.C. § 2518(5), such Interception Period is authorized to begin on the earlier of the day on which the investigative or law enforcement officers first begin conducting interception under this Court's Order or 10 days after the date the Order is filed by the Court.

d. The authorization given is intended to apply not only to the telephone numbers for the **Target Telephones** listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the **Target Telephones** during the 30-day interception period. The authorization is also intended to apply to the **Target Telephones** regardless of service provider, and to background conversations intercepted in the vicinity of the **Target Telephones** while the telephone is off the hook or otherwise in use.

e. Pursuant to 18 U.S.C § 2518(3), in the event the **Target Telephones** are used outside the territorial jurisdiction of this Court, interceptions may continue within the Central District of California, where interceptions will first be heard and minimized.

f. Pursuant to 18 U.S.C. §§ 3122 and 3123, agents of the FBI: (1) may install, or cause to be installed, and use a pen register anywhere in the United States to record or decode dialing, routing, addressing, or signaling information for the **Target Telephones**, and dialing, routing, addressing, or signaling information transmitted over the Service Providers (defined below) network by a two-way radio feature transmitted from the **Target Telephones**, to record the date and time of such dialings or transmissions, and to record the length of time the telephone receiver in question is off the hook for incoming or outgoing calls; and (2) may install, or cause to be installed, and use a trap and trace device anywhere in the United States to capture and record the incoming electronic or other impulses for the **Target Telephones** which identify the originating numbers or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or oral communication, and to record the date, time, and duration of calls created by such incoming impulses; both for a period of 60 days from the date this Order is filed by the Court. The tracing operations and use of the caller identification feature shall be without geographical limits.

**Requested Orders: Service Providers**

In addition, on the basis of the allegations contained in this application, on the basis of the affidavit of Special Agent Andrew J. Roosa and pursuant to the power conferred on this Court by 18 U.S.C. §§ 2518, 2703, 3122, 3123, and 3127, and Federal Rule of Criminal Procedure 41, I request this Court order SBC Communications, Inc. or any subsidiary thereof, Ameritech, Southern New England Telephone

Company, Verizon California, Inc., XO Communications, Comcast Cable Communications Inc./AT&T Corporation, Verizon, Verizon New York, Inc., Verizon California, Inc., General Telephone Company, MPower Communications, Verizon New Jersey Inc., Bell South Telephone Company, Allegiance Telecom, Cox Communications and Qwest Communications, AT&T, U.S. Sprint, WorldCom, Pacific Bell Telephone Company, Pacific Bell Wireless, Cellco Partnership, dba Verizon Wireless, AT&T Wireless Services, AirTouch Cellular Telephone Company, U.S. Cellular, MetroPCS, Cingular Wireless, Nextel of California, Inc., Boost Mobile LLC, Cricket Communications, Sprint Communications, T-Mobile USA, Inc., Virgin Mobile USA, AT&T Broadband, Nextel Communications and Western Wireless Corp., and any other telephone companies, and local long distance or wireless carriers who are providers of wire, oral and electronic communications services as defined in 18 U.S.C. § 2510(15), including any subsequent service provider which provides such defined service to the **Target Telephones**, (the "Service Providers") to do the following:

a. Provide the FBI and other law enforcement agencies involved in this investigation with 24-hour-a-day, seven-days-a-week information, facilities, and technical assistance necessary to accomplish the interception over the **Target Telephones** unobtrusively, expeditiously, and with a minimum of interference to the services that the Service Providers are providing to the persons whose communications are to be intercepted. The switch mechanisms that allow law enforcement to receive audio shall be programmed within four business hours of receipt of the Court's Order.

b. Provide the FBI with such 24-hour-a-day information and services for the **Target Telephones** as the following: rotary numbers associated with the **Target Telephones**, call forwarding, speed dialing, call waiting, cell site and real-time locations/Global Positioning Satellite (GPS) information (including User Name(s), Pass Code(s), and historical and ongoing activity related to the physical location of the **Target Telephones**, pen register data, toll data, trap and trace extended digit dialed data, Direct Connect/Digital Dispatch (Push-to-Talk) services, three-way calling, and all other services. In addition, the Service Providers shall (if available) initiate a signal to determine the location of the **Target Telephones** on the Service Provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the FBI. Provide the requested GPS information at times as determined by investigators during the authorized period of interception, and information regarding the location of **Target Telephones** during the 60 days preceding the date that the Order is entered (the "Requested Location Information"), for a period of 30 days.

c. Within 48 hours of an oral or written demand of the FBI or other law enforcement agencies involved in the investigation, disclose to same: all account information and records in their files for the **Target Telephones** and the telephones that place or send wire communications to, or receive wire communications from the **Target Telephones** (based on the FBI's written representation of same), including but not limited to subscriber names and addresses whether published or unpublished, listed or unlisted, and any changes

(defined hereto include additions, deletions, and transfers) thereto; MEIDs, ESNs, IMSIs, IMEIs, UMFIs, SIMs or other identifying information and any changes thereto; subscriber date of birth, driver's licenses (state and number), social security number, contact names and numbers, and employment information and any changes thereto; all telephone numbers listed to subscribers under the same or different account; method of payment; length of service, periods of telephone activation, and type of service utilized; applications, account and billing information; and historical toll information, including Direct Connect/Digital Dispatch ("Push-to-Talk") services and call detail.

d. Disclose at such intervals and times as directed by the FBI, information concerning the location (physical address) of the cell-site at call origination (for outbound calling), call termination (for incoming calls), and, if reasonably available, during the progress of a call, for the **Target Telephones**, as well as such other information, apart from the content of any communication, that is reasonably available to the Service Provider and that is requested by the FBI or any law enforcement agency working with the FBI, concerning the cell-sites/sectors receiving and transmitting signals to and from the **Target Telephones** whether or not a call is in progress.

e. Disclose at such intervals and times as directed by the FBI the approximate physical location of the **Target Telephones**, to include E-911 Phase II data and latitude and longitude data gathered for the **Target Telephones**, including Global Positioning Satellite ("GPS") and/or network timing information, and including

Case 2:22-mj-00021-FLA Document 25 Filed 03/24/23 Page 30 of 101 Page ID #:911

information from such programs as Nextel Mobile Locator, Boost Mobile Loopt, Sprint/Nextel Findum Wireless, or a similar program, which will establish the approximate location of the **Target Telephones**, and which information is acquired in the first instance by the Service Provider, which will establish the approximate location of the **Target Telephones** (referred to herein as "GPS information"), and shall furnish all information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively. As explained in Exhibit B, there is probable cause to believe that the location of the **Target Telephones** during the Interception Period, and from the 60 days preceding the date that the order is entered, will constitute evidence of the Target Offenses.

f. Enter the telephone numbers of the **Target Telephones** into the pen register system during the Interception Period.

g. Authorize the installation and/or use of dialed number recorders to detect and record all numbers dialed or pulsed by the **Target Telephones**.

h. Execute the Court's Order as soon as practicable after it is signed. If a copy of the order is given to any Service Provider, the copy may be redacted to exclude the Targeted Communicators and a description of the Target Offenses under investigation.

i. To avoid prejudice to this criminal investigation, the Service Providers and their agents and employees shall not disclose or cause a disclosure of this Court's Order or the request for information, assistance, and facilities by the FBI or other law enforcement agencies involved in the investigation or the existence

of this investigation to any person other than those of their agents and employees who require said information to accomplish the services herein requested. In particular, the Service Providers and their agents and employees should be ordered not to make such disclosure to the lessee, telephone subscribers or any interceptee or participant in the intercepted communications.

j. In the event that the Service Provider (currently AT&T) changes during the course of the Interception Period, interception may continue with the new Service Provider without further order of this Court. Both the previous and the new Service Provider shall inform the FBI immediately if the Service Provider changes during the Interception Period, or if the IMSI or telephone number for the **Target Telephones** is supplied to another Service Provider.

k. The Service Providers furnishing such facilities, service, or technical assistance shall be compensated for reasonable expenses incurred in doing so.

**Requested Orders: Delayed Notice of Acquisition of GPS Information**

I further request that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that this Court authorize delay of notice of the acquisition of the above GPS Information for a period not to exceed 120 days from the date that the order is entered. For the reasons set forth in Exhibit B, there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target**

Case 2:22-mj-00021-HLA *SEALED* Document 25 Filed 03/24/23 Page 32 of 101 Page ID #:913

**Telephones** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. The period of delay may thereafter be extended by the Court for good cause shown.

**Requested Orders: Progress Reports, Monitoring, and Sealing**

I further request this Court issue the following orders:

a. Pursuant to 18 U.S.C. § 2518(6), an Assistant United States Attorney familiar with the facts of this case shall provide the Court with a report after about the fifteenth day of the Interception Period showing what progress has been made toward achievement of the authorized objectives of the investigation and the need for continued interception. In the event that the FBI is made aware that the Service Provider has changed during the course of the interception, the periodic progress report will include that information.

b. Pursuant to 18 U.S.C. § 2518(5), the interception may be conducted in whole or in part by government personnel (full- or part-time), or by an individual operating under contract with the government, acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

c. As set forth in more detail in the attached affidavit, all monitoring of wire communications be conducted in such a way as to minimize the interception and disclosure of communications not relevant to the investigation, or otherwise criminal in nature. Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications

subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during a portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent may spot-check to ensure that the conversation has not turned to criminal matters. Special attention shall be given to minimize all privileged communications.

d. In the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the Government, will be under the direct supervision of a federal agent.

e. A memorandum outlining all of the guidelines for minimization and application of privileges, as well as a copy of the application and Order, will be provided to all monitors.

f. IT IS FURTHER REQUESTED that no inventory or return of the results of the foregoing interception need be made, other than the above-required reports, before 90 days from the date of the expiration of this Order, or any extension of the Order, or at such time as the Court in its discretion may require.

g. IT IS FURTHER REQUESTED that, upon an ex parte showing of good cause to a judge of competent jurisdiction, the service of the above inventory or return may be postponed for a further reasonable period of time.

h. This application with attached affidavit, any resulting Order and all interim reports filed with the Court shall be sealed until further order of this Court. Copies of the Order may be given by the FBI to any other law enforcement officer involved in the investigation and to the Service Providers as is necessary to implement the Order.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

EXECUTED at Los Angeles, California, on March 16, 2023.

KEVIN J. BUTLER
Assistant United States Attorney
Violent and Organized Crime Section

# EXHIBIT A

# Office of the Attorney General
## Washington, D. C. 20530

ORDER NO. 5000-2021

SPECIAL DESIGNATION OF CERTAIN OFFICIALS OF THE CRIMINAL DIVISION AND NATIONAL SECURITY DIVISION TO AUTHORIZE APPLICATIONS FOR COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS

By virtue of the authority vested in me as the Attorney General, including 28 U.S.C. § 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in order to preclude any contention that the designations by the prior Attorney General have lapsed, the following officials are hereby specially designated to exercise the power conferred by Section 2516(1) of Title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire and oral communications by the Federal Bureau of Investigation or a Federal agency having responsibility for the investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any of the offenses specified in Section 2516 of Title 18, United States Code:

1. The Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division;

2. The Assistant Attorney General for National Security, any Acting Assistant Attorney General for National Security, any Deputy Assistant Attorney General for National Security, and any Acting Deputy Assistant Attorney General for National Security, with respect to those matters delegated to the supervision and responsibility of the Assistant Attorney General for National Security. These officials of the National Security Division shall exercise this authority through, and in full coordination with, the Office of Enforcement Operations within the Criminal Division.

Attorney General Order No. 4417-2019 of March 25, 2019, is revoked effective at 11:59 p.m. of the day following the date of this order.

3/12/2021
Date

Merrick B. Garland
Attorney General

U.S. Department of Justice

Criminal Division

Washington, D.C. 20530

March 16, 2023

**MEMORANDUM**

TO: Ashley Dugger, Acting Director
Office of Enforcement Operations
Criminal Division

ATTN: Amy Pomerantz

FROM: Kenneth A. Polite, Jr.
Assistant Attorney General
Criminal Division

SUBJECT: Authorization for Interception Order Application

This is with regard to your recommendation that an appropriately designated official of the Criminal Division authorize an application to a federal judge of competent jurisdiction for an order under Title 18, United States Code, Section 2518, authorizing for a thirty (30) day period the continued interception of wire communications occurring to and from the cellular telephones bearing the numbers 323-251-9267, subscribed to by Uneek Music, 512 Bay St., Santa Monica, CA, and accessed through International Mobile Subscriber Identity ("IMSI") number 310410330237469, 657-966-8517, no subscriber information provided, and accessed through IMSI number 310260563780967, and 470-620-8336, subscribed to by Kierston Chandler, 704 Venice Way, Apartment 18, Inglewood, California, and accessed through IMSI number 311480747310562, and the initial interception of wire communications occurring to and from the cellular telephone bearing the number 323-703-7362, subscribed to Mark Martin, 5705 5th Ave., Los Angeles, California, and accessed through IMSI number 310260548509701, in connection with an investigation into possible violations of Title 18, United States Code, Sections 922, 924, 1014, 1341, 1343, 1344, 1951, 1955, and 1791, and Title 21, United States Code, Sections 841 and 846, by Eugene Henley, Jr., Sylvester Robinson, Mark Martin, Devonne Douglas, Termaine Ashley

Williams, Devaughn Jermaine Hill, Zihirr Mitchell, Bernard Dory, Federick Blanton, Jr., Shamanicka Boykins, "Weige," UM-1, Stacey Henley, Lonnie Love, Tiffany Hines, UM-2, Vernon Grady Pettaway, Sabrina Ka-Ren Joy Lopes, Christopher Campbell, Jamius Rainey, Melvin Carter, Lamarc Saunders, Giovanni Jones, John Daniels, UM-3, "Kent," "Bull," UF-1, "Rambo," Sytrice Oldham, and others as yet unknown.

By virtue of the authority vested in the Attorney General of the United States by Section 2516 of Title 18, United States Code, the Attorney General has by Order Number 5000-2021, dated March 12, 2021, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communications. As a duly designated official in the Criminal Division, this power is exercisable by the undersigned. WHEREFORE, acting under this delegated power, the appropriately designated official authorizes the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty (30) day period. The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

KEVIN DRISCOLL
Digitally signed by KEVIN DRISCOLL
Date: 2023.03.16 10:55:53 -04'00'

__________________________
Kevin O. Driscoll
Deputy Assistant Attorney General
Criminal Division

March 16, 2023
__________________________
Date

# EXHIBIT B

# AFFIDAVIT

I, Andrew James Roosa, being duly sworn, declare and state as follows:

## I. INTRODUCTION

### A. TRAINING AND EXPERIENCE

1. I am an investigative or law enforcement officer of the United States within the meaning 18 U.S.C. § 2510(7) who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. I am a Special Agent of the Federal Bureau of Investigation (the "FBI") and have been employed as such since September 2018. I am currently assigned to a Criminal Enterprise Squad at the Los Angeles Field Office of the FBI, where I am tasked with investigating violent gangs and organized criminal enterprises, in conjunction with the Los Angeles Metropolitan Task Force on Violent Gangs (the "LAMTFVG"), a multi-agency federal, state, and local gang task force and have been so assigned since March 2019. My experience as an SA with the FBI includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, working with informants, issuing subpoenas, analyzing pen register and trap and trace records, interviewing subjects and witnesses, consensually monitored meetings and telephone calls, and conducting court-authorized interception of wire communications. I have received training in the investigation of violations of federal law, including racketeering laws and federal drug conspiracy laws, and have personally participated in and assisted with several gang investigations involving racketeering and drug conspiracies.

3. I am currently one of the agents assigned to an investigation of EUGENE HENLEY JR. ("HENLEY") occurring in Los Angeles, California. I have been participating in the investigation of HENLEY's extortion activities since July 2021. As shown and discussed in more detail below, HENLEY is widely regarded as

the long-time leader of the Rollin 60's. In the television series Hip Hop Uncovered, which HENLEY executive produced, HENLEY explained the Rollin 60's was a large Crip gang known to instill fear in the community. (The "Crips" are an alliance of street gangs based largely in Southern California comprised of a loosely connected network of individual "sets.") In the 1980's, HENLEY rose to a prominent position in the Rollin 60's Los Angeles drug hierarchy. During this time, HENLEY earned a reputation as an "enforcer," or a person who intimidated through violence, for the Rollin 60's. Based on my training, experience, and knowledge of this investigation, I believe that HENLEY can extract extortion payments from victims because of a decades-long reputation he established as a member of the Rollin 60's. During the investigation, the LAMTVG developed information that SYLVESTER ROBINSON ("ROBINSON") collects extortion payments on behalf of HENLEY. HENLEY, ROBINSON, and others are also engaged in other illegal activities. With respect to extortion, the LAMTFVG developed information that some rap artists and professional athletes are required to pay HENLEY a fee when they visit Los Angeles. Based on my training, experience, and knowledge of the investigation, I believe the fees HENLEY collects from rap artists and professional athletes are extortion payments, which are required in exchange for HENLEY's protection from gang violence HENLEY would order if payments were not made.

4. On November 2, 2022, the Honorable Fernando L. Aenlle-Rocha ("Judge Aenlle-Rocha"), a United States District Judge in the Central District of California, authorized the interception of wire and electronic communications of **TARGET TELEPHONE #1**, a telephone number used by HENLEY. The order was served, and interception began, on November 3, 2022. During interception, the LAMTFVG was able to identify potential victims of extortion, identify co-conspirators of the Target Offenses (as defined below), identify potential links to elected public officials of Los Angeles, corroborate information provided by CHS-1,

and conduct physical surveillance of HENLEY with the aid of GPS ping information. The LAMTFVG also determined that ROBINSON used **TARGET TELEPHONE #2** and ZIHIRR MITCHELL ("MITCHELL") used **TARGET TELEPHONE #3** in furtherance of the Target Offenses ("Prior Affidavit #1").

5. During the initial interception period, the LAMTFVG identified additional co-conspirators of the Target Offenses and developed information about new Target Offenses ("Prior Affidavit #2"). Accordingly, on December 20, 2022, Judge Aenlle-Rocha authorized the renewed interception of wire communications of **TARGET TELEPHONE #1**. The order was served, and interception began, on December 21, 2022. During the second interception period, the LAMTFVG identified other potential victims of extortion and identified other co-conspirators of the Target Offenses.

6. On February 3, 2023, Judge Aenlle-Rocha authorized the renewed interception of wire communications of **TARGET TELEPHONE #1** and the initial interception of wire communications of **TARGET TELEPHONE #2** and **TARGET TELEPHONE #3**. The order was served, and interception began, on February 6, 2023. During interception, the LAMTFVG identified a network of firearms and narcotics trafficking in Atlanta, Georgia and Houston, Texas, corroborated information provided by CHS-1, and identified a location where HENLEY, ROBINSON, and MARK MARTIN, aka "BEAR CLAW" ("MARTIN"), meet in person to discuss the Target Offenses with the aid of GPS ping information and a pole camera. The LAMTFVG also determined that MARTIN used **TARGET TELEPHONE #4**[1] in furtherance of the Target Offenses ("Prior Affidavit #3") (collectively, with Prior Affidavit #1 and #2, the "Prior Affidavits").

---

[1] HENLEY also used **TARGET TELEPHONE #4** in furtherance of the Target Offenses.

7. This affidavit supports an application for an order authorizing, pursuant to 18 U.S.C. § 2518, the renewed interception of wire communications occurring over **TARGET TELEPHONE #1** by HENLEY, also known as ("aka") "BIG U," aka "DRAWS," aka "UNC;" the renewed interception of wire communications over **TARGET TELEPHONE #2** by ROBINSON, aka "VEY," aka "V;" the renewed interception of wire communications over **TARGET TELEPHONE #3** by MITCHELL, aka "BRICC," aka "BIG SHITTY;" the initial interception of wire communications over **TARGET TELEPHONE #4** by MARTIN; DEVONNE DOUGLAS, aka "DBO" ("DOUGLAS"); TERMAINE ASHLEY WILLIAMS, aka "LUCE CANNON" ("WILLIAMS"); DEVAUGHN JERMAINE HILL, aka "NEWPORT" ("HILL"); BERNARD DORY ("DORY"); FREDRICK BLANTON, JR. ("BLANTON"); SHAMANICKA BOYKINS ("BOYKINS"); FNU LNU, aka "WEIGE" ("WEIGE"); UNIDENTIFIED MALE 1 ("UM-1"); STACEY HENLEY ("S. HENLEY"); LONNIE LOVE, aka "L" (LOVE); TIFFANY HINES ("HINES"); UNIDENTIFIED MALE 2 ("UM-2"); VERNON GRADY PETTAWAY ("PETTAWAY"); SABRINA KA-REN JOY LOPES ("LOPES"); CHRISTOPHER CAMPBELL ("CAMPBELL"); JAMIUS RAINEY ("RAINEY"); MELVIN CARTER ("CARTER"); LAMARC SAUNDERS, aka "TINY DRAWS" ("SAUNDERS"); GIOVANNI JONES, aka "FLOSS," aka "LEE MACK" ("JONES"); JOHN DANIELS ("DANIELS"); UNIDENTIFIED MALE 3 ("UM-3"); FNU LNU, aka "KENT" ("KENT"); FNU LNU, aka "BULL" ("BULL"); UNIDENTIFIED FEMALE 1 ("UF-1"); FNU LNU, aka "RAMBO" ("RAMBO"); SYTRICE OLDHAM ("OLDHAM"); and others yet unknown (the "Targeted Communicators").

8. I am familiar with the facts described in this affidavit based on involvement in this investigation, including:

a. my experience investigating complex criminal organizations and street gangs involved in extortion and the distribution of narcotics and firearms;

b. oral and written reports, and documents about this investigation I have received from members of the FBI, local law enforcement, and other federal law enforcement agencies;

c. discussions I have had personally concerning this investigation with experienced fraud, human trafficking, and money laundering investigators;

d. physical surveillance conducted by the FBI and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

e. public records;

f. telephone toll records, pen register and trap and trace information, and telephone subscriber information;

g. statements of confidential human sources ("CHS") and a Cooperating Witness ("CW");

h. intercepted recordings and telephone calls over **TARGET TELEPHONE #1** from the consensually monitored telephone of CHS-1;

i. intercepted telephone calls and electronic communications over **TARGET TELEPHONE #1, TARGET TELEPHONE #2**, and **TARGET TELEPHONE #3**;

j. controlled extortion payments to HENLEY and ROBINSON;

k. consensually recorded meetings with HENLEY and ROBINSON;

l. financial statements and records.

9. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I have included summaries of conversations and text messages, which are subject to revision after further review and may represent only a portion of the exchanged information.

10. Based upon the investigation in this case as described below, there is probable cause to believe:

a. Targeted Communicators have committed, are committing, and will continue to commit the Target Offenses (as described below);

b. Investigators will obtain wire communications of Targeted Communicators concerning the Target Offenses through the continued interception of **TARGET TELEPHONE #1**, **TARGET TELEPHONE #2**, and **TARGET TELEPHONE #3**, and the initial interception of **TARGET TELEPHONE #4**, which Targeted Communicators are using in connection with the commission of the Target Offenses.

## II. PRIOR APPLICATIONS

11. On July 21, 2022, August 17, 2022, October 31, 2022, November 30, 2022, December 5, 2022, December 27, 2022, January 12, 2023, and March 3, 2023, FBI Special Agent Ramesh Ganesh searched FBI electronic surveillance indices, as well as a search of the indices of ATF, ICE/I, DEA, USSS, and USPIS. I know of no other applications that have been made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same Targeted Communicators or the **TARGET TELEPHONES** specified in this affidavit, other than the following:

a. HENLEY was named as a principal in an FBI Los Angeles case 281C-LA0246605ELA, record number LA-CDCA 1033 on February 22, 2008, signed by United States District Judge John W. Walker in the Central District of California. This interception has terminated.

b. HENLEY was named as a principal in an FBI Los Angeles case 281D-LA-4612810, record number 16-CRIM-2311028 on August 18, 2016, and record number 16-CRIM-2021227 on July 20, 2016, both signed by United States

District Judge Dolly M. Gee in the Central District of California. This interception has terminated.

c. LOVE was named as a principal in an FBI Atlanta case 245D-AT-2474432, record number 15-CRIM-2541000 on September 11, 2015, signed by United States District Judge Steve C. Jones in the Northern District of Georgia. This interception has terminated.

d. CAMPBELL was intercepted in a DEA case RZ-22-0020, record number 1:22-SW-0493-JLT, on September 15, 2022, signed by United States District Judge Jennifer L. Thurston in the Eastern District of California. This interception has terminated.

e. On November 2, 2022, Judge Aenlle-Rocha signed an order in Case No. 2:22-CM-221-FLA authorizing the interception of wire and electronic communications; the installation and use of a pen register and trap and trace device; and the release of subscriber information and cell site information on **TARGET TELEPHONE #1** used by HENLEY, which ended on December 2, 2022. On December 20, 2022, Judge Aenlle-Rocha signed an order in Case No. 2:22-CM-221-FLA(A) authorizing the renewed interception of wire communications; the installation and use of a pen register and trap and trace device; and the release of subscriber information and cell site information on **TARGET TELEPHONE #1** used by HENLEY, which ended on January 19, 2023. On February 6, 2022, Judge Aenlle-Rocha signed an order in Case No. 2:22-CM-221-FLA(B) authorizing the renewed interception of wire communications; the installation and use of a pen register and trap and trace device; and the release of subscriber information and cell site information on **TARGET TELEPHONE #1** used by HENLEY; and the initial interception of wire communications; the installation and use of a pen register and trap and trace device; and the release of subscriber information and cell site information on **TARGET TELEPHONE #2** and **TARGET TELEPHONE**

**#3** used by ROBINSON and MITCHELL, respectively, which ended on March 7, 2023. The affidavits that I submitted in support of interception are incorporated herein ("Prior Affidavits").

A. **TARGETED COMMUNICATORS**

12. This Affidavit shows that there is probable cause to believe that the Targeted Communicators are using the **TARGET TELEPHONES** to commit the Target Offenses. I have reviewed public records, law enforcement databases, and criminal history records for the Targeted Communicators I was able to identify sufficiently. Based upon this review, the relevant criminal history and personal identifying information of the Targeted Communicators is as follows:

a. The information that I have ascertained to date regarding Targeted Communicators DOUGLAS, WILLIAMS, HILL, DORY, BLANTON, BOYKINS, WEIGE, UM-1, LOVE; HINES; UM-2; PETTAWAY; LOPES; CAMPBELL; and RAINEY is set forth in the Prior Affidavits, which are incorporated by reference herein.

13. HENLEY, born November 29, 1966, lives at 4159 West 62nd Street, Los Angeles, California 90043. HENLEY is the user of **TARGET TELEPHONE #1** and has also used **TARGET TELEPHONE #4.**[2] He has a 1991 felony conviction for robbery that resulted in a 23-year prison sentence. HENLEY has been identified through source information, surveillance, financial records, and wire interception as being involved in the Target Offenses.

14. ROBINSON, born June 5, 1965, lives at 17720 Superior Street, Unit 111, Northridge, California 91325. ROBINSON has used multiple telephones in this investigation to commit the Target Offenses. ROBINSON is the user of **TARGET TELEPHONE #2**. ROBINSON defers to HENLEY's authority and

---

[2] MARTIN is the primary user of **TARGET TELEPHONE #4**. However, on February 14, 2023, HENLEY used **TARGET TELEPHONE #4** to place multiple calls to **TARGET TELEPHONE #2**.

completes all tasks assigned to him. During this investigation, HENLEY directed ROBINSON to collect cash representing extortion payments. ROBINSON has a pending case with the San Bernardino County Sheriff's Department for burglary. LAPD arrested ROBINSON on June 15, 2022, pursuant to that warrant, and seized a pistol from ROBINSON's vehicle during an inventory search.[3]

15. MITCHELL, born January 6, 1988, is a member of the Rollin 60's. MITCHELL is the user of **TARGET TELEPHONE #3.** He has a 2016 felony conviction for threatening crime with the intent to terrorize that resulted in a sentence of three years of probation and a 2020 felony conviction for robbery that resulted in a six-year prison sentence.

16. MARTIN, born December 2, 1974, lives at 5705 5th Avenue, Los Angeles, California 90043. MARTIN is the user of **TARGET TELEPHONE #4**. Subpoena returns from Bank of America revealed that MARTIN is the Chief Financial Officer of DEVELOPING OPTIONS, a non-profit organization, funded by the City of Los Angeles, that has a stated goal of reducing gang activity in Los Angeles.[4] MARTIN is one of HENLEY's closest associates and has assisted HENLEY with extortion and financial crimes. He has a 1994 felony conviction for assaulting a person with a firearm that resulted in a seven-year prison sentence. CHS-1 told law enforcement that MARTIN collected extortion money on behalf of HENLEY from a club owner in December 2021.[5]

17. S. HENLEY, born April 18, 1967, lives at 4159 West 62nd Street, Los Angeles, California 90043. S. HENLEY is the wife of HENLEY and a co-founder of DEVELOPING OPTIONS. S. HENLEY participated in conversations about

---

[3] The Los Angeles County District Attorney's Office rejected a prosecution of the case.

[4] HENLEY is the CEO of DEVELOPING OPTIONS.

[5] The LAMTFVG has not interviewed the club owner to corroborate CHS-1's statements: we will make an effort to interview the club owner in conjunction with court-authorized wire interception.

receiving grants from the City of Los Angeles to fund DEVELOPING OPTIONS. On January 3, 2023, the FBI intercepted a wire communication over **TARGET TELEPHONE #1**, where HENLEY stated to UM-2 that S. HENLEY sent packages to prison via legal mail addressed to an attorney in order to get contraband into prison.

18. BLANTON, born March 19, 1982, lives at 1453 West 85th Street, Los Angeles, California 90047. BLANTON is an employee at DEVELOPING OPTIONS. As set forth in Prior Affidavit #2, BLANTON and MITCHELL participated in robberies and HENLEY collected the proceeds from them.

19. CARTER, as set forth in more detail below, discussed firearms trafficking with HENLEY. The LAMTFVG has not yet developed additional identifying information for CARTER.

20. SAUNDERS, born August 30, 1985, lives at 1636 West 70th Street, Los Angeles, California 90047. As set forth in more detail below, SAUNDERS stored a firearm for HENLEY. While SAUNDERS is not a convicted felon, HENLEY is a convicted felon and prohibited from possessing firearms.

21. JONES, born December 2, 1985, lives at 2216 Jeans Court, Signal Hill, California 90755. JONES has a 2011 felony conviction for vehicle theft that resulted in a two-year prison sentence. As set forth in more detail below, JONES discussed firearms trafficking with ROBINSON.

22. DANIELS, as set forth in more detail below, discussed firearms trafficking with MITCHELL. The LAMTFVG has not yet developed additional identifying information for DANIELS.

23. UM-3 and MITCHELL are involved with narcotics trafficking. No further identifying information for UM-3 is available.

24. KENT is involved in a scheme with ROBINSON and BULL to fraudulently withdraw large sums of money from an unidentified financial institution. No further identifying information is available.

25. BULL is involved in a scheme with ROBINSON and KENT to fraudulently withdraw large sums of money from an unidentified financial institution. No further identifying information is available.

26. UF-1 and MITCHELL discussed narcotics trafficking. No further identifying information for UF-1 is available.

27. "RAMBO" assisted HENLEY and MARTIN with threatening Victim 2. No further identifying information for RAMBO is available.

28. OLDHAM, born September 27, 1984, lives at 13199 Tierra Canyon Drive, Moreno Valley, California 92553. OLDHAM received money from HENLEY that was obtained from illegal means.

## B. TARGET TELEPHONES

29. This Affidavit supports the interception of wire communications, as described above, of the following cellular telephones:

a. 323-251-9267, a cellular telephone issued by AT&T with international mobile subscriber identity ("IMSI") number 310410330237469, subscribed to Uneek Music at 512 Bay St., Santa Monica, CA 90405 and believed to be used by HENLEY ("**TARGET TELEPHONE #1**"), including, but not limited to, any: (a) contemporaneously received or retrieved voice mail messages, and (b) any background conversations intercepted in the vicinity of, occurring to and from **TARGET TELEPHONE #1** listed in the following section.

b. 657-966-8517, a cellular telephone issued by T-Mobile with IMSI number 310260563780967, subscribed to an unknown subscriber, with an unknown subscriber address, and believed to be used by ROBINSON ("**TARGET TELEPHONE #2**"), including, but not limited to, any: (a) contemporaneously

received or retrieved voice mail messages, and (b) any background conversations intercepted in the vicinity of, occurring to and from **TARGET TELEPHONE #2** listed in the following section.

c. 470-620-8336, a cellular telephone issued by Verizon with IMSI number 311480747310562, subscribed to Kierston Chandler, 704 Venice Way, Apartment 18, Inglewood, California 90302 and believed to be used by MITCHELL ("**TARGET TELEPHONE #3**"), including, but not limited to, any: (a) contemporaneously received or retrieved voice mail messages, and (b) any background conversations intercepted in the vicinity of, occurring to and from **TARGET TELEPHONE #3** listed in the following section.

d. 323-703-7362, a cellular telephone issued by Sprint with IMSI number 310260548509701, subscribed to Mark Martin, 5705 5th Ave., Los Angeles, California 90043 and believed to be used by MARTIN ("**TARGET TELEPHONE #4**"), including, but not limited to, any: (a) contemporaneously received or retrieved voice mail messages, and (b) any background conversations intercepted in the vicinity of, occurring to and from **TARGET TELEPHONE #4** listed in the following section (collectively, with **TARGET TELEPHONES #1, #2**, and **#3,** the "**TARGET TELEPHONES**").

## C. TARGET OFFENSES

30. This Affidavit establishes that there is probable cause to believe the Targeted Communicators are using the **TARGET TELEPHONES** in connection with, and to facilitate the commission of, the following crimes: 18 U.S.C. § 1951 (interference with commerce by threats or violence), 18 U.S.C. § 922 (g) (felon in possession of a firearm or ammunition), 18 U.S.C. § 924(c) (use of a firearm in furtherance of a crime of violence or drug trafficking crime), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1955 (conducting an illegal

gambling business[6]), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1014 (false statements in loan applications), 18 U.S.C. § 1791 (providing contraband in prison[7]), 21 U.S.C. § 841 (a)(1) (distribution of a controlled substance), and 21 U.S.C. § 846 (conspiracy to distribute a controlled substance) (collectively, the "Target Offenses").

## III. GOALS OF THE INVESTIGATION

31. Based on my knowledge of the investigation, training and experience, I believe communications to be intercepted will identify and provide admissible evidence concerning:

a. the Target Offenses;

b. the knowledge and intent of the Targeted Communicators;

c. the identities and roles of Targeted Communicators' aiders and abettors and co-conspirators in the Target Offenses;

d. the acts taken in furtherance of the Target Offenses, including co-conspirators of the Targeted Communicators involved in extortion, robbery, drug trafficking, firearms trafficking, human trafficking, money laundering and public corruption;

e. the manner in which the Targeted Communicators are committing the Target Offenses, including the nature, scope, dates, times, places, and methods of operation of the Target Offenses; the source of monies received by the Targeted Communicators and the methods by which they conceal these sources;

---

[6] 18 U.S.C. § 1955 defines "illegal gambling business" as a business which, among other things, is "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i). Here, there is probable cause to believe that the illegal gambling business contemplated by HENLEY, MITCHELL, and their associates will be in violation of Cal. Penal Code § 330 (prohibited games including "any banking or percentage game played with cards [or] dice…") and Cal. Penal Code § 332 (fraudulently obtaining money or property from another person).

[7] 18 U.S.C. § 1791 is not a predicate offense for the interception of wire communications under 18 U.S.C. § 2516.

f. the administration, control, management and disposition of proceeds of the Target Offenses, including the manner which any proceeds are laundered;

g. the existence of potential victims of the Target Offenses;

h. the existence and location of records concerning the Target Offenses;

i. the acquisition and distribution of controlled substances and money by the Targeted Communicators and others unknown or unidentified;

j. the locations where controlled substances, records, money and contraband are stored;

k. the existence, location and source of resources used to finance the illegal activities ("the goals of the investigation"); and

l. attempts to conceal the Target Offenses

(collectively, the "goals of the investigation").

32. As described in more detail below, although normal investigative procedures have been successful in initiating this investigation, those techniques have been tried and failed, or reasonably appear unlikely to succeed in achieving all of the objectives of this investigation or are too dangerous or too risky to employ or to continue to employ.

## IV. SUMMARY OF PROBABLE CAUSE

33. As set forth in the Prior Affidavits, which are incorporated herein by reference, beginning in July 2021, the FBI began using CHS-1[8] to assist in the investigation of HENLEY's robbery and extortion activities. Throughout the

[8] CHS-1's background is discussed in Prior Affidavit #1. On January 15, 2023, the LAPD arrested CHS-1 for pandering. The court case is still pending. As a club promoter, CHS-1 promotes events with artists who travel to Los Angeles from out of state. Likewise, as discussed in Prior Affidavit #1, HENLEY's music industry dealings entail business transactions conducted out of state as well as other commercial ventures that cross state lines.

investigation, CHS-1 has placed a large volume of consensually recorded telephone calls to HENLEY and ROBINSON, who discussed the furtherance of the Target Offenses and collecting extortion payments from CHS-1. After some of the calls, CHS-1 met with HENLEY and ROBINSON, where he/she provided HENLEY and/or ROBINSON with an extortion payment. Multiple payments were captured on video. From approximately November 3, 2022 until January 19, 2023, the FBI intercepted HENLEY pursuant to the court order. During this time period, the FBI learned that HENLEY used **TARGET TELEPHONE #1** in furtherance of the Target Offenses. The FBI also learned that ROBINSON and MITCHELL used **TARGET TELEPHONE #2** and **TARGET TELEPHONE #3**, respectively, in furtherance of the Target Offenses.

34. Beginning on or about February 6, 2023, the FBI intercepted **TARGET TELEPHONE #1, TARGET TELEPHONE #2**, and **TARGET TELEPHONE #3** pursuant to the Court Order, Case No. 22-CM-221-FLA(B). The calls provided information about convicted felons who possess and carry firearms. The calls also provided information about other victims of HENLEY and ROBINSON's extortion activities. We also learned of MITCHELL's interstate firearms and narcotics trafficking network. Based on my review of the intercepted communications and my review of an active pen register installed on the **TARGET TELEPHONES**, I believe HENLEY, ROBINSON, and MITCHELL are using, and will continue to use, **TARGET TELEPHONE #1**, **TARGET TELEPHONE #2**, and **TARGET TELEPHONE #3**, respectively, and that both HENLEY and MARTIN are using **TARGET TELEPHONE #4** to commit the Target Offenses.

## V. <u>STATEMENT OF PROBABLE CAUSE</u>

### A. INTERCEPTIONS OVER TARGET TELEPHONE #1

35. On or about February 10, 2023, at approximately 3:58 p.m., HENLEY, who was using **TARGET TELEPHONE #1**, received a call from phone number

909-991-6183, used by CARTER. During the call, HENLEY and CARTER discussed carrying firearms. The following is a transcription of a portion of the conversation:

CARTER: Hey you remember what you had last time, you still, you got it on you?

HENLEY: Yeah, naw uh uh, I got the little one.

CARTER: Yeah.

HENLEY: I only got my little one on me, you ain't got none with you?

CARTER: No I just, I just realized nigga I pulled all the way up over here cuz.

36. Based on my training, experience, and knowledge of the investigation, I believe that, in this conversation, HENLEY and CARTER are discussing the possession and carrying of firearms. I know that HENLEY is a convicted felon and cannot legally be in possession of a firearm. When CARTER asked, "you remember what you had last time, you still, you got it on you?" and HENLEY replied, "yeah, nah uh uh, I got the little one," I believe that CARTER was asking HENLEY if he has the same firearm on his person that he had on a previous occasion. When HENLEY said, "I got the little one," I believe that HENLEY is telling CARTER that he is carrying a firearm, specifically a smaller pistol.[9]

37. On or about March 1, 2023, at approximately 8:39 p.m., HENLEY, who was using **TARGET TELEPHONE #1**, received a call from phone number 424-552-6257, believed to be used by OLDHAM. During the call, HENLEY told OLDHAM that, in light of an Internal Revenue Service ("IRS") investigation into HENLEY, he did not feel comfortable sending money electronically and would

---

[9] The LAMTFVG reviewed GPS pings for **TARGET TELEPHONE #1** but was unable to determine where HENLEY was meeting CARTER because the GPS pings were not precise enough to ascertain their meeting location. Therefore, the LAMTFVG was unable to take actions to seize the firearm from HENLEY.

rather provide OLDHAM with the money in person. The following is a transcription of a portion of the conversation:

HENLEY: Hey.

OLDHAM: You alright? You sound like you want to fight.

HENLEY: Nah, I'm just trying to do do some stuff and...I gotta go the other way but Im'ma just....if I don't if I don't bring it to you, I got it it's just, I don't really wanna send nothing no more right now.

OLDHAM: I understand. (talks to child in the background)

HENLEY: So...

OLDHAM: You a baller hahaha.

HENLEY: I told you what's going on right?

OLDHAM: Yes. You did so I understand.

HENLEY: Alright I'm gonna call you tomorrow. I'll see you tomorrow. Either way tomorrow it's gonna happen.

OLDHAM: (unintelligible)

HENLEY: Alright. If you just need it to happen tonight I'll do it tonight. I just you know...

OLDHAM: No, it's not worth it. After the 3rd it's late.

HENLEY: I'll do it tonight. I'll do it in a few minutes. I'll do it in a few minutes. I think you should still (overlapping voices).

38. Based on my training, experience, and knowledge of the investigation, I believe that this is a conversation about bank fraud. I also believe that HENLEY wanted to obfuscate the source of his financial transfers to OLDHAM because of an ongoing IRS investigation into HENLEY. When HENLEY said, "I got it it's just, I don't really wanna send nothing no more right now," I believe HENLEY wanted to deliver money to OLDHAM, in person, rather than by means of an electronic bank transfer. Based on my training and experience, HENLEY's actions will prevent any

investigative agencies from seeing the transaction on his financial statement. When HENLEY asked, "I told you what's going on right?" and OLDHAM replied, "Yes. You did so I understand," I believe that HENLEY discussed the recent IRS interview with his accountant with OLDHAM. When HENLEY said, "if you just need it to happen tonight I'll do it tonight," and OLDHAM replied, "after the 3rd it's late," I believe that HENLEY is helping OLDHAM make regular monthly payments with funds that have been obtained from an illegal activity.

39. On or about March 3, 2023, at approximately 12:59 p.m., HENLEY, who was using **TARGET TELEPHONE #1**, received a call from phone number 702-979-8957, used by SAUNDERS. During the call, SAUNDERS provided HENLEY with the stash location for HENLEY's firearm. The following is a transcription of a portion of the conversation:

HENLEY: Where you put that toy at?

SAUNDERS: At the top of the spot you usually put it.

HENLEY: It ain't there, let me look good. Oh yea ok I got it.

SAUNDERS: You get it?

HENLEY: [UI] in the motherfucker, alright

SAUNDERS: Alright

40. Based on my training, experience, and knowledge of the investigation, I believe this is a conversation about firearms trafficking. I know HENLEY has used the Targeted Communicators to store firearms for him, such as DOUGLAS. As set forth in the Prior Affidavits, I also know HENLEY and the Targeted Communicators refer to a firearm as a "toy." When HENLEY asked, "where you put that toy at," I believe he wanted SAUNDERS to tell him where his firearm was

located. When SAUNDERS said, "at the top of the spot you usually put it," I believe he was telling HENLEY that the firearm was located in its usual stash location.[10]

## B. INTERCEPTIONS OVER TARGET TELEPHONE #2

41. On or about February 6, 2023, at approximately 3:49 p.m., ROBINSON, who was using **TARGET TELEPHONE #2**, was on a call with phone number 310-418-9406, used by an unidentified male referred to as "Keys" ("Victim 3"). During the call, ROBINSON told Victim 3 that he and other tenants of HENLEY's rental property needed to clean the house, otherwise HENLEY would financially extort them and retaliate using violence. The following is a transcription of a portion of the conversation:

> ROBINSON: That's why I'm telling you homie, and you can get your money out the way, boom, shoot me that money, I say okay [Victim 3], gave me his money, KO didn't gave no money up and the he ain't trying to clean this mothafucka up, so he's finna get pressured, he's gonna get real pressure, cuz I'm telling you right now, if that mothafuckin' house is left like it's left, is gonna be a problem, a major problem. I'm trying to relieve you from a problem homie, I'ma keep it 100 with you cuz from the looks of it, a nigga ain't gonna give a fuck about a secure place for me and my son nigga, uh okay, that's fine and dandy, now I want to secure my place where I can make some money off of it that you fucked up.
>
> Victim 3: Yup.
>
> ROBINSON: Listen, you get yours, you be hustlin', you do what you supposed to do homie, don't need to catch this storm that's about to come.

---

[10] The LAMTFVG reviewed GPS pings for **TARGET TELEPHONE #1** but was unable to determine where HENLEY met SAUNDERS because the GPS pings were not precise enough to ascertain their meeting location. Therefore, the LAMTFVG was unable to take actions to seize the firearm from HENLEY.

Victim 3: 1,000 dollars is all I owe now. I'ma have that by today, not no tonight, none of that.

ROBINSON: Once you get that shit, give it to me, I'ma call (unknown), and say the homie, been gave up, the fat nigga said he had to use his money to move and do this and do that. Tell that nigga, he got to come up with the money to pay this girl to clean his house, he got to, ain't no if ands, say homie, KO, we can't leave (unknown) out like that my nigga, I'm just goin tell you right now, we leave (unknown) outs like that, you might as well go back to wherever the fuck you at nigga, you ain't gonna be in LA and nigga be gonna hunt you down. 3,000 gonna turn into 20,000 nigga.

Victim 3: Basically.

ROBINSON: I don't want to take off on KO, I like the nigga man, all bullshit aside, I don't wanna fuck a nigga up behind this shit, but that's what it's gonna be looking like homie.

42. Based on my training, experience, and knowledge of the investigation, I believe that, in this conversation, ROBINSON warned Victim 3 that the tenants of HENLEY's property needed to pay to get the house cleaned, otherwise HENLEY will retaliate with violence and future extortion. When ROBINSON said, "cuz when he came in there it didn't look like that, and he goin feel like that's disrespectful, like y'all niggas just trashed my mothafuckin' house nigga like this, and left it and said fuck me," I believe ROBINSON was telling Victim 3 that HENLEY believed Victim 3 and the other tenants disrespected HENLEY. When ROBINSON said, "you might as well go back to wherever the fuck you at nigga, you ain't gonna be in LA and nigga be gonna hunt you down. 3,000 gonna turn into 20,000 nigga," I believe ROBINSON was warning that if Victim 3 failed to clean HENLEY's house, he would need to leave Los Angeles permanently because HENLEY will find and threaten him. I also believe ROBINSON meant that the $3,000 Victim 3 owed for

cleaning the property would increase to a $20,000 extortion payment to HENLEY. When ROBINSON said, "I don't want to take off on KO, I like the nigga man, all bullshit aside, I don't wanna fuck a nigga up behind this shit, but that's what it's gonna be looking like homie," I believe that ROBINSON likes "KO," an unidentified tenant, but will resort to using violence against him if this issue does not get settled.

43. On or about February 22, 2023, at approximately 7:07 p.m., ROBINSON, who was using **TARGET TELEPHONE #2**, made an outgoing call to telephone number 310-975-4643, used by JONES. During the call, ROBINSON and JONES discussed being in possession of a firearm. The following is a transcription of a portion of the conversation:

ROBINSON: You ain't been in that shop yet? I thought you been over there before.

JONES: Nah, I ain't been in that shop.

ROBINSON: You got, you got the, the, the toy right?

JONES: Yeah, I got it.

ROBINSON: Oh, okay. We straight. Don't worry about it.

JONES: Why, what happened?

ROBINSON: Nothin', I'm just saying though man, you know?

JONES: Oh yeah, I (UI)

ROBINSON: It's the shop nigga. Ain't shit happened, but you know what I'm saying?

44. Based on my training, experience, and knowledge of the investigation, I believe that, in this conversation, JONES was in possession of a firearm prior to meeting ROBINSON at a marijuana shop. I know that JONES is a convicted felon and cannot legally be in possession of a firearm. I also know from my training, experience, and knowledge of the investigation that some of the Targeted

Communicators refer to a firearm as a "toy." When ROBINSON asked, "You got, you got the, the, the toy right?" and JONES replied, "Yeah, I got it," I believe that JONES was in possession of a firearm.[11]

45. On or about February 28, 2023, at approximately 4:03 p.m., ROBINSON, who was using **TARGET TELEPHONE #2**, received a call from phone number 323-330-3425, believed to used by KENT. An associate of KENT, named "BULL," was also on the call. During the call, KENT told ROBINSON that he and BULL had a plan to fraudulently withdraw large sums of money from a bank. The following is a transcription of a portion of the conversation:

KENT: Vey, I hit a jackpot for us man. Hold on.

ROBINSON: Yeah?

KENT: Yeah, Hold on. Hold on. Hold on. Hold on.........Hold on. Hold on. Hold on. Hold on Vey. Nigga this leg. Hold on one sec. Aye okay. So listen. I got my folks right here on the phone right. So. So. So. The person we fucking with is my day one right here this this Big Vey, I got my other day one right here this "Mike." He got his boy on there right.

ROBINSON: Umhum.

KENT: His name Bull, Bull gone head and tell em, Bull gone head and tell em how you gone play. This and what you got going. He on the mic? Bull there? Bull? Bull?

BULL: Yeah, yeah, Im right here.

KENT: Okay, No listen. You know my boy, you got an inside jug, tell em what you need.

BULL: I got the, I got the inside plug at the bank so anything 80 and under, we can get the whole 80 out that day, anything over that...

---

[11] The LAMTFVG was unable to ascertain JONES' location, due to not having court-authorized GPS pings on JONES' telephone. Therefore, the LAMTFVG was unable to take actions to seize the firearm from JONES.

KENT: Same day?!

BULL: Yeah, I can go get 80 even if you give me something for 20k, I can get the 80 out, and then after that it's gone be like in increments to, plus the next day get the rest out, its gone be like repetitive because it's too much. Anything 80 and under…

KENT: Vey? Vey? And it don't matter if it's a name…

ROBINSON: Yeah.

KENT: Or a company on there. I'm talking about, it don't matter, long as it is under 80, its coming out the same day, so we give it to him in the morning, we getting it later on that evening.

ROBINSON: That's out this way?

KENT: Yeah, yeah this way, my folks.

ROBINSON: Yeah.

KENT: Been doing this leg work, my nigga just hit me but I heard somebody else, you must have talk to somebody else because your name hit the streets and somebody else just said 30-80, but I ain't gone fuck with them, Ima fuck with my buddy right here. Come put that on the table but the thing is Vey look, they taking 40 to do it, which ain't, they taking 40 and 60 coming back our way.

46. Based on my training, experience, and knowledge of the investigation, I believe that, in this conversation, KENT, BULL, and ROBINSON were discussing a way to fraudulently take out large sums of money from the bank in multiple transactions. When KENT said, "his name Bull, Bull gone head and tell em, Bull gone head and tell em how you gone play. This and what you got going," I believe BULL had a plan in place for the bank withdrawal. When BULL said, "I got the inside plug at the bank so anything 80 and under, we can get the whole 80 out that day," I believe BULL has a known associate at the bank where he plans to

withdraw the money. He plans to withdraw only $80,000 because it is the max amount that can be withdrawn on a same-day withdrawal. When BULL said, "I can go get 80 even if you give me something for 20k, I can get the 80 out, and then after that it's gone be like in increments to, plus the next day get the rest out, its gone be like repetitive because it's too much," I believe that after the initial withdrawal of $80,000, they will withdraw the remaining $20,000 for a total of $100,000. When KENT said, "they taking 40 to do it, which ain't, they taking 40 and 60 coming back our way," I believe KENT was explaining to ROBINSON that after the total amount is withdrawn, they will pay unknown associates $40,000 for a deal, and they will keep the remaining $60,000.

47. On or about March 1, 2023, at approximately 7:07 p.m., ROBINSON, who was using **TARGET TELEPHONE #2**, placed an outgoing call to an unidentified male ("Victim 5"), who was using telephone number 424-237-5868. During the call, ROBINSON requested a status update related to an extortion payment from Victim 5. The following is a transcription of a portion of the conversation:

Victim 5: Hey Vey.

ROBINSON: What's going on man?

Victim 5: Listen, lemme...I know I need to give something to you bro. I am...I'm just in the middle of something. I don't wanna talk about it on the phone brother (UI).

ROBINSON: You still out that way?

Victim 5: I'm at home. I had to go fly to San Francisco cuz my dad has cancer. He had surgey on his stomach. Just got back.

ROBINSON: Alight well shit I'll be there on Friday. Let's chop it up.

Victim 5: You it's gonna be way (UI)....just give me a couple more days. And uh...I'll be here. I'm going back out there like Monday...like Monday morning.

ROBINSON: But you're gonna see me before then though right?

Victim 5: Yeah, I'm gonna see you before then man. Just...like I said man I just don't wanna put it all out there on the air.

ROBINSON: I gotchua gotchu. Alright. I'll call you Friday or something to see where we at.

Victim 5: Alright.

ROBINSON: Alright.

48. Based on my training, experience, and knowledge of the investigation, I believe Victim 5 was requesting an extended deadline from ROBINSON for an extortion payment. When ROBINSON asked, "what's going on man," I believe he wanted a status update related to an extortion payment that had not yet been paid to ROBINSON. When Victim 5 said, "I know I need to give something to you," I believe he was acknowledging to ROBINSON that he had not yet provided the payment to ROBINSON. When Victim 5 said, "just give me a couple more days," I believe he wanted leniency from ROBINSON. When ROBINSON said, "I'll call you Friday or something to see where we at," I believe he was telling Victim 5 that he needed an additional status update about the extortion payment later that week.

## C. INTERCEPTIONS OVER TARGET TELEPHONE #3

49. On or about February 12, 2023, at approximately 10:02 a.m., MITCHELL, who was using **TARGET TELEPHONE #3,** received a call from telephone number 323-818-2840, believed to be used by DANIELS. During the call, MITCHELL and DANIELS discussed prices for multiple firearms. The following is a transcription of a portion of the conversation:

DANIELS: Hey cuz what were you charging me for these again?

MITCHELL: Huh?

DANIELS: What was you charging me again cuzzo?

MITCHELL: Say it one more time.

DANIELS: I said what was your charging me again?

MITCHELL: Thirty one altogether.

DANIELS: I thought one was fourteen?

MITCHELL: No, fifteen and sixteen remember, cause remember it was seven, remember I got one that was like seventeen and sixteen, but I got one for sure that was fifteen on gang.

DANIELS: You ain't got, you ain't got another that's fifteen?

MITCHELL: Yeah.

DANIELS: Where you at?

MITCHELL: At the house with Sandy.

DANIELS: Where they at, around the corner?

MITCHELL: Uh uh, nah the door fucked up over there so I been just at the (OV).

DANIELS: So why haven't you had your door fixed?

MITCHELL: Cause nigga, the door company that was going to come do it they couldn't do it, then I called another one they had to cancel, it's been all just bullshit, it's on twelve hundred.

DANIELS: On hood.

MITCHELL: Damn. (Overlapping Voices) ("OV") I can come down though, oh you need. Like I can be there in thirty minutes nigga I ain't doin' shit.

DANIELS: I really need ah, but what Imma do is, what Imma do is, I swear I can, my bad it ain't no (UI) on the hood.

MITCHELL: What you thought it was fourteen?

DANIELS: Nah I really, I really need another one that is fifteen. I thought the (UI) was fifteen but you know what Imma do is, Imma, how many more of them fifteens you got?

MITCHELL: Ahhh, like, I mean, I got a gang. I got a gang of ah, ah, ah, like I probably got three that I can do for that. But you know I'm only doing that for you though, I ain't even, that ain't even, but I got some shit, I got three or four more that I can do for the fifteen probably.

DANIELS: But look, what I'm a do is, I'm about to (UI) is they like the ones you gave me like that, are they good like that though, you know what I'm talking about?

MITCHELL: Yeah they all in the thing (UI) I just dropped the number for you gang on hood.

DANIELS: Nah, I appreciate it.

MITCHELL: All my shit is eighteen two that's all I'm doing, you get what I'm saying?

DANIELS: On hood, that's that's...

MITCHELL: Yeah I'm just doin' it for you cause I know what I paid, I know what room I got on certain, like make two, three hundred on that bitch, like you know what I'm saying.

DANIELS: Yeah, yeah, so, so I'm about to have my folks come get this, this one for fifteen.

MITCHELL: Alright.

DANIELS: Fifteen, and then if he wants some more Imma just...

MITCHELL: I'll double back down on you.

DANIELS: Yeah.

50. Based on my training, experience, and knowledge of the investigation, I believe this call is about firearms trafficking. When DANIELS asked, "what were you charging me for these again?" and MITCHELL replied, "thirty-one altogether," I believe MITCHELL was willing to sell DANIELS two firearms for a total price of $3,100. When DANIELS asked MITCHELL, "you ain't got another that's fifteen?" I

believe DANIELS was asking MITCHELL if he has a firearm that he can sell to him for $1,500. When DANIELS asked, "how many more of them fifteens you got?" and MITCHELL replied, "I got a gang of ah, ah, ah, like I probably got three that I can do for that," I believe that MITCHELL is in possession of three or more firearms that he can sell to DANIELS for $1,500.[12] Based on my knowledge of the investigation, I know that MITCHELL is a convicted felon and prohibited from possessing or carrying a firearm.

51. On or about February 23, 2023, at approximately 9:17 p.m., MITCHELL, who was using **TARGET TELEPHONE #3,** received a call from phone number 404-771-1595, used by UM-3. During the call, MITCHELL explained to UM-3 that his packages (that we believe to contain narcotics) have an identifiable marking on them. The following is a transcription of a portion of the conversation:

MITCHELL: Why he ain't take the damn shit out, all out, I be doing that when I send them gang. It's got a "T" on that muthafucka. Take the shit out. It say it on there. Nigga ain't trying to send that shit, we don't wanna know what nobody else (OV) this nigga, hehehe.

UM-3: I told him to bring that muthafucka back though.

MITCHELL: Yeah, hell yeah. My bad. (UI) There's a "T" on every one so they know that it's there bro.

UM-3: Aight.

MITCHELL: Aight. If, if you ever come across a bag with a "T" on it you know (UI).

52. Based on my training, experience, and knowledge of the investigation, I believe this call is about narcotics trafficking. When MITCHELL said, "I be doing that when I send them gang. It's got a "T" on that muthafucka," I believe

[12] The LAMTFVG reviewed GPS pings for **TARGET TELEPHONE #3** but was unable to determine MITCHELL's location during this call. Therefore, the LAMTFVG was unable to take actions to seize the firearms from MITCHELL.

MITCHELL was explaining that the narcotics he sells have a "T" symbol marked on each package. Based on my training and experience, I know that drug dealers use graphic symbols on wrapped packages of illicit drugs including methamphetamine, heroin, cocaine, and fentanyl. The symbols are known to the supplier and purchaser of the narcotics. When MITCHELL said, "there's a "T" on every one so they know that it's there" and "if you ever come across a bag with a "T" on it you know," I believe MITCHELL, the supplier, was telling UM-3, the purchaser, that all of his narcotic shipments are bags[13] that are branded with a "T" symbol on the packaging and unique to MITCHELL.

53. On or about March 2, 2023, at approximately 10:43 a.m., MITCHELL, who was using **TARGET TELEPHONE #3**, received a call from UF-1, who used telephone number 323-378-1399. During the call, MITCHELL told UF-1 that he avoids storing narcotics at his residence and instead uses an unknown location to store them. The following is a transcription of a portion of the conversation:

UF-1: He had just got out of jail too, [UI] but he ended up giving them back to her.

MITCHELL: [in the background] around the corner yeah. [to UF-1] I know. Listen, I don't care about none of that shit no more. That's what I'm trying to tell you. I don't got a lick of dope in my house. I don't have a house. I live with my baby momma. So if you wanna go ahead and call the police, go head. What you gonna do, get a search warrant for a house that's not in my name, while trying to figure it out? You have to prove I live there to get the search warrant.

54. Based on my training, experience, and knowledge of the investigation, I believe this is a conversation about the storage of narcotics. I know from other

---

[13] The fact that the contraband is being shipped in bags indicates that it is narcotics, not firearms, which would likely be shipped in some sort of case.

wire interceptions that MITCHELL has directed unidentified customers to obtain narcotics from him at an unidentified location in Culver City, California. When MITCHELL said, "I don't got a lick of dope in my house," I believe he was telling UF-1 that he does not store narcotics at his residence but instead at the unidentified location in Culver City. When MITCHELL said, "what you gonna do, get a search warrant for a house that's not in my name, while trying to figure it out? You have to prove I live there to get the search warrant," I believe he was telling UF-1 that, in spite of not storing narcotics at his residence, it would be difficult for law enforcement to conduct a productive search warrant of MITCHELL because he does not have a primary residence.

**D. INTERCEPTIONS OVER TARGET TELEPHONE #4**

55. On or about November 7, 2022, at approximately 4:39 P.M., HENLEY, who was using **TARGET TELEPHONE #1**, placed a call to telephone number 951-855-1043, used by a possibly-identified male ("Victim 2"), and joined a multi-way call with MARTIN, who was using **TARGET TELEPHONE #4**, and RAMBO. During the call, HENLEY threatened Victim 2 over how much money was paid for the repair of two vehicles at Victim 2's automotive repair shop, where cars come and go from outside California for repairs, and which utilizes automotive parts manufactured out of state. HENLEY told Victim 2 that he had committed robberies for far more money. The following is a transcription of a portion of the conversation:

> HENLEY: I remember the whole day, and I remember why you said 18 now. I gave you the first money in the backyard when we was all back there talking, then I walked you to the front, and that's when I gave you another bag, cuz I had took the 22, the first 22 you asked me for, I gave it to you in the back when we was all in the back, I took the bag back gave you the bag and took 4 out. Me and you walked to the front, and that's when I gave you the second money. All I needed was Rambo to remind me what happened.

RAMBO: Yeah I remember, in the back when you gave him more money. I know that for sure.

Victim 2: Yes, ok so, my thing is, you gave me another 4,000 up in the front Big U.

HENLEY: No, I took 4,000 out the bag that was 22, your first initial number to me was 22, then we start, then everybody else got you to say 20, when you got to say 20, I took the 4 out the bag, I walked you to the front, and I said here go the rest of the money for the other car, and I gave you both money for both cars, cuz I took the money I had and put the 4 with that, with the other money that was in the other bag, and I gave you the other bag, and I said that was for both cars. You was like you paying me for both cars right now, it's good.

Victim 2: Ok.

HENLEY: Cuz you was excited, and you like ok you paying for both of em right now, oh ok no problem, I have no problem with that.

Victim 2: I, ok, that's no problem, I thought I had.

HENLEY: I just hit a lick, that's why I was like we could do it today, I just hit a lick, I never even registered the money, remember Claw, I was like I'ma pay this nigga for everything cuz I just, it ain't even my money, I just had got the money, from somebody.

56. Based on my training, experience, and knowledge of the investigation, I believe HENLEY was threatening Victim 2 in this portion of the call for disagreeing with the amount of money HENLEY provided for the repair of two vehicles. When HENLEY said, "me and you walked to the front, and that's when I gave you the second money. All I needed was RAMBO to remind me what happened," I believe HENLEY was leveraging "RAMBO," one of his associates, to intimidate Victim 2 into accepting $18,000 less for the repair of HENLEY's vehicles.

When Victim 2 said, "I, ok, that's no problem, I thought I had," I believe Victim 2 was accepting HENLEY's preferred payment amount to avoid HENLEY's intimidation tactics. Based on my training and experience, I know that a "lick" is street vernacular for a robbery. When HENLEY says, "I just hit a lick, that's why I was like we could do it today. I never even registered the money. It ain't even my money," I believe HENLEY attained the money used for the vehicle repairs from a robbery and had not yet laundered, or "registered," it.

57. Later in the call, HENLEY reiterated to MARTIN and RAMBO that he paid Victim-2 for his vehicle repairs with the proceeds of a robbery. The following is a transcription of a portion of the conversation:

HENLEY: Man, that mother fucker trippin man. I don't know what cuz on.

MARTIN: Hahaha.

HENLEY: That mother fucker trippin', I just had just robbed a nigga for 50,000.

RAMBO: I remember.

HENLEY: I just had robbed a nigga for 50,000, you bitch as nigga.

RAMBO: That dude, he, that dude trippin'.

HENLEY: And I gave, I just robbed a nigga for 50 bands, I gave it all to that nigga.

58. Based on my training and experience, I believe HENLEY was telling MARTIN and RAMBO, who were assisting HENLEY with threatening Victim 2, that he used the proceeds of a robbery to pay Victim 2 for the vehicle repairs. When HENLEY said, "I just robbed a nigga for 50 bands," I believe HENLEY committed a robbery for $50,000 and used part of those proceeds to pay for the vehicle repairs.

59. Later in the call, HENLEY continued to threaten Victim 2. The following is a transcript of a portion of the conversation:

HENLEY: All the engine, I was finna do the um, call that nigga back on 6 O.

MARTIN: That nigga, haha, he like, I'm about to make this nigga remember.

HENLEY: Bro, I ain't owe nobody no money ever in my fuckin life my nigga, in my life.

Victim-2: No, I'm not saying that

HENLEY: 18,000 from a mother fucka, I don't even like being accused of that, 18,000, nigga if we robbin a nigga, Ima rob a nigga for way more than 18,000, it better be 1 point, if it's gonna be a robbery, it's gonna be 1.8

60. Based on my training and experience, I believe HENLEY was threatening Victim 2 in this portion of the call. I know that doing an act "on 6 0" is action committed on behalf of the Rollin 60's. When HENLEY tells MARTIN to merge Victim 2 back into the telephone conversation "on 6 0," I believe HENLEY was directing MARTIN to do so on behalf of the Rollin 60's. When MARTIN said, "I'm about to make this nigga remember," I believe he was telling HENLEY that he would intimidate Victim 2 on HENLEY's behalf. When HENLEY said, "I aint owe nobody no money ever in my fuckin life," I believe he was calling Victim 2 a liar and that HENLEY did not owe Victim 2 any money. When HENLEY said, "I'ma rob a nigga for way more than 18,000, it better be one point, if it's gonna be a robbery, it's gonna be 1.8," I believe HENLEY was warning Victim 2 that he would commit a robbery for much more money than $18,000, for example, $1,800,000.

61. On or about January 4, 2023, at approximately 8:32 p.m., MARTIN, who was using **TARGET TELEPHONE #4**, received a call from HENLEY, who was using **TARGET TELEPHONE #1**. During the call, MARTIN facilitated a mortgage fraud scheme involving HENLEY, BLANTON, and HINES. The following is a transcription of a portion of the conversation:

HENLEY: Yeah I was tryin' to do $4,555 [UI] filed at the same damn time.

MARTIN: No I heard it in your voice.

HENLEY: Yeah.

MARTIN: I mean I was thinking about, you know when we was sayin' how to do it, but I talked to him so I'm looking at money on the card to see when, when it's gonna happen. But she was looking for like an exact date, you know what I'm sayin'? You know what I'm sayin', I don't know an exact date. [UI] was sayin'.

HENLEY: Oh, okay.

MARTIN: One thing it gonna be. But you know...we gotta figure it out. Or I'll call the dude in the morning to figure it out and I'll let you know.

HENLEY: Well shit, I'm gonna be back in the morning. I won't be back...I won't be back until, um...when...

MARTIN: Yeah, enjoy yourself.

HENLEY: Yeah, [UI]

MARTIN: I got it. [UI] told me I talked to you earlier today about that little situation. So, we gonna take it get it all together, or figure out another route.

HENLEY: Yup.

MARTIN: Alright.

62. Based on my training, experience, and knowledge of the investigation, I believe this call demonstrates that MARTIN is facilitating the mortgage fraud scheme involving HENLEY, BLANTON, and HINES. As set forth in Prior Affidavit #3, Paragraphs 33 – 34 and Paragraphs 41 – 42, HINES instructed HENLEY to increase BLANTON's salary to make the fraudulent mortgage loan appear less suspicious. I also know that MARTIN is the Chief Financial Officer of DEVELOPING OPTIONS and would therefore have access to BLANTON's payroll information. When MARTIN said, "she was looking for like an exact date, you know what I'm sayin'? You know what I'm sayin', I don't know an exact date," I believe he was telling HENLEY that HINES needed more specific information to approve the loan. When MARTIN said, "I'll call the dude in the morning to figure it out and I'll

let you know," I believe he was telling HENLEY that he would call BLANTON the following morning to confirm details related to BLANTON's salary in relation to the fraudulent mortgage loan.

63. On or about February 14, 2023, at approximately 5:34 p.m., HENLEY, who was using **TARGET TELEPHONE #4**, made an outgoing call to **TARGET TELEPHONE #2**, used by ROBINSON. During the call, HENLEY and ROBINSON discuss finding and extorting an unidentified male ("Victim 4"), who owed someone money. The following is a transcription of a portion of the conversation:

HENLEY: I smacked the Jew Boy again.

ROBINSON: We just left the first spot.

HENLEY: Yall find him?

ROBINSON: No, they said he wasn't there, so I asked for the manager and I gave him the spiel.

HENLEY: What'd he say?

ROBINSON: That nigga just like got nervous and start walking away, and like alright alright ok ok, so I'm going to the next one.

HENLEY: It's another spot.

ROBINSON: Yeah two of em.

HENLEY: I'ma tell him one was visited, (UI).

ROBINSON: Uh shit it don't matter, but fo sho one was visited fo sho, the one on um, Pico.

HENLEY: Yeah you visited the last one, go on and go, check out wifey.

ROBINSON: Alright.

HENLEY: We gonna let em think for a while, you told him he had to take care of that lady.

ROBINSON: Yeah I told him he owes two people money, he know who he owe and if he don't pay, we gonna let him make a payment plan, if he don't pay we gonna shut this mother fucker down. Walked out that mother fucker, but the white boy walking away as I was talkin, he like ok ok ok, what's your last name, you don't need to know my last name motha fucka.

HENLEY: You should of gave him the lady name.

ROBINSON: Alright I will at this one, do we have it.

HENLEY: Yeah Krita got it written on the paper, give him the information, tell him he need to take care of that, he know what he needs to take care.

ROBINSON: Alright.

HENLEY: He got a hundred and somethin bucks from the lady, she possed to get invested in this woowoo shit right here, and then she gonna get her pay, some kinda pay UI or is gonna be a fuckin misunderstanding for the whole establishment.

ROBINSON: Alright, see I didn't know how much or none of that, and I didn't know Krita had the lady name, he was standing right there, alright I get the name on this one, I'll play the name.

HENLEY: Call me when yall get there so I can make sure, where yall, what area.

ROBINSON: Uh, the one was like, we going to UI right now, and that one was like West LA.

64. Based on my training, experience, and knowledge of the investigation, I believe ROBINSON and HENLEY were planning to extort Victim 4, who is associated with the legal cannabis dispensary "ERBA" in west Los Angeles[14], if he does not pay HENLEY's associates. When ROBINSON said, "he owes two people

[14] The LAMTFVG has not yet ascertained which ERBA location Victim 4 works at; we will make an effort to interview Victim 4 once I am able to identify him.

money, he know who he owe and if he don't pay, we gonna let him make a payment plan, if he don't pay we gonna shut this motherfucker down," I believe ROBINSON meant that if Victim 4 does not make a payment, ROBINSON and HENLEY will extort him and shut down the ERBA location he works at. When HENLEY said, "she gonna get her pay, some kinda pay (UI) or is gonna be a fuckin' misunderstanding for the whole establishment," I believe HENLEY is telling ROBINSON that if an unknown female (UF) does not receive her payment from Victim 4, the entire business will be subject to extortion.

## VI. <u>TOLL ANALYSIS</u>

### A. TOLL ANALYSIS FOR TARGET TELEPHONE #1

65. On December 22, 2022, and February 24, 2023, United States Magistrate Judge Alka Sagar, Central District of California, signed an order authorizing the installation and use of a pen register and trap and trace device on **TARGET TELEPHONE #1**.

66. Based on the data and phone records for **TARGET TELEPHONE #1** provided by AT&T, I have analyzed records for the time period and have learned the following about **TARGET TELEPHONE #1**.

67. I have analyzed data produced by the above-referenced court-authorized pen register and trap and trace device on **TARGET TELEPHONE #1**. Between the period of December 23, 2022, and March 13, 2023, records show that over 15,143 calls, including push-to-talk ("PTT") calls, and text messages were placed to and from **TARGET TELEPHONE #1**.

68. During this time, **TARGET TELEPHONE #1** was in contact with the cellphone number 323-926-9013 used by DOUGLAS approximately 145 times. Of these contacts, all 123 were telephone calls and 22 were text messages. As of my review on March 13, 2023, the last call between these two phones was on March 5, 2023 and the last text message between these two phones was on March 2, 2023.

## B. TOLL ANALYSIS FOR TARGET TELEPHONE #4

69. On December 22, 2022, and February 24, 2023, United States Magistrate Judge Alka Sagar, Central District of California, signed an order authorizing the installation and use of a pen register and trap and trace device on **TARGET TELEPHONE #4.**

70. Based on the data and phone records for **TARGET TELEPHONE #4** provided by Sprint, I have analyzed records for the time period and have learned the following about **TARGET TELEPHONE #4.**

71. I have analyzed data produced by the above-referenced court-authorized pen register and trap and trace device on **TARGET TELEPHONE #4.** Between the period of December 23, 2022, and March 8, 2023, records show that over 15,143 calls, including push-to-talk ("PTT") calls, and text messages were placed to and from **TARGET TELEPHONE #4.**

72. During this time, **TARGET TELEPHONE #4** was in contact with telephone number 323-926-9013 used by DOUGLAS approximately 7 times. Of these contacts, all 7 were telephone calls. As of my review on March 8, 2023, the last call between these two phones was on February 17, 2023. As set forth in the Prior Affidavits, DOUGLAS has access to firearms and stores them for ROBINSON and HENLEY. I know from my work in this investigation that HENLEY, DOUGLAS, and ROBINSON are each convicted felons and are therefore prohibited from possessing firearms. Additionally, DOUGLAS has been intercepted over TARGET TELEPHONE #1. For example, on January 9, 2023, at approximately 9:36 p.m., DOUGLAS, who was using telephone 323-926-9013, placed a call to TARGET TELEPHONE #4. During the call, DOUGLAS was in an automobile accident and told HENLEY he was going to confront the driver, who had abandoned their vehicle. I know from wire interceptions over TARGET TELEPHONE #4 and debriefs of CHS-1 that DOUGLAS stores firearms at his residence. During the call,

when DOUGLAS said, "go back and get me a pistol," I believe DOUGLAS was going to obtain one of his firearms to threaten the driver in the automobile accident.

73. On or about November 9, 2022, at approximately 6:24 P.M., HENLEY, who was using **TARGET TELEPHONE #1**, placed a call to telephone number **TARGET TELEPHONE #2**, used by ROBINSON. During the call, HENLEY and ROBINSON discussed obtaining a firearm from DOUGLAS because HENLEY did not have his. The following is a transcription of a portion of the conversation:

ROBINSON: What up bro?

HENLEY: Where you at?

ROBINSON: DBO's I'm about to go up to the school though shit, 7 o'clock (Unintelligible ("UI"), I'll meet you up there.

HENLEY: Grab one of them um them tools from DBO cause I ain't got mine.

ROBINSON: Alright.

HENLEY: Alright.

ROBINSON: Alright.

74. Based on my training, experience, and knowledge of the investigation, I believe DOUGLAS assists HENLEY and ROBINSON in firearms distribution. I know that a "tool" is street vernacular for a firearm. Based on my knowledge of the investigation and conversations with CHS-1, I also know that DOUGLAS is known as "DBO" and is in possession of firearms. When HENLEY said, "grab one of them um them tools from DBO cause I ain't got mine," I believe he was directing ROBINSON to obtain a firearm from DOUGLAS' residence. I know from my work in this investigation that HENLEY, DOUGLAS, and ROBINSON are each convicted felons and are therefore prohibited from possessing firearms.

75. During this time, **TARGET TELEPHONE #4** was in contact with telephone number 424-653-9608, used by BLANTON, 51 times. Of these contacts,

Case 2:22-cr-00021-FLA Document 174-1 Filed 03/24/23 Page ... Page ID #:1044

42 were calls and 9 were text messages. As of my review on March 8, 2023, the last call between these two phones was on March 1, 2023.

76. On or about January 13, 2023, at approximately 10:48 a.m., HENLEY, who was using **TARGET TELEPHONE #1**, received a call from phone number 424-653-9608, used by BLANTON. During the call, HENLEY and BLANTON discussed additional details related to a conspiracy to commit mortgage fraud. The following is a transcription of a portion of the conversation:

BLANTON: Hey, big brah. I think I gave you 3,500. I'm trippin' like a motherfucker.

HENLEY: Oh

BLANTON: Before you give it to the bank then you know what I'm sayin. But uh, I'll link up with you later on.

HENLEY: Okay.

BLANTON: Alright, yeah know what I'm sayin cause. I'm out trippin like a motherfucker.

HENLEY: Shit, $7,500?

BLANTON: Yeah, cause shit. Just count it before you give it to him. Know what I'm sayin?

HENLEY: It's one, two, three, four, five, six. It's six five. Remember you gave me the five stack. You gave me one stack of a 1,000 then it's 500. So it's, it's um, 65.

BLANTON: Dang I lost some money then. Make sure before you give it to that motherfucker bank.

HENLEY: Okay. They gone count it regardless.

BLANTON: Okay.

HENLEY: Alright.

BLANTON: Alright.

77. Based on my training and experience, I believe HENLEY and BLANTON conspired to defraud a bank related to a fraudulent mortgage loan for BLANTON. I know that HENLEY and HINES were trying to set up a fraudulent mortgage loan for BLANTON on January 2, 2023. When BLANTON said, "I think I gave you 3,500," and "before you give it to the bank," I believe he was confirming that he gave HENLEY $3,500 to deposit to an unknown bank related to BLANTON's fraudulent mortgage loan. When HENLEY said, "remember you gave me the five stack. You gave me one stack of a 1,000 then it's 500. So it's, it's um, 65," I believe he was correcting the amount of money BLANTON gave him. When BLANTON said, "make sure before you give it to that motherfucker bank," I believe he was reiterating to HENLEY that HENLEY needed to deposit his money to the bank for BLANTON's fraudulent mortgage loan.

78. During this time, **TARGET TELEPHONE #4** was in contact with telephone number 323-864-3380, used by S. HENLEY, approximately 131 times. Of these contacts, 113 were calls and 18 were text messages. As of my review on March 8, 2023, the last telephone call between these two phones was on March 8, 2023. Information about S. HENLEY is set forth in Prior Affidavit #2, which is incorporated by reference herein.

## VII. <u>NECESSITY</u>

79. Based upon my training and experience, as well as the experience of the other Special Agents of the FBI with whom I have spoken about this investigation, and based upon all of the facts set forth herein, I believe that the requested interception continuance of wire communications is necessary to establish a reasonable likelihood of meeting the goals of the investigation, which I have described above. As set forth below, normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if tried, and/or are too dangerous. For example, physical surveillance, mail covers, and trash covers alone

will not aid in intercepting conspiratorial conversations that are in furtherance of the Target Offenses.

## A. PREVIOUSLY INTERCEPTED COMMUNICATIONS

### 1. The Instant Investigation

80. This will be a renewal of a court order authorizing wire interceptions referencing HENLEY's, ROBINSON's, and MITCHELL's involvement in extortion, robbery, firearms trafficking, wire fraud, and illegal gambling. From the interceptions, we have learned that HENLEY is extorting more victims, in addition to CHS-1, and has collected proceeds from robberies with unknown victims. We have also learned that HENLEY may be engaging in additional fraud schemes, including possible mortgage fraud, and a scheme to illegally smuggle cell phones into prison using mail intended for legal counsel to prisoners. We have also confirmed that DOUGLAS facilitates firearms trafficking for HENLEY and that other Targeted Communicators, such as MARTIN, MITCHELL, BLANTON, and WEIGE assist HENLEY with his extortion and robbery activities. We have also identified a Los Angeles City employee from whom HENLEY may be receiving favors in relation to HENLEY's charity, DEVELOPING OPTIONS. Due to the large volume of calls made from HENLEY, ROBINSON, and MITCHELL, I believe that continuing interception of **TARGET TELEPHONE #1**, **TARGET TELEPHONE #2**, and **TARGET TELEPHONE #3** is necessary to capture telephonic communications that show furtherance of the various Target Offenses that would not be possible utilizing other investigative techniques. The current Title III application was signed by United States District Judge Aenlle-Rocha, on February 3, 2023. Interception began on February 3, 2023 and expired on March 8, 2023. From interception of **TARGET TELEPHONE #1** during the last 30 days, we have learned about more Targeted Communicators facilitating firearms trafficking for HENLEY. We have also learned more information about HENLEY's

involvement in financial crimes. From interception of **TARGET TELEPHONE #2** during the last 30 days, we have learned about ROBINSON's extortion of Victim 3 and Victim 5 and ROBINSON's involvement with financial crimes. From interception of **TARGET TELEPHONE #3**, we learned about MITCHELL's involvement in narcotics and firearms trafficking and obtained information related to a narcotics stash location.

81. This will be an initial order authorizing wire interceptions demonstrating MARTIN's involvement in extortion activities. From the interceptions, we have learned that HENLEY uses MARTIN to financially extort victims using intimidation and threats of violence and robbery. While using **TARGET TELEPHONE #4**, both HENLEY and MARTIN participated in threats of violence and extortion against a Los Angeles-based cannabis company and an automotive paint business.

2. <u>Telephones/Devices Intercepted in Other Investigations</u>

82. HENLEY has been intercepted in prior Title III applications signed by the Honorable Dolly M. Gee, on July 20, 2016, and August 18, 2016, that have since expired. HENLEY was intercepted speaking with a narcotics trafficker, but was not charged. HENLEY was also intercepted in a prior Title III application signed by an unknown United States District Judge in the Central District of California, on February 22, 2008. The previous wire and electronic interceptions did not capture any information related to HENLEY's role in the current investigation.

83. In addition, CAMPBELL has been intercepted in a prior Title III application while communicating with a Target Communicator in 1:22-SW-0493-JLT, a large-scale check fraud investigation involving the CA Employment Development Department.

B. PEN REGISTERS AND TELEPHONE RECORDS

84. Courts have issued orders authorizing the installation and use of a pen register and trap and trace device on the **TARGET TELEPHONES** and other telephones used by HENLEY and ROBINSON related to this investigation. Investigators have also obtained toll records for telephones related to this investigation through the issuance of administrative subpoenas. We will continue to seek and use pen registers, trap and trace devices, and toll record analysis during this investigation. Pen register and toll information provide frequency and identifying information regarding calls made from a particular telephone. This technique, however, will only provide agents with a list of numbers called and will not establish the identities of all the persons called or the contents of the conversations.

85. Moreover, based on my training and experience, I know that members of criminal enterprises often subscribe to telephones in fictitious names or use the names of family members and other associates when subscribing to phone service in an attempt to thwart law enforcement investigation of their illegal activities. In this investigation, I have issued administrative subpoenas for numbers used by ROBINSON, MARTIN, DOUGLAS and other associates.

86. A trap and trace device is simply a complement of a pen register device. It identifies the telephone number of any telephone that has dialed the target phone, but it is also subject to the same limitations of a pen register. For all the reasons stated above, pen register, trap and trace devices, and toll analysis are all valuable investigative tools, but will not by themselves achieve the goals of the government's investigation.

87. As discussed above, multiple orders authorizing the installation and use of a pen register and trap and trace device on the **TARGET TELEPHONES**. The results led to newly identified numbers believed to be used by some of

HENLEY's extortion victims as well as co-conspirators of his drug distribution, firearm, human trafficking, and public corruption activity. While the results were helpful, the LAMTFVG heavily depended on wire communication interception to receive content from the communications.

## C. CONFIDENTIAL SOURCES

88. It is my experience that confidential sources provide significant value to investigations, but their information is normally limited, in that it is either furnished by a subject or learned secondhand from others. I believe that this information would not, without the evidence sought by this application, result in a successful prosecution of all Targeted Communicators.

89. In the present case, several confidential sources have been developed by the LAMTFVG. Although each confidential informant has been able to provide information in varying degrees regarding the Targeted Communicators and the Rollin 60's, the information, by itself, is insufficient to achieve the goals and objectives of this investigation for the following reasons.

90. As discussed in Prior Affidavit #1 at paragraphs 52-66, the FBI has used five different CHSs, who have contributed to this investigation. The CHSs have provided information related to extortion activities, robberies, firearms trafficking, and human trafficking, some of which has been corroborated. The FBI also debriefed a CW, who provided information about HENLEY's involvement with a large buy-in dice game. The backgrounds for each CHS and the CW were discussed in Prior Affidavit #1. As discussed in Prior Affidavit #2 at paragraphs 61-76, the FBI continues to use the same CHSs and debriefed the CW on one additional occasion. The CHSs and the CW provided additional information related to HENLEY and other Targeted Communicators' involvement in the Target Offenses.

91. The information the CHSs and the CW provided the FBI have been corroborated through wire interception of **TARGET TELEPHONE #1, TARGET**

**TELEPHONE #2**, **TARGET TELEPHONE #3**, and **TARGET TELEPHONE #4**. The information is insufficient to fully achieve the goals of the investigation, however, because the CHSs and the CW are unable to improve their access to the Targeted Communicators. The FBI will continue to evaluate these methods and, if appropriate, will incorporate them into the investigation.

**D. UNDERCOVER AGENTS**

92. As discussed in Prior Affidavit #2 at paragraph 77, the LAMTFVG attempted to introduce two undercover law enforcement agents, "UCs," to HENLEY and ROBINSON, but were unsuccessful due to safety concerns. The FBI will continue to evaluate these methods and, if appropriate, will incorporate them into the investigation.

**E. WITNESS INTERVIEWS AND ARRESTS**

93. As discussed in Prior Affidavit #3, paragraphs 92 – 96, interviews have been conducted during the course of the investigation that have been effective in gathering information related to HENLEY's collection of extortion payments and recruiting confidential sources, but the information gained from these interviews is limited. As previously mentioned, HENLEY associates with a tight-knit circle of people who have known each other for decades; continued interviews without court-authorized interception of wire communications could unnecessarily alert the Targeted Communicators to the interest of law enforcement in their illegal activity. The FBI will continue to evaluate these methods and, if appropriate, will incorporate them into the investigation where appropriate.

**F. GRAND JURY SUBPOENAS FOR TESTIMONY AND GRANTS OF IMMUNITY**

94. Based upon my training and experience, I do not believe subpoenaing witnesses to testify before the grand jury would be successful for multiple reasons:

a. Based on my training and experience, subjects and targets of investigations are informed of their rights before testifying in the grand jury. This ordinarily results in individuals with criminal exposure invoking their Fifth Amendment privileges and refusing to testify. It would be unwise to seek any kind of immunity for these persons, because the granting of such immunity might foreclose prosecution of those members of the conspiracy and could not ensure that such immunized witnesses would provide truthful testimony. Additionally, the service of Grand Jury subpoenas would only alert the Targeted Communicators to the existence of this investigation, causing them to become more cautious in their activities, possibly destroy evidence, coordinate their stories, or otherwise compromise the investigation.

b. Currently, I am not aware of any person who could be subpoenaed before the Grand Jury or interviewed who I believe would provide significant and truthful evidence to prove the Target Offenses against all of the Targeted Communicators and meet the goals of the investigation.

95. Thus, I believe that these techniques, in particular, are likely to impede the government's investigative objectives at this time.

## G. PHYSICAL SURVEILLANCE OF LOCATIONS AND PEOPLE

96. Surveillance, in and of itself, even if highly successful, rarely succeeds in gathering evidence of the criminal activities under investigation. It is an investigative technique that is used to confirm meetings and other suspected, criminal activity between alleged participants but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and other activity.

97. As set forth in Prior Affidavit #3, paragraphs 100-106, physical surveillance has been used throughout the investigation to identify associates of the Targeted Communicators and co-conspirators in the criminal enterprise. Physical surveillance has been conducted of the Targeted Communicators on approximately

63 occasions; however, no evidence of illegal activity has been observed or confirmed.

98. Surveillance was conducted of MITCHELL on January 19, 2023, and February 16, 2023. During surveillance, the LAMTFVG identified possible vehicles and an address associated with MITCHELL. However, the LAMTFVG was not able to observe MITCHELL or any of the other Targeted Communicators during surveillance.

99. Surveillance was conducted of ROBINSON on February 15, 2023, while ROBINSON met with CHS-1. During the meeting, which was audio and video recorded, ROBINSON was driving a vehicle associated with HENLEY and S. HENLEY.

100. Surveillance was conducted of MARTIN's residence on February 24, 2023. During the surveillance, the LAMTFVG identified possible vehicles and an address associated with MARTIN. However, the LAMTFVG was not able to observe MARTIN or any of the other Targeted Communicators during surveillance.

101. The LAMTFVG intends to continue conducting physical surveillance in order to positively identify additional associates of HENLEY, ROBINSON, MITCHELL, MARTIN, and the other Targeted Communicators. I believe that continued surveillance done in conjunction with electronic surveillance will achieve these objectives. When surveillance can be planned and conducted with prior knowledge of the Targeted Communicators whereabouts and intentions, tactics can be employed to minimize their awareness of surveillance and therefore be more productive. At the same time, though, the LAMTFVG has intercepted wire communications in February 2023, where HENLEY discussed exchanging vehicles with ROBINSON and renting other vehicles. Based on my training, experience, and knowledge of the investigation, I believe HENLEY and other Targeted

Communicators are aware of LAMTFVG surveillance and attempting to obfuscate their criminal activities.

102. Even if physical surveillance was possible without risks and even if highly successful in terms of actually observing Targeted Communicators, it is not reasonably likely to succeed in gathering sufficient evidence to meet the goals of the investigation. It is unlikely that physical surveillance will result in agents overhearing the conversations between the Targeted Communicators, which is vital in this investigation. This is unlike a bank robbery investigation in which the mere robbery, if able to be observed, will go a long way toward proving the crime. With the intent requirements of extortion and money laundering crimes being investigated, what the Targeted Communicators say matters significantly. And the Targeted Communicators have shown that they are careful in their communications with CHS-1. Therefore, any in-person communications of import are unlikely to occur in public and are more likely to occur in discreet private locations. That said, we will continue to consider physical surveillance when, in conjunction with interceptions, we believe that, for example, surveillance of a secret or timely meeting of Targeted Communicators will significantly aid the investigation such that it would be the worth the inherent risk of exposing the investigation.

103. Continued physical surveillance used in conjunction with court-authorized interception of wire communications, will allow the purpose of meetings to take on a new significance and may constitute admissible, persuasive evidence of criminal activity.

## H. MOBILE TRACKING DEVICES, CELL-SITE DATA, AND GPS

104. As discussed in Prior Affidavit # 3, paragraphs 107-108, GPS location information and historical tracking information has been useful in determining locations where HENLEY and ROBINSON frequented that corroborated other information learned during this investigation, such as home addresses and

frequently visited addresses, as well as identifying and corroborating HENLEY's location while traveling out of state.

105. I do not believe, however, that using GPS location data will be sufficient to achieve the goals of the investigation. GPS will provide information about where Targeted Communicators are located but will not provide the significance of the location. Further, it does not reveal the presence or absence of contraband or illegal activity, nor the context needed to determine the reasons why a Targeted Communicator travelled to a given location. Thus, while the GPS data will be gathered and reviewed, it is not sufficient to achieve the goals of the investigation.

**I. STATIONARY CAMERAS**

106. A pole camera has been placed at 5444 Crenshaw Blvd., Los Angeles, CA 90043. The LAMTFVG has learned that HENLEY, MARTIN, S. HENLEY, and other associates frequent this address. Based on my review of financial statements, I have learned that this address is associated with both UNEEK Music and Developing Options. As discussed above, multiple Targeted Communicators have been observed meeting at this location. From the location of the pole camera, the LAMTFVG is able to capture license plates and individuals that arrive to and depart from this address.

107. A pole camera has been placed at 1613 West 134th St., Gardena, CA 90249. Based on wire and electronic interception and GPS location information, the LAMTFVG has observed that this is a meeting location for HENLEY, MARTIN, ROBINSON, and possibly other Targeted Communicators. The LAMTFVG plans to use the pole camera to establish additional associations between the Targeted Communicators and other associates.

108. The pole cameras has proven beneficial in identifying individuals who visit both meeting locations. However, this information will not enable law

enforcement to achieve all of the goals of this investigation. For example, a pole camera typically does not provide specific information about the individuals observed on the camera, including why they are there, or to what extent those subjects are involved in the organization. A pole camera is also limited to the location that is being recorded and, more specifically, to the outside of that location; the cameras cannot capture any activities once the subjects go inside. A pole camera also will not record the many important members of the conspiracy who would not likely make appearances at a particular location. Additionally, a pole camera does not capture what is being said at the location. Law enforcement could only speculate about the activity that was being observed while viewing the surveillance video footage. Therefore, the video footage will not, on its own, achieve the goals and objectives of this investigation.

### J. SEARCH WARRANTS, CONSENT SEARCHES, PAROLE/PROBATION SEARCHES

109. Search warrants have not been executed in this investigation in relation to the Targeted Communicators. As discussed in Prior Affidavit # 3, paragraphs 112 and 113, due to the ongoing and covert nature of this investigation, I believe the execution of search warrants at this time may disrupt law enforcement's ability to achieve the goals of the investigation. While I do believe that search warrants may produce some evidence of isolated criminal and/or narcotics-related activity by certain members of the criminal enterprise, search warrants would not be effective at achieving the larger goals of this investigation. The complexity of HENLEY's criminal enterprise limits the effectiveness of search warrants in addressing the enterprise as a whole. The FBI will continue to evaluate these methods and, if appropriate, will incorporate them into the investigation.

K. **SOCIAL MEDIA**

110. As set forth in Prior Affidavit # 3, paragraph 114, the LAMTFVG has monitored the social media accounts of HENLEY, WILLIAMS, and MITCHELL, but does not believe they are using social media to commit Target Offenses. We are not aware of social media accounts for ROBINSON, MARTIN, or the other Targeted Communicators. The FBI will continue to evaluate these methods and, if appropriate, will incorporate them into the investigation.

L. **TRASH SEARCHES**

111. As discussed in Prior Affidavit # 3, paragraph 115, we have considered trash searches but believe they would provide limited evidentiary value to this type of investigation and also risk jeopardizing the covert nature of the investigation. A trash search of HENLEY's residence, or the residences of other Targeted Communicators, may produce evidence of illegal activity, however the evidence would be unlikely to produce evidence sufficient for prosecution and the trash would need to be searched on a frequent basis to gather substantial evidence, increasing the likelihood of detection. ROBINSON lives in a multi-unit apartment complex with a shared dumpster. As such, law enforcement will not be able to discern ROBINSON's trash from the trash of other residents in the building. HENLEY's residences either use communal trash dumpsters or are in neighborhoods with a known presence of Rollin 60's gang members. The LAMTFVG considered a trash search of the address associated with Developing Options and UNEEK Music, due to association of the Targeted Communicators at the business; however, after review of surveillance reports and pole camera footage, I learned that the trash dumpster for the business is in a gated area and is shared with multiple businesses. The LAMTFVG has not observed MITCHELL or MARTIN at their residences at this point of the investigation, but plans on evaluating whether a trash search is feasible at their residences in the future. Furthermore, trash searches are not

effective in fully identifying the participants and scope of a criminal enterprise. Although trash searches may reveal the phone numbers and monikers of some conspirators, they will not fulfill the goals of this investigation. For these reasons, along with the aforementioned complications associated with the locations where HENLEY, ROBINSON, MITCHELL, or MARTIN work and reside, a trash search was not attempted.

**M. MAIL COVER**

112. I have considered requesting that the United States Postal Service provide a "mail cover," or a list of all sender and receiver names and addresses on each piece of mail received at the Targeted Communicator's known residences and businesses. A mail cover does not allow law enforcement access to the content of the pieces of mail. I have not discovered information that leads me to believe that a mail cover at the residence/business of HENLEY, ROBINSON, MITCHELL, or MARTIN would achieve all of the goals of this investigation, or provide any evidence of criminal conduct. There is no indication from any source of this investigation that HENLEY, ROBINSON, MITCHELL, or MARTIN are using the mail themselves to conduct criminal business. Further, I am not certain that the mail carrier could be relied upon to perform this task without compromising the investigation (unwittingly or otherwise) and alerting HENLEY, ROBINSON, MITCHELL, and MARTIN that they are being watched or investigated. Therefore, the risks of pursuing this investigative technique far outweigh the value.

**N. FINANCIAL INVESTIGATION**

113. I have been examining recent bank account records for HENLEY, S. HENLEY, BLANTON, Developing Options, and other related records from 2017 to 2022. The LAMTFVG is working a joint investigation with the IRS and focusing on those bank accounts. The LAMTFVG has issued 26 Grand Jury subpoenas to financial institutions for bank accounts associated with HENLEY and his

businesses and nonprofits, such as DEVELOPING OPTIONS, as well as S. HENLEY and BLANTON. For example, multiple wire transactions and cash deposits of $10,000 to $100,000 at a time were discovered. The information the FBI has obtained from these account records has been useful in my investigation in that it has helped corroborate statements made by the CW and CHS-1. Based on my review of subpoenaed bank statements, I noted wire transfers between professional athletes, who I believe are victims of extortion and fraudulent activities, and HENLEY. The LAMTFVG also issued a subpoena to and interviewed Hasani Ellis ("Ellis"), the accountant for Developing Options. Following the interview, Ellis immediately placed a call to HENLEY and informed him about the subpoena. While the LAMTFVG obtained useful evidence in several wire interceptions thereafter, I do not believe the goals and objectives of the investigation will be accomplished without further court-authorized wire interception, in conjunction with subpoenas. From my review of financial records and HENLEY's own statements, I know that one of his businesses is the non-profit organization DEVELOPING OPTIONS, which receives hundreds of thousands of dollars in funding from the City of Los Angeles. Although the financial records have been useful—and review of the subpoena returns is ongoing—and I plan to continue using them as well as additional grand jury subpoenas to financial institutions for ROBINSON, MITCHELL, MARTIN, and in investigating the mortgage fraud scheme,[15] I do not believe that they will allow me to meet all of the goals of the investigation. I believe the court-authorized wire interception, used in conjunction with financial analysis, will provide evidence into the method and means HENLEY uses to launder money and collect extortion payments.

---

[15] As of March 8, 2023, the LAMTFVG has not received all Grand Jury Subpoena returns related to the fraudulent mortgage scheme.

## VIII. MINIMIZATION

114. Interception of the **TARGET TELEPHONES** pursuant to this application will only take place on telecommunication facilities or networks (e.g., cell towers/switches/servers) located in the United States. Devices outside of the United States may utilize telecommunication facilities or networks within the United States, and, therefore, these communications will be intercepted. All intercepted communications will be first heard and minimized within the Central District of California.

115. Before interception begins, a meeting will be held for all monitoring personnel, wherein the requirements of minimization will be discussed. A memorandum regarding minimization will be provided to all monitoring personnel as well as a copy of the Court's Order authorizing interception. Any monitoring personnel not in attendance will be instructed on the requirements of minimization at a later time prior to their involvement in any monitoring activity. A copy of that Order and a minimization memorandum will remain posted at the interception site.

116. Before any monitor personnel begins to intercept communications, that monitor will be required to sign a form indicating that: (a) the monitor has read this Affidavit, the Court's Order authorizing interception, and the minimization memorandum; (b) the monitor is familiar with the contents of the Order; and (c) the monitor will intercept communications in compliance with the Order.

117. I am aware of the necessity to promptly minimize the interception of privileged communications. Accordingly, all monitoring personnel will be instructed on the various privileges and will be directed to immediately minimize communications if and when they are determined to be privileged.

118. All wire interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code.

119. All intercepted wire conversations will be recorded and all recordings will be securely preserved. Logs will be prepared regarding the date and time of calls, the parties involved, the subjects of the calls, and if and when minimization occurred. Reports detailing the course of the interception will be filed with the Court after the 15th day following the commencement of interception pursuant to the Court's order.

120. Interception of wire communications will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise that the Targeted Communicators, or any other associates are not participants in the conversation. Monitoring personnel will monitor all wire communications to determine if a party to a conversation is a conspirator. Monitoring will be discontinued if, while making this identification, the monitor determines that the conversation does not involve the Targeted Communicators or is not criminal in nature. If monitoring is discontinued, monitoring personnel will spot check the conversation in order to determine whether the conversation becomes criminal in nature. Monitoring personnel will give special attention to the minimization of privileged communications.

121. I do not anticipate the Targeted Communicators will be communicating about the Target Offenses in any language other than English. In the event the language in the intercepted communication is in a foreign language (other than English), and foreign language speaking monitoring personnel or an expert in that foreign language is not reasonably available during the interception period, the entirety of the foreign language conversations will be intercepted and recorded and minimization shall be accomplished as soon as practicable after the interception.

122. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the

government, will be under the direct supervision of a federal agent. Because officers, detectives, and investigators from other law enforcement agencies work closely with the FBI, and their further participation would aid this investigation, it is requested that they be authorized to assist investigative and law enforcement officers of the United States in conducting this wire surveillance, including monitoring and receiving disclosure of intercepted communications. These participating officers, detectives, and investigators may be deputized by the FBI to make arrests for offenses enumerated in Title 18, Section 2516, pursuant to Title 18, Section 2510(7). The custody of the tapes, once sealed, will be maintained by the FBI.

123. If, however, a translator is not reasonably available, the following after-the fact minimization procedures have been established, pursuant to 18 U.S.C. § 2518(5):

a. all such foreign language conversations will be intercepted and recorded in their entirety;

b. as soon as practicable after such interception, these conversations will be reviewed and minimized by a translator under the guidance of a federal agent authorized to conduct the interception, after which an English translation of the pertinent criminal conversations will be furnished to the supervising federal agent.

124. All intercepted conversations will be recorded and all recordings will be securely preserved. Logs will be prepared regarding the date and time of communications, the identified parties involved, the believed subject matters of the calls, and if and when minimization occurred.

125. Reports detailing the course of the interception will be filed with the Court on or about the fifteenth day following the commencement of interception pursuant to the Court's order pursuant to 18 U.S.C. § 2518(6). The report will

discuss what progress has been made toward achievement of the authorized objectives of the investigation and the need for continued interception.

126. The custody of the intercepted communications, once sealed, will be maintained by the FBI.

## IX. <u>AUTHORIZATION REQUESTED</u>

127. The facts set forth in this affidavit establish that the Targeted Communicators and their co-conspirators described herein are engaged in ongoing criminal activity and that the evidence sought will be intercepted on a continuing basis following the first receipt of the particular communications that are the subject of this request.

128. Therefore, I request that the Court order that the interception need not terminate when the communications described herein are first intercepted, but may continue until the the goals of the investigation are achieved, or for a period not to exceed 30 days from the day on which the investigative or law enforcement officers begin to conduct an interception under the order or ten days after the order is entered, whichever is earlier.

129. Pursuant to 18 U.S.C. § 2518(5), I request that, if necessary, government personnel or other individuals operating under a contract with the government (e.g., interpreters) and acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception, be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted communications.

130. Based on the mobility of cellular telephones, in the event the **TARGET TELEPHONES** is used outside the territorial jurisdiction of this court, I request that interceptions may continue in the Central District of California where interceptions will first be heard and minimized.

131. The authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty (30) day period. The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

132. Pursuant to the provisions of Section 2518(4) of Title 18, United States Code, the Court may, pursuant to a request of the applicant, direct that a communication service provider, landlord, custodian, or other person furnish the applicant with all information, facilities and technical assistance necessary to accomplish the interception unobtrusively. The assistance of AT&T and other communication service providers may be required to accomplish the objectives of the interceptions. Reasonable expenses incurred pursuant to this authority will be processed for payment by the FBI or other assisting law enforcement agency.

133. Based on the foregoing, I further submit that the information likely to be obtained through the use of the pen register and trap and trace devices on the **TARGET TELEPHONES** is relevant and material to an ongoing criminal investigation.

134. Based on the foregoing, I further submit that there are reasonable grounds to believe that subscriber information for numbers in contact with the **TARGET TELEPHONES** is relevant and material to an ongoing criminal investigation insofar as such information, in conjunction with intercepted communications, will assist investigators in identifying those persons with whom the users of the **TARGET TELEPHONES** are engaging in criminal conversations. Experience from other investigations and discussions with more senior agents

shows that subscriber information often results in investigative leads concerning: (a) the names of individuals associated with, and businesses relevant to, the subject of the investigation; (b) the locations of places from which the subject and his confederates conduct criminal activity; (c) information regarding the sources of funds relating to criminal activity, as well as regarding the disposition of criminally-obtained funds; and (d) the whereabouts of the subject, and the existence of communications between the subject and associates, at times significant to the investigation.

## X. <u>REQUEST FOR GPS DATA</u>

135. In addition, there is probable cause to believe that the location of the **TARGET TELEPHONES** at times determined by investigators during the authorized period of interception, and information regarding the location of the **TARGET TELEPHONES** during the 60 days preceding the date that the order is entered (the "Requested Location Information"), will constitute evidence of the Target Offenses. Additionally, based on the above information, I seek location (GPS) information, to the extent it will be possible to receive, because this information will assist me in gathering evidence in the ongoing investigation I have described above in the following ways: (1) I am investigating a conspiracy, and determining concert of action and contact between the conspirators is of value to my investigation; (2) the information will allow me to identify members of the conspiracy that I have not previously identified; (3) the information will provide insight into the roles and actions of the members of the conspiracy, and the criminal conduct committed by the people being investigated; (4) it will provide information regarding whether the individuals being investigated meet or have contact prior to, or after, committing any criminal conduct; (5) it will more readily provide information about any victims of the criminal conduct; and (6) the information will

Case 2:25-cr-00021-FLA Document 174-1 Filed 03/20/26 Page 100 of 101 Page ID #:965

often identify locations where evidence is stored and where search warrants may be appropriate.

136. Moreover, it will assist in targeting surveillance conducted in this case, and reduce the risk of being detected and revealing the nature or fact of the investigation. Based upon my training and experience, people involved in criminal activity are often conscious of being followed and keep a close eye out for surveillance units. The chance of being discovered increases with the more surveillance that is done and the closer the surveillance units must get to the targets. Use of the GPS location information allows the investigative team to be more focused and judicious in its use of surveillance to those times when it appears that events of significance are going to occur. It also allows the investigative team the ability to conduct surveillance at a greater distance, because the fear of losing the target is reduced when surveillance is maintained via GPS site information.

137. Based on my training and experience, I believe that providing immediate notification of the GPS tracking pursuant to Federal Rule of Criminal Procedure 41 is likely to place the investigation in serious jeopardy. The investigation is ongoing, and providing immediate notification to the user(s) of the **TARGET TELEPHONES** will compromise the investigation. Specifically, providing immediate notification would give the user(s) of the **TARGET TELEPHONES** and other participants in the conspiracy an opportunity to destroy evidence, obtain a new telephone and telephone number, change patterns of behavior, flee from prosecution, and cause or threaten harm to any suspected cooperators.

///

//

## XI. CONCLUSION

138. Based upon all of the facts set forth herein, and my training and experience, there is probable cause to believe that: (a) the Targeted Communicators and others yet unknown have committed and are continuing to commit the Target Offenses; (b) particular communications by and among such persons concerning the Target Offenses will be obtained through court-authorized interception of wire communications over the **TARGET TELEPHONES**; and (c) renewed interception of wire communications over **TARGET TELEPHONE #1**, **TARGET TELEPHONE #2**, **TARGET TELEPHONE #3** and initial interception of wire communications over **TARGET TELEPHONE #4** is necessary because normal investigative techniques have failed to achieve all of the goals of the investigation, or appear reasonably unlikely to succeed if tried, or are too dangerous to be tried.

Dated: March 24, 2023

03/24/2023

Andrew James Roosa
Special Agent
FBI

Subscribed to and sworn before:

FERNANDO L. AENLLE-ROCHA
United States District Judge