# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of<br>The premises located at 1613 West 134th Street, Suite 3, Gardena, CA 90249<br>Described further in Attachment A | )<br>)<br>)<br>)<br>) | Case No. 2:23-MJ-2777<br>**[AMENDED]** |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1962 and 1963 | Racketeer Influenced and Corrupt Organizations ("RICO") offenses |
| 18 U.S.C. § 1951 | Interference with Commerce by Threats or Violence |
| 18 U.S.C. § 922 (g) | Felon in Possession of a Firearm or Ammunition |
| 18 U.S.C. § 924(c) | Use of a Firearm in Furtherance of a Crime of Violence or Drug Trafficking Crime |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1955 | Conducting an Illegal Gambling Business |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1014 | False Statements in Loan Applications |
| 18 U.S.C. § 1791 | Providing Contraband in Prison |
| 21 U.S.C. § 841 (a)(1) | Distribution of a Controlled Substance |
| 21 U.S.C. § 846 | Conspiracy to Distribute a Controlled Substance |
| 18 U.S.C. § 1952 | Travel Act Unlawful Activities |
| California Penal Code § 187(a) | Murder |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☒ Delayed notice of 45 days (*give exact ending date if more than 30 days*: July 16, 2023) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Special Agent Ramesh Ganesh*

*Applicant's signature*

*Ramesh Ganesh*, FBI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ____________________

*Judge's signature*

City and state: Los Angeles, CA

Hon. Patricia Donahue, U.S. Magistrate Judge

*Printed name and title*

AUSA: Kevin Butler (213-894-6495)

**ATTACHMENT A**

PREMISES TO BE SEARCHED

UNDER THE HOOD MUSCLE CARS, 1613 West 134th Street, Suite 3, Gardena, CA 90249, aka "Bear Claw's Shop," aka "the Shop," aka "the Car Place" (the "**SUBJECT LOCATION**"). The City of Los Angeles, Office of the Tax Assessor, describes 1613 West 134th Street, Suit 3, Gardena, CA 90249 as a one-story distribution warehouse with 8,987 square feet on 0.882 acres. The interior of UNDER THE HOOD MUSCLE CARS includes an open floor shop area with a roll-up garage door facing west into a shared parking lot with other businesses.

**ATTACHMENT B**

ITEMS TO BE SEIZED

Agents and their authorized representatives are authorized to enter onto the **SUBJECT LOCATION** identified in Attachment A to obtain, collect and retain:

a. Information related to any wireless network, including the identity of any devices connected to any wireless network;

b. Measurements of the **SUBJECT LOCATION's** exterior door lock(s) including its depth, pin locations, and number, and any interior angles and depths to support a mechanical key duplication;

c. Photographs of the **SUBJECT LOCATION's** exterior, exterior doors and door locks;

d. Information related to any exterior cameras to determine if a heat signature is present and/or an infrared (IR) light signature is present;

e. Information related to the location of any communications cabinet or hard-wired ingress into the **SUBJECT LOCATION**; and

f. The specific radio frequency band operating the electronic access gate to **SUBJECT LOCATION.**

**AMENDED AFFIDAVIT**

I, Ramesh Ganesh, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and have been employed in this capacity since 2021. I am currently assigned to the FBI Los Angeles Field Office, Los Angeles Metropolitan Task Force on Violent Gangs (LAMTFVG) and have been so for approximately two years. The LAMTFVG consists of the following agencies: FBI and the Los Angeles Police Department (LAPD).

2. In my current capacity as a FBI SA and as a member of the LAMTFVG, I primarily investigate drug trafficking and money laundering organizations, focusing on violent organized gangs and enterprises. Through my training and experience, I have become familiar with the methods of operation that members of corrupt enterprises use, including the distribution, storage, and transportation of drugs and firearms, the collection of proceeds from trafficking, and various methods of money laundering used to conceal the nature of the proceeds. I am also familiar with the ways in which members of such enterprises communicate, including through coded communications in calls, text messages, messages through messaging applications, and sometimes result in clandestine, in-person meetings.

## II. PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of a search warrant for UNDER THE HOOD MUSCLE CARS, 1613 West 134th Street, Suite 3,

Gardena, CA 90249, aka "Bear Claw's Shop," aka "the Shop," aka "the Car Place," (the "**SUBJECT LOCATION**") described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1962 and 1963 (Racketeer Influenced and Corrupt Organizations ("RICO") offenses);[1] 18 U.S.C. § 1951 (interference with commerce by threats or violence), 18 U.S.C. § 922 (g) (felon in possession of a firearm or ammunition), 18 U.S.C. § 924(c) (use of a firearm in furtherance of a crime of violence or drug trafficking crime), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1955 (conducting an illegal gambling business[2]), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1014 (false statements in loan applications), 18 U.S.C. § 1791 (providing contraband in

---

[1] There is probable cause that the TARGET SUBJECTS and their conspirators constitute an enterprise, that is, a group of individuals associated in fact. Members and associates of this enterprise are believed to have violated 18 U.S.C. § 1962(c) (RICO Substantive) and § 1962(d) (RICO conspiracy), which is punishable by 18 U.S.C. § 1963, by conducting and conspiring to conduct the affairs of an association-in-fact enterprise, which enterprise engaged in, and the activities of which affect, interstate or foreign commerce, through a pattern of racketeering activity consisting of acts involving extortion in violation of California state law and murder in violation of Nevada state law and acts indictable under Title 18, United States Code, Section 1952.

[2] 18 U.S.C. § 1955 defines "illegal gambling business" as a business which, among other things, is "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i). Here, there is probable cause to believe that the illegal gambling business contemplated by HENLEY, MITCHELL, and their associates will be in violation of Cal. Penal Code § 330 (prohibited games including "any banking or percentage game played with cards [or] dice…") and Cal. Penal Code § 332 (fraudulently obtaining money or property from another person).

prison)[3], 21 U.S.C. § 841 (a)(1) (distribution of a controlled substance), 21 U.S.C. § 846 (conspiracy to distribute a controlled substance), 18 U.S.C. § 1952 (travel act unlawful activities), and California Penal Code § 187(a) (murder) (the "SUBJECT OFFENSES").

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

5. The FBI and the U.S. Attorney's Office for the District of Central District of California have received approval from the United States Department of Justice to present an application to this Court for an order authorizing the interception of oral communications, and, pursuant to Federal Rule of Criminal Procedure 41(b) and the All Writs Act, 28 U.S.C. § 1651, the monitoring and recording of visual, non-verbal conduct of several individuals occurring within the enclosed office at the **SUBJECT LOCATION** (commonly known as a T-III and CCTV order) concerning offenses involving violations of

[3] 18 U.S.C. § 1791 is not a predicate offense for the interception of wire communications under 18 U.S.C. § 2516.

the SUBJECT OFFENSES. The proposed orders are pending with the district court. The instant search warrant application is sought to permit law enforcement officers to enter upon the property of the **SUBJECT LOCATION** in order to assess the appropriate methods and technology that will be needed to effectuate the anticipated T-III/CCTV Court order in the safest, most effective way possible.

## III. SUMMARY OF PROBABLE CAUSE

6. Since 2021, the FBI has been investigating EUGENE HENLEY JR., also known as ("aka") "BIG U," aka "DRAWS," aka "UNC" ("HENLEY"), MARK MARTIN, aka "BEAR CLAW" ("MARTIN"), and SYLVESTER ROBINSON, aka "VEY" ("ROBINSON") (collectively, the "TARGET SUBJECTS"), and others, including members of the Rollin 60's street gang. As discussed below and in prior affidavits authorizing wire interceptions of telephones belonging to HENLEY, ROBINSON, and MARTIN have revealed that HENLEY and others are engaging in the SUBJECT OFFENSES. We also learned, as detailed below, that HENLEY is the lead suspect in a January 2021 homicide in Las Vegas, Nevada.

7. During the course of the investigation, the LAMTFVG learned that MARTIN operates the **SUBJECT LOCATION.** The LAMTFVG obtained a certified copy of the Grant Deed for 1613 W. 134th Street, Gardena, California 90249, where the **SUBJECT LOCATION** is located, from the Official Records Recorder's Office for Los Angeles County. The certified Grant Deed lists Halldale Partners LLC as the owner. According to information obtained from an FBI Undercover Employee on March 31, 2023, the **SUBJECT**

**LOCATION** is known as UNDER THE HOOD MUSCLE CARS. According to information obtained from wire interceptions, HENLEY, ROBINSON, and MARTIN utilize the **SUBJECT LOCATION** as a base of operations to discuss the SUBJECT OFFENSES. Specifically, after Las Vegas detectives made inquiries about the 2021 homicide with Stacey Henley (S. Henley), HENLEY's wife, HENLEY immediately called MARTIN and directed him to meet him at the **SUBJECT LOCATION.** Based on my review of the intercepted communications and knowledge of the investigation, as set forth in more detail below, I believe HENLEY wanted to meet MARTIN at the **SUBJECT LOCATION** to discuss the homicide, thereby avoiding law enforcement interception. Surveillance of a pole camera revealed that HENLEY met with MARTIN for approximately six hours at the **SUBJECT LOCATION** following the call. Wire interception also revealed that HENLEY directed ROBINSON to meet him at the **SUBJECT LOCATION** prior to an attempted extortion of an employee of a legal cannabis dispensary.

8. I anticipate that interception of the **SUBJECT LOCATION** is necessary for investigators to more fully identify the network of co-conspirators associated with the TARGET SUBJECTS, including the true scope of operations of the Enterprise, the depth and breadth of the leadership structure of the Enterprise, the role played by the Rollin 60's, and key facilitation components, such as money launderers and others, who comprise the network operating in furtherance of the illegal activity described in the SUBJECT OFFENSES. Court-authorized wire interception, as set forth in more detail below, has revealed

that HENLEY only discusses incriminating details related to various Target Offenses, such as RICO offenses, with other TARGET SUBJECTS in person inside of the **SUBJECT LOCATION** in order to avoid law enforcement detection. I believe that access to the **SUBJECT LOCATION** is necessary to ensure safe and proper installation of the putative interception of oral and visual communication within the **SUBJECT LOCATION**, which must be installed imminently upon court authorization.

## IV. STATEMENT OF PROBABLE CAUSE

### A. BACKGROUND OF THE ROLLIN 60's GANG AND THE HENLEY RACKETEERING ENTERPRISE

9. The Enterprise is comprised of associates of HENLEY, as well as members and associates of the Rollin 60's.[4] HENLEY is widely regarded as the long-time leader of the Rollin 60's. The Rollin 60's is a criminal street gang with approximately 1,600 documented members in South Los Angeles and multiple sets throughout the United States. While the Rollin 60's "territory" in Los Angeles has changed over time, it is generally understood to be contained from La Brea Avenue to the west, Arlington Avenue to the east, Florence Avenue to the South, and roughly Slauson Avenue to the north. Based on the strength of its numbers and its reputation for violence, the Rollin 60's gang controls drug trafficking, and other illegal activities within this territory. Rollin 60's members are commonly "jumped" into the gang, a process where a prospective member must fight

[4] Although HENLEY uses his Rollin 60's affiliation for purposes of intimidation, the Henley Racketeering Enterprise is distinct from the Rollin 60's criminal street gang.



USAO_007407

multiple gang members at once. If Rollin 60's members were not jumped, they usually had familial ties to the gang or were vouched for by other Rollin 60's members.

10. In the television series Hip Hop Uncovered, which HENLEY executive produced, HENLEY explained that the Rollin 60's is a large Crip gang known to instill fear in the community. In the 1980's, HENLEY rose to a prominent position in the Rollin 60's Los Angeles drug hierarchy. During this time, HENLEY earned a reputation as an "enforcer," or a person who intimidated through violence, for the Rollin 60's. Based on my training, experience, and knowledge of this investigation, I believe that HENLEY is able to lead the Enterprise, and can extract extortion payments from victims, because of the decades-long reputation he established as a member of the Rollin 60's. HENLEY is also the leader of the Enterprise, as further explained below.

11. HENLEY is considered the boss, or "Unc," of the Enterprise, an organization that includes long-time confidants, lieutenants, or second tier level members that have proven trustworthy by HENLEY, and low-level members that conduct other criminal activities. Interceptions from the wiretaps, as set forth in more detail below, reveal that HENLEY surrounds himself with associates and individuals engaging in criminal activity on his behalf. Based on my knowledge of the totality of the investigation and my training and experience as an FBI SA, the following describes the structure of the Henley criminal enterprise. HENLEY is the kingpin, or boss. He is commonly

referred to as "Unc," "Big U," or "Draws" by other members of the Enterprise, confidential sources, TARGET SUBJECTS, and other criminal elements and individuals in the Los Angeles area.

12. Several decades-old associates of HENLEY, or lieutenants, serve directly underneath HENLEY in the Enterprise. ROBINSON is considered the underboss, or second in charge. According to ROBINSON's statements during a consensually monitored meeting with CHS-1[5] on September 15, 2022, while ROBINSON is not a member of the Rollin 60's, he is aware that HENLEY was actively killing people and he is entrusted to collect money, or "tax," from businesses and individuals in the Los Angeles area, on behalf of the Enterprise. ROBINSON also plans robberies, or "plays," for HENLEY. ROBINSON has told CHS-1 that he often has to give HENLEY 90% of the proceeds of the robberies. On or about August 15, 2021, and August 16, 2021, CHS-1 conducted a consensually monitored meeting with ROBINSON and others. During the meeting, ROBINSON told CHS-1 that HENLEY is in charge, ROBINSON is second in command, and everybody else reports to them. ROBINSON also told CHS-1 during a consensually monitored telephone call that he only needs to report to HENLEY and nobody else. HENLEY told CHS-1 and others that he relies on

---

[5] CHS-1 has a criminal history that includes arrests for narcotics conspiracy and distribution, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), respectively, robbery, in violation of California Penal Code Section 211, as well as a felony conviction for human trafficking of a minor under the age of 18, in violation of California Penal Code Section 236.1(C). CHS-1 is receiving consideration in connection with a pending drug case from the United States Attorney's Office in the Southern District of Ohio for his/her cooperation with law enforcement.

ROBINSON to obtain supplies when threatening others, such as masks and tape. HENLEY, ROBINSON, and others are also engaged in other illegal activities.

13. MARTIN is considered to have a similar stature to ROBINSON in the Enterprise but, unlike ROBINSON, is a member of the Rollin 60's. MARTIN has been a confidant of HENLEY for decades, as he admits in the docuseries. On September 15, 2022, during a consensually monitored meeting between ROBINSON and CHS-1, ROBINSON told CHS-1 that ROBINSON and MARTIN know almost everything about HENLEY. According to financial records, MARTIN is also the chief financial officer of DEVELOPING OPTIONS. I have reviewed the financial records obtained throughout the investigation and believe that MARTIN is laundering money through DEVELOPING OPTIONS. MARTIN operates the **SUBJECT LOCATION** and is entrusted to take part in conversations about the SUBJECT OFFENSES.

**B. HOMICIDE OF [redacted] AND IDENTIFICATION OF THE SUBJECT LOCATION**

14. On the morning of January 25, 2021, North Las Vegas Police Department (NLVPD) detectives discovered the body of [redacted] ("[redacted]") lying in the desert near the Apex Landfill in North Las Vegas, Nevada. [redacted] had been shot multiple times and his body had been dragged and left in a ditch not far from Interstate 15. Hours before his homicide, [redacted] was seen at Jamal Rashid's ("Rashid") studio, located at 4311 East Oquendo Road, Las Vegas, Nevada 89120 ("the studio") with HENLEY. NLVPD investigation revealed that [redacted] was one of

HENLEY's recording artists and was at the studio as a guest of HENLEY. According to a witness ("Witness-1"),[6] HENLEY was one of the last people seen with [redacted] prior to the homicide. Witness-1 also stated that ROBINSON drove HENLEY to Las Vegas from Los Angeles in a dark grey Lexus.[7] NLVPD detectives obtained a court-ordered search warrant for AT&T records for two of HENLEY's telephones, Target Telephone #1 and 323-893-3652 ("Phone #2") (collectively, "HENLEY's phones"), for the week leading up to the homicide of [redacted]. According to Witness-1 and an analysis of HENLEY's phones, HENLEY and ROBINSON arrived in Las Vegas on January 23, 2021. On January 24, 2021, at approximately 7:04 p.m., HENLEY arrived at the studio. At approximately 8 p.m. or 9 p.m., [redacted] arrived at the studio and recorded a song from approximately 11 p.m. until midnight. On January 25, 2021, at approximately 12:37 a.m., HENLEY left the studio, and the dark grey Lexus was not at the studio. At approximately 12:58 a.m., HENLEY's phones were turned off in the vicinity of the studio. At approximately 1:13 a.m.,

---

[6] Witness-1 is associated with the studio and has a criminal history that includes a 2020 misdemeanor arrest for soliciting prostitution. Witness-1 is not receiving any benefits for providing information about the homicide to NLVPD. Witness-1's information has been independently corroborated through interviews with family members of the victims and an analysis of historical cellular telephone tower data. Witness-1 did not know HENLEY well nor did Witness-1 ever meet SCOTT prior to the homicide. Witness-1 is motivated to cooperate with NLVPD because Witness-1 has a family member who works for law enforcement. For these reasons, I consider Witness-1 reliable.

[7] The Las Vegas Metropolitan Police Department's Forensic Laboratory compared DNA that the FBI surreptitiously collected from ROBINSON on February 17, 2022, and foreign DNA that was collected from the socks and shoes of [redacted]. The foreign DNA collected from [redacted] was not a match to ROBINSON's DNA.

surveillance footage of 5711 Roundrock Drive, Las Vegas, Nevada 89142, an Airbnb [redacted] was renting prior to the homicide ("the Airbnb"), revealed a dark grey or silver sedan arriving to the Airbnb. [redacted] exited the passenger side of the vehicle and entered the Airbnb. At approximately 1:20 a.m., [redacted] exited the Airbnb with a suitcase, put the suitcase in the trunk, and got in the dark grey or silver sedan, which departed. At approximately 2:15 a.m., both of HENLEY's phones were turned back on. Target Telephone #1 placed a call to ROBINSON, who Witness-1 reported was at the studio. At approximately 2:30 a.m. or 3 a.m., HENLEY returned to the studio alone in the dark grey Lexus and spoke with Witness-1. [redacted]' body was found at approximately 9:00 a.m. One of the NLVPD detectives believed [redacted] died at that location, after he observed the roadway contained a distinct patch of blood, which trailed down the hill from the roadway into the desert along with the drag marks. HENLEY's Phones departed Las Vegas to return to California at approximately 10:00 a.m.

15. On January 27, 2021, NLVPD detectives spoke with [redacted]' family and learned he lived in California and worked as a musician. The family explained [redacted] had recently been working with HENLEY and had previously lived at HENLEY's home for approximately four years. HENLEY arranged travel and living accommodations for [redacted] at the Airbnb in the Las Vegas area a few days earlier. The NLVPD investigation revealed that [redacted], aka "Lucc" ("[redacted]"), a friend of [redacted], spent the weekend in Las Vegas and visited [redacted] at the

Airbnb. [redacted] told NLVPD detectives that HENLEY visited the Airbnb and asked [redacted] why he did not show up to the music studio to record on January 23, 2021. [redacted] also told them that [redacted] told HENLEY he did not have a ride to the studio, but HENLEY did not appear to be upset. [redacted] thought it was odd that HENLEY went to the Airbnb.

16. Witness-1 told NLVPD detectives that SCOTT removed video recording equipment from the studio a couple of days after the homicide. Witness-1 explained that three surveillance Digital Video Recording (DVR) devices had been removed from the studio and all security cameras were disabled. I spoke with [redacted] ("[redacted]") on April 7, 2021, who installed the DVR equipment at the recording studio. On January 31, 2021, [redacted] went to the studio to fix video cameras that were not working at the studio, after Rashid called [redacted] to fix them. [redacted] analyzed the equipment and concluded the DVR system was unplugged or turned off. Based on my training, experience, and knowledge of the investigation, I believe SCOTT tampered with the DVR system. I also believe that footage from the DVR system would have shown an altercation between HENLEY and [redacted] on the night of January 24, 2021.

17. During the course of the investigation, the LAMTFVG learned that MARTIN operates the **SUBJECT LOCATION**, which functions as an automotive repair shop. From February 14, 2023 to February 16, 2023, NLVPD detectives travelled to Los Angeles and attempted to interview HENLEY about the homicide. NLVPD detectives spoke with S. Henley, who told them HENLEY was not

home. After the attempted interview, HENLEY met with MARTIN at the **SUBJECT LOCATION**.

### C. INTERCEPTION OF THE TARGET SUBJECTS REVEAL MEETINGS AT THE SUBJECT LOCATION

18. On February 3, 2023, Judge Aenlle-Rocha authorized the renewed interception wire communications of Target Telephone #1, belonging to HENLEY, and the initial interception of wire communications of Target Telephone #2 and Target Telephone #3. The order was served, and interception began, on February 6, 2023. During interception, the LAMTFVG identified co-conspirators of the SUBJECT OFFENSES and, with the aid of GPS ping information and a pole camera, determined HENLEY, ROBINSON, and MARTIN met in person to discuss the SUBJECT OFFENSES at the **SUBJECT LOCATION**.

19. On or about February 14, 2023, at approximately 12:05 p.m., HENLEY, who was using Target Telephone #1, placed a call to MARTIN, who was using telephone number Target Telephone #4. During the call, HENLEY told MARTIN he wanted to meet with him at the **SUBJECT LOCATION** to discuss HENLEY's involvement with the homicide. The following is a transcription of a portion of the conversation:

HENLEY: Uhh five detectives went by my house this morning. From uh Las Vegas. And uh said they wanted to talk to me. You hear me?

MARTIN: Yeah

HENLEY: [U/I] Umm probably let you know. [U/I] They was asking about [redacted] and um told [static and call cuts

out] um two year anniversary. Two year anniversary it was uhh they wanted to follow up and talk to everybody who was close and um where you at?

MARTIN: I'm at the shop

HENLEY: Alright I'm pulling up on you.

MARTIN: 'Ight.

20. Based on my training, experience, and knowledge of the investigation, I believe HENLEY directed MARTIN to speak with him in the **SUBJECT LOCATION** to avoid speaking with him about the homicide over the telephone. As discussed above, I know that NLVPD considers HENLEY to be the only suspect in the homicide and was the last person seen with [redacted]. When HENLEY said, "five detectives went by my house this morning. From uh Las Vegas. And uh said they wanted to talk to me," I believe HENLEY was telling MARTIN, one of his closest associates, that detectives from NLVPD wanted to speak with HENLEY about his involvement in the homicide. I also believe that HENLEY wanted to avoid speaking about the homicide over the phone and instead use the **SUBJECT LOCATION** as a platform to discuss his culpability related to the homicide. When HENLEY said, "they was asking about [redacted]" and "they wanted to follow up and talk to everybody who was close," I believe HENLEY was informing MARTIN that the NLVPD specifically wanted to speak about HENLEY's involvement with the homicide of [redacted]. When HENLEY asked, "where you at?" and MARTIN responded, "I'm at the shop," I believe MARTIN was telling HENLEY that he was at the **SUBJECT LOCATION**. Further, I believe HENLEY was trying to be discreet

while using Target Telephone #1 to avoid divulging details related to the homicide until he met with MARTIN at the **SUBJECT LOCATION.** Based on my review of the intercepted calls throughout the investigation, I know that HENLEY believes the FBI is intercepting his telephone calls. When HENLEY said, "alright I'm pulling up on you," I believe HENLEY was telling MARTIN that he would meet with him inside of the **SUBJECT LOCATION** to discuss his involvement with the homicide to avoid such interception.

21. Following the call to MARTIN, HENLEY immediately placed multiple calls to SCOTT. The first few calls were not answered. On or about February 14, 2023, at approximately 12:05 p.m., HENLEY, who was using Target Telephone #1, placed a call to SCOTT, who was using telephone number 424-335-1090. During the call, HENLEY told SCOTT he needed to meet with him. The following is a transcription of a portion of the conversation:

HENLEY: Where you at?

SCOTT: At the house, ready to jump in the shower. What you on?

HENLEY: I need to pull up on you.

SCOTT: 'Ight I'm right here at the house.

HENLEY: 'Ight I gotta pull up on you and [UI]

SCOTT: How long you gonna be?

HENLEY: You ain't bout to go no where are you?

SCOTT: Nah I'm [UI]

HENLEY: Okay.

Case 2:25-mj-02700-DUTY *SEALED* Document 1-1 Filed 05/20/25 Page 20 of 34 Page ID #:100

SCOTT: I'll just jump in the shower though just to be ready though

HENLEY: Okay

SCOTT: Alright for sure

22. Based on my training, experience, and knowledge of the investigation, I believe HENLEY needed to meet with SCOTT in person to discuss NLVPD's presence in Los Angeles and SCOTT's involvement as an accessory to the homicide. When HENLEY asked, "where you at," I believe he wanted to meet with SCOTT in person. When SCOTT asked, "what you on," I believe he wanted to know why HENLEY was calling him repeatedly. As discussed above, I know that SCOTT removed evidence of HENLEY and [redacted]' presence at the studio hours before the homicide. When HENLEY said, "I need to pull up on you" and asked, "you ain't bout to go no where are you," I believe he wanted to meet with SCOTT at SCOTT's residence as soon as possible to discuss SCOTT's involvement with the SUBJECT OFFENSES. Based on my review of follow-up wire interceptions and GPS ping data for Target Telephone #1, I believe HENLEY and SCOTT met inside of HENLEY's vehicle outside of SCOTT's residence.[8] I believe this behavior is consistent with the fact that HENLEY does not discuss facts related to the [redacted] Homicide over the phone, instead choosing to discuss such matters in person.

23. I reviewed pole camera footage of the **SUBJECT LOCATION** and GPS ping data for Target Telephone #1 for February 14, 2023.

---

[8] The LAMTFVG was unable to conduct surveillance of the meeting.

At approximately 12:34 p.m., HENLEY entered the **SUBJECT LOCATION.** Based on my review of the footage, MARTIN was at the **SUBJECT LOCATION** when HENLEY arrived. HENLEY and MARTIN did not leave the **SUBJECT LOCATION** until approximately 6 p.m. Based on my training, experience, and knowledge of the aforementioned wire interception, I believe HENLEY and MARTIN discussed HENLEY's involvement with the homicide inside of the **SUBJECT LOCATION.**

24. On or about February 14, 2023, at approximately 3:59 p.m., ROBINSON, who was using telephone number Target Telephone #2, made an outgoing call to HENLEY, who was using Target Telephone #1 and, based on my review of the pole camera footage and GPS pings, inside of the **SUBJECT LOCATION.** During the call, HENLEY directed ROBINSON to meet him at the **SUBJECT LOCATION** to discuss the financial extortion of an employee of the legal cannabis dispensary ERBA. The following is a transcription of a portion of the conversation:

HENLEY: What up bro?

ROBINSON: Y'all going to AG?

HENLEY: Nah, we at uh the car place.

ROBINSON: Oh yeah, well we can make that move.

HENLEY: Krita on um, at AG, waiting on him.

ROBINSON: Aight, well I'm on my way.

25. Based on my training, experience, and knowledge of the investigation, I believe HENLEY was directing ROBINSON to meet him to discuss the extortion of the ERBA employee. I know that MARTIN works on vehicles at the **SUBJECT LOCATION** and the **SUBJECT**

**LOCATION** is referred to as the "Shop" and "Car Place." When ROBINSON asked, "y'all going to AG?" and HENLEY said, "nah, we at uh the car place," I believe HENLEY was telling ROBINSON that he was with MARTIN at the **SUBJECT LOCATION**. When ROBINSON said, "we can make that move," I believe he was using coded language to tell HENLEY that he would extort the ERBA employee for HENLEY. When ROBINSON said "I'm on my way," I believe he was telling HENLEY that he would meet with HENLEY at the **SUBJECT LOCATION** to further discuss their extortion activities in person, rather than using the telephone.[9]

26. On or about February 14, 2023, at approximately 5:34 p.m., HENLEY, who was using telephone number Target Telephone #4, a phone that I know is primarily used by MARTIN, made an outgoing call to ROBINSON, who was using Target Telephone #2. Based on my review of the pole camera footage, HENLEY, who arrived to the **SUBJECT LOCATION** a couple of hours earlier and was with MARTIN inside of the **SUBJECT LOCATION**, directed ROBINSON to go to ERBA and collect an extortion payment from an unidentified male ("Victim 4"). The following is a transcription of a portion of the conversation:

HENLEY: I smacked the Jew Boy again.

ROBINSON: We just left the first spot.

HENLEY: Yall find him?

---

[9] Based on my review of a GPS ping on Target Telephone #2 and the pole camera, I was not able to confirm whether ROBINSON met with HENLEY and MARTIN at the **SUBJECT LOCATION** following the call.

ROBINSON: No, they said he wasn't there, so I asked for the manager and I gave him the spiel.

HENLEY: What'd he say?

ROBINSON: That nigga just like got nervous and start walking away, and like alright alright ok ok, so I'm going to the next one.

HENLEY: It's another spot.

ROBINSON: Yeah two of em.

HENLEY: I'ma tell him one was visited, (UI).

ROBINSON: Uh shit it don't matter, but fo sho one was visited fo sho, the one on um, Pico.

HENLEY: Yeah you visited the last one, go on and go, check out wifey.

ROBINSON: Alright.

HENLEY: We gonna let em think for a while, you told him he had to take care of that lady.

ROBINSON: Yeah I told him he owes two people money, he know who he owe and if he don't pay, we gonna let him make a payment plan, if he don't pay we gonna shut this mother fucker down. Walked out that mother fucker, but the white boy walking away as I was talkin, he like ok ok ok, what's your last name, you don't need to know my last name motha fucka.

HENLEY: You should of gave him the lady name.

ROBINSON: Alright I will at this one, do we have it.

HENLEY: Yeah Krita got it written on the paper, give him the information, tell him he need to take care of that, he know what he needs to take care.

ROBINSON: Alright.

HENLEY: He got a hundred and something bucks from the lady, she possed to get invested in this woowoo shit right here, and then she gonna get her pay, some kinda pay UI or is gonna be a fuckin misunderstanding for the whole establishment.

ROBINSON: Alright, see I didn't know how much or none of that, and I didn't know Krita had the lady name, he was standing right there, alright I get the name on this one, I'll play the name.

HENLEY: Call me when yall get there so I can make sure, where yall, what area.

ROBINSON: Uh, the one was like, we going to UI right now, and that one was like West LA.

27. Based on my training, experience, and knowledge of the investigation, I believe HENLEY, who was using MARTIN's phone inside the **SUBJECT LOCATION** and directed ROBINSON to meet him at the **SUBJECT LOCATION**, and ROBINSON were planning to extort Victim 4, who is associated with the legal cannabis dispensary ERBA in west Los Angeles.[10] When ROBINSON said, "we just left the first spot" and "I'm going to the next one," I believe ROBINSON was discreetly referring to ERBA locations throughout

[10] The LAMTFVG has not yet ascertained which ERBA location Victim 4 works at; we will make an effort to interview Victim 4 once I am able to identify him.

Los Angeles to search for Victim 4, which HENLEY wanted to brief ROBINSON on inside of the **SUBJECT LOCATION.** When ROBINSON said, "he owes two people money, he know who he owe and if he don't pay, we gonna let him make a payment plan, if he don't pay we gonna shut this motherfucker down," I believe that if Victim 4 does not make a payment, ROBINSON and HENLEY will extort him and shut down the ERBA location he works at. When HENLEY said, "she gonna get her pay, some kinda pay (UI) or is gonna be a fuckin' misunderstanding for the whole establishment," I believe HENLEY is telling ROBINSON that if an unknown female (UF) does not receive her payment from Victim 4, the entire business will be subject to extortion. Further, I believe this call demonstrates that HENLEY uses the **SUBJECT LOCATION** as a platform to openly discuss the illegal activities of the Enterprise.

28. On or about February 15, 2023, at approximately 1:41 p.m., HENLEY, who was using Target Telephone #1, made an outgoing call to MARTIN, who was using telephone number Target Telephone #4. During the call, HENLEY directed MARTIN to meet him at the **SUBJECT LOCATION** to discuss one of the homicide witnesses. The following is a transcript of a portion of the conversation:

HENLEY: Did 'fat boy' call you?

MARTIN: Nah uhhh (Long Pause)

HENLEY: Yeah. Yeah they went there.

MARTIN: Yeah

HENLEY: You know what I'm talking about.

MARTIN: No. I know what you talking about. Yeah yeah yeah yeah yeah yep. HENLEY: Yeah. Yeah he said they showed him a a video. I'll pull up on you though.

MARTIN: Aight

29. Based on my training, experience, and knowledge of the investigation, I believe HENLEY directed MARTIN to meet with him inside of the **SUBJECT LOCATION** to discuss [redacted] ("[redacted]"), a witness to the homicide. I further believe HENLEY wanted to discuss the witness at the **SUBJECT LOCATION** to avoid law enforcement wire interception. I know that NLVPD interviewed Nathan Martin ("N. Martin"), who is also known as "Fat Boy," in an effort to locate and speak with [redacted], approximately one hour prior to this wire interception. When HENLEY said, "did 'fat boy' call you" and "they went there," I believe he was questioning whether MARTIN learned about NLVPD's interview of N. Martin. When HENLEY said, "you know what I'm talking about," I believe HENLEY was using code to remind MARTIN about previous conversations they had related to the homicide inside of the **SUBJECT LOCATION** and to avoid discussing the murder witness over the telephone. I also know that NLVPD showed N. Martin a video of [redacted], his nephew, leaving the Airbnb one day before the homicide. When HENLEY said, "he said they showed him a a video," I believe he was telling MARTIN that N. Martin told HENLEY that NLVPD showed N. Martin the video of [redacted] leaving the Airbnb one day before the homicide. When HENLEY said, "I'll pull up on you though," I believe he was directing MARTIN to speak about [redacted], the witness, at the

**SUBJECT LOCATION**, so that he could openly discuss his involvement with the homicide of [redacted].

30. I reviewed pole camera footage of the **SUBJECT LOCATION** and GPS ping data for Target Telephone #1. At approximately 2:30 p.m. on February 15, 2023, HENLEY entered the **SUBJECT LOCATION.** Based on my review of the footage, MARTIN was at the **SUBJECT LOCATION** when HENLEY arrived. HENLEY and MARTIN did not leave the **SUBJECT LOCATION** until approximately 4 p.m. Based on my training, experience, and knowledge of the investigation, I believe HENLEY and MARTIN discussed [redacted] and HENLEY's involvement with the homicide inside of the **SUBJECT LOCATION.**

**D. RECENT ACTIVITY AT THE SUBJECT LOCATION**

31. The TARGET SUBJECTS continue to utilize the **SUBJECT LOCATION** as a meeting location. MARTIN is observed via the pole camera at the **SUBJECT LOCATION** daily. During multiple surveillances, the LAMTFVG has observed MARTIN and MARTIN's vehicle at the **SUBJECT LOCATION** as recently as April 25, 2023, the date wire interception ended. An FBI Undercover Employee spoke with MARTIN as he/she was exiting the **SUBJECT LOCATION** on March 31, 2023. During the past 21 days, HENLEY was either observed at the **SUBJECT LOCATION** or the GPS ping for Target Telephone #1 placed HENLEY's phone at the **SUBJECT LOCATION.** From my review of the pole camera and GPS ping data for Target Telephone #1 and Target Telephone #4 on April 15, 2023, I observed MARTIN and HENLEY meeting at the **SUBJECT LOCATION** at approximately 3:23 p.m. At that time, I also observed multiple unidentified males meeting with MARTIN and HENLEY at the **SUBJECT**

**LOCATION.** On the evening of April 8, 2023, I observed the GPS ping for Target Telephone #1 near the **SUBJECT LOCATION.** The LAMTFVG did not intercept any wire communications setting up a meeting between MARTIN and HENLEY on that date. As such, based on my training, experience, and knowledge of the investigation, I believe that MARTIN and HENLEY are discussing more racketeering offenses at the **SUBJECT LOCATION** with unidentified co-conspirators, in addition to the 2021 homicide and extortion. Based on my review of GPS ping data for Target Telephone #2, I am not able to ascertain whether ROBINSON visited the **SUBJECT LOCATION.** While GPS ping data was active on Target Telephone #2, I observed that ROBINSON routinely turned off Target Telephone #2 for hours at a time. Likewise, the large uncertainty of the GPS ping radius provided to me by the telephone provider for Target Telephone #2 made it frequently difficult to ascertain ROBINSON's location. Thus, the LAMTFVG believes that the TARGET SUBJECTS continue to use and will continue to use the SUBJECT LOCATION as a base of operations for their racketeering activities.

## V. AUTHORIZATION REQUESTED

32. As explained above, the FBI and the United States Attorney's Office for the District of Central District of California have obtained approval from United States Department of Justice to present to the Court an application to intercept the oral communications within **SUBJECT LOCATION** and to monitor and record visual, non-verbal conduct. The FBI expects that

such an application will be presented to this Court during the week of June 5, 2023.

33. The requested search warrant would authorize the FBI to enter the **SUBJECT LOCATION** surreptitiously in order assess the ability/ viability to install, maintain, and remove the surveillance equipment that is anticipated to be used by the FBI to intercept and record oral communications and visual, non-verbal conduct occurring within the **SUBJECT LOCATION** upon the execution of the future Court order.

34. Specifically, I request that the FBI agents executing the warrant be authorized to enter upon the **SUBJECT LOCATION** property to:

a. Scan the **SUBJECT LOCATION's** Wireless Access Point (WAP) to monitor and capture the "communication packets" sent and received by the router to any WIFI connected devices;

b. Scan the wireless network used at the **SUBJECT LOCATION** to identify any security cameras ;

c. Obtain measurements of the **SUBJECT LOCATION's** exterior door lock including its depth, pin locations, and number, and any interior angles and depths to support a mechanical key duplication;

d. Photograph the **SUBJECT LOCATION's** exterior doors and door locks;

e. Scan the lens area of any exterior cameras to determine if a heat signature is present;

f. Scan the lens area of any exterior cameras to determine if an infrared (IR) light signature is present, which would indicate that the camera(s) has power and is operational;

g. Determine the location where any communications cabinet or hard-wired ingress into the **SUBJECT LOCATION** exists of any wired external security cameras to determine if disconnection and any hard-wired cameras is feasible; and

h. Monitor and capture the specific radio frequency band that facilitates opening and closing the electronic gate at the **SUBJECT LOCATION.**

35. The WAP scan and packet capture will enable agents to generate a network password. With the network password, agents will then scan the full network to determine what devices are Wi-Fi connected to the router on the network that includes the interior security cameras and any Wi-Fi/ IoT cameras on the exterior of the **SUBJECT LOCATION.** The list of devices generated from the network scan can then be compared to the cameras observed on the exterior of the building to determine what cameras are potentially hard wired and are in working order, which will assist agents on the day of the actual entry into the **SUBJECT LOCATION.**

36. Capturing the specific radio frequency band that facilitates the opening and closing of the **SUBJECT LOCATION's** electronic gate will enable agents to duplicate an electronic key, commonly referred to as a "FOB," to access the property.

37. To ensure the safety of the executing officers and to avoid premature disclosure of the investigation, I request that the Court authorize the execution of the warrant during both daytime and nighttime hours.

## VI. NIGHT SERVICE

38. Based on my training and experience, I know that the safest and most advantageous time to covertly enter a premise and to determine the safest and most advantageous time to install, repair, replace, or maintain a CCTV monitor is often late at night, between the hours of 10:00 p.m. and 6:00 a.m. due to the fact that targets of the investigation and any nearby associates are less likely to detect officers attempting to search. In addition, the **SUBJECT LOCATION** is located in an area surrounded by other tenants, some of whom may have a connection to the TARGET SUBJECTS or may decide to alert the TARGET SUBJECTS. If the TARGET SUBJECTS or their associates detect or become aware of agents entering and searching the **SUBJECT LOCATION**, it will very likely compromise the investigation and could put the agents and others at risk. In addition, the search and seizure procedures may be time consuming. Therefore, I request night service authorization to both search the **SUBJECT LOCATION** and to assess the location as described in Attachment B.

## VII. DELAYED NOTICE

39. Pursuant to Federal Rule of Criminal Procedure 41(f)(2)(c), (f)(3), and 18 U.S.C. § 3103a, I also request permission to delay service of the warrants to the TARGET SUBJECTS and/or the lessees of the **SUBJECT LOCATION** for a period of (i) 45 days after the date of the execution of the search and (ii) 30 days from the date that the interception of the location via Title III intercepts has ended. Based on my training and experience and my investigation in this matter, I believe that reasonable cause exists to delay service of the warrants for a period of 45 days because immediate notification of the warrant is likely to have adverse result of placing the investigation in serious, if not certain, jeopardy.

40. Specifically, this criminal investigation is ongoing, and neither public nor known to all of the subjects of the investigation. For instance, the TARGET SUBJECTS are unaware that FBI has intercepted their telephone communications via Title III intercepts, nor are they aware that the FBI has used those intercepts to identify the **SUBJECT LOCATION** as a meeting spot for clandestine communications that are deemed too sensitive for telephonic or public dissemination. Moreover, this warrant is specifically requested to allow for covert installation of additional intercept devices. Alerting the TARGET SUBJECTS to the existence of the investigation, particularly that the investigation involves the **SUBJECT LOCATION**, is likely, if not certainly, to cause them to take steps to stop using the **SUBJECT LOCATION** for such communication.

This would seriously jeopardize the investigation and make it more difficult for law enforcement to identify and locate additional targets and to investigate the SUBJECT OFFENSES.

41. Additionally, given the nature of the conduct under investigation, evidence of the SUBJECT OFFENSES is likely to be stored digitally, largely in the form of communication, and is susceptible to destruction and obfuscation. If alerted to the investigation or the specific premise or items of interest in the investigation, the TARGET SUBJECTS could destroy or conceal that evidence, including information saved on their digital devices or with various Internet Service Providers.

42. Finally, while the investigation has been underway for some time, it is expected to nonetheless take several more months to conclude. Although the requested orders are expected to yield some evidence, contraband, fruits, and/or instrumentalities of the SUBJECT OFFENSES, subsequent investigation will be necessary to identify additional targets, reveal the full scope of their criminal conspiracies, and gather additional evidence needed for any criminal prosecution. This is expected to involve additional legal process, including search warrants, grand jury subpoenas, and other court orders. For the foregoing reasons, I request permission to delay service of the warrants to the lessees of the **TARGET LOCATION** for a period of (i) 45 days after the date of execution of the search and (ii) 30 days from the date that the use of the oral and visual interception has ended.

## VIII. CONCLUSION

43. For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES will be found at the **SUBJECT LOCATION**, as described in Attachment A.

/s/
Ramesh Ganesh, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 30th day of May, 2023.

HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE