FILED
CLERK, U.S. DISTRICT COURT
06/06/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: TF DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INTERCEPTION OF ORAL COMMUNICATIONS AT 1613 WEST 134TH STREET, SUITE 3, GARDENA, CA 90249 | Case No. 2:22-cm-00221-FLA(D)<br><br>ORDER [DKT. 35]<br><br>**(UNDER SEAL PURSUANT TO 18 U.S.C. § 2518(8))** |

Application under oath has been made before this court by Kevin J. Butler, Assistant United States Attorney for the Central District of California, an "investigative or law enforcement officer" as defined in 18 U.S.C. § 2510(7) and an attorney for the government as defined in Federal Rule of Criminal Procedure 1, for an Order authorizing, the interception of oral communications pursuant to 18 U.S.C. § 2518, and full consideration having been given to the matter set forth therein and in supporting documents, the court FINDS AS FOLLOWS:

1. There is probable cause to believe that EUGENE HENLEY, JR., also known as ("aka") "BIG U," aka "DRAWS," aka "UNC" ("HENLEY"); SYLVESTER ROBINSON, aka "VEY," aka "V" ("ROBINSON"); MARK MARTIN, aka "BEAR CLAW" ("MARTIN"); ZIHIRR MITCHELL, aka "BRICC," aka "BIG SHITTY" ("MITCHELL"); DARRAL SCOTT ("SCOTT"); DEVONNE DOUGLAS, aka "DBO" ("DOUGLAS"); LAMARC SAUNDERS, aka "TINY DRAWS" ("SAUNDERS"); and others yet unknown (collectively, the "Target Communicators") have committed, are committing, and will continue to commit violations of 18 U.S.C. §§ 1962 and 1963 (Racketeer Influenced and Corrupt Organizations ("RICO") offenses[1]); 18 U.S.C. § 1951 (interference with commerce by threats or violence); 18 U.S.C. § 922 (g) (felon in possession of a firearm or ammunition); 18 U.S.C.

---

[1] There is probable cause that the Target Communicators and their conspirators constitute an enterprise, that is, a group of individuals associated in fact. Members and associates of this enterprise are believed to have violated 18 U.S.C. § 1962(c) (RICO Substantive) and § 1962(d) (RICO conspiracy), which is punishable by 18 U.S.C. § 1963, by conducting and conspiring to conduct the affairs of an association-in-fact enterprise, which enterprise engaged in, and the activities of which affect, interstate or foreign commerce, through a pattern of racketeering activity consisting of acts involving extortion in violation of California state law and murder in violation of Nevada state law and acts indictable under Title 18, United States Code, Section 1952. The Target Communicators use the **Target Location** to arrange and coordinate the activities of this enterprise.

Case 2:22-cr-00021-FLA Document 38 Filed 06/06/23 Page 3 of 90 Page ID #:1093

§ 924(c) (use of a firearm in furtherance of a crime of violence or drug trafficking crime); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1955 (conducting an illegal gambling business[2]); 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 1014 (false statements in loan applications); 18 U.S.C. § 1791 (providing contraband in prison[3]); 21 U.S.C. § 841 (a)(1) (distribution of a controlled substance); 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); 18 U.S.C. § 1952 (travel act); and California Penal Code § 187 (murder) (collectively, "Target Offenses").

2. There is probable cause to believe that particular oral communications of the Target Communicators, and other persons yet unknown will be obtained through the interception of oral communications at the confines of an automotive repair shop called "Under the Hood Muscle Cars," located at 1613 West 134th Street, Suite 3, Gardena, CA 90249, aka "Bear Claw's Shop," aka "the Shop," aka "the Car Place" (the "**Target Location**").

3. In particular, there is probable cause to believe that these communications will concern the specifics of the Target Offenses, including identifying and providing admissible evidence of the following: (a) acts taken in furtherance of the Target Offenses, including acts taken by co-conspirators of the Target Communicators involving racketeering acts such as murder, conspiracy to commit

---

[2] 18 U.S.C. § 1955 defines "illegal gambling business" as a business which, among other things, is "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i). Here, there is probable cause to believe that the illegal gambling business contemplated by HENLEY, MITCHELL, and their associates will be in violation of Cal. Penal Code § 330 (prohibited games including "any banking or percentage game played with cards [or] dice…") and Cal. Penal Code § 332 (fraudulently obtaining money or property from another person).

[3] 18 U.S.C. § 1791 is not a predicate offense for the interception of communications under 18 U.S.C. § 2516.

murder, extortion, robbery, and drug trafficking; (b) the knowledge and intent of the Target Communicators; (c) the identities and roles of Target Communicators' aiders and abettors and co-conspirators in the Target Offenses; (d) the manner in which the Target Communicators are committing the Target Offenses, including the nature, scope, dates, times, places, methods of operation, source of monies, and the methods by which the Target Communicators conceal such sources; (e) the administration, control, management and disposition of proceeds of the Target Offenses, including the manner which any proceeds are laundered; (f) the identification of shell companies and financial institutions used by the Target Communicators; (g) the existence of potential victims of the Target Offenses; (h) the existence and location of records concerning the Target Offenses; (i) the existence, location, and source of resources used to finance the illegal activities; and (j) attempts to conceal the Target Offenses (collectively, the "goals of the investigation").

4. It has been adequately established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

5. There is probable cause to believe that the **Target Location** has been, is being, and will continue to be used in connection with the commission of the Target Offenses.

WHEREFORE, IT IS HEREBY ORDERED pursuant to 18 U.S.C. § 2518, Federal Rule of Criminal Procedure 41, and 28 U.S.C. § 1651, that Special Agents of the Federal Bureau of Investigation ("FBI"), other duly authorized state and local law enforcement officers working under the supervision of FBI, government personnel acting under the

supervision of the FBI, and personnel acting under contract to and supervision of the FBI, pursuant to an application authorized by Jennifer A. H. Hodge, Deputy Assistant Attorney General, Criminal Division, a duly designated official of the Criminal Division, United States Department of Justice, who has been specially designated by the Attorney General of the United States, pursuant to pursuant to Order Number 5000-2021, dated March 12, 2021, to exercise the power conferred on that official by 18 U.S.C. § 2516, are authorized to intercept oral communications within the **Target Location.** Attached to the Government's application for this Order, and incorporated into this Order, are copies of the Attorney General's Order of special designation and the Memorandum of Authorization approving this application.

IT IS FURTHER ORDERED that such interceptions shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others conduct their illegal activities, but may continue until all communications are intercepted which fully reveal the manner in which the Target Communicators and others as yet unknown are committing the Target Offenses, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy, but not to exceed a period of thirty (30) days measured from the earlier of the day on which law enforcement officers first begin to conduct an interception under this Order or ten (10) days after the Order is entered.

IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2518(3), interceptions will occur in the Central District of California, where

Case 2:25-cr-00211-FLA Document 174-3 Filed 06/06/23 Page 6 of 90 Page ID #:1383

communications within the **Target Location** will first be heard and minimized.

IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2518(5), that monitoring of communications be performed by Special Agents of the FBI, government personnel, and employees and/or individuals operating under a contract with the United States Government, all of whom will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interceptions as defined by and pursuant to 18 U.S.C. § 2510(7).

IT IS FURTHER ORDERED that this Order be executed as soon as practicable after it is signed, and that all monitoring of oral communications be conducted in such a way as to minimize the interception and disclosure of communications not relevant to the investigation, or otherwise criminal in nature. Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during a portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent may spot-check to determine if one of the named interceptees or their co-conspirators, when identified, is a participant, or if the conversation has turned to criminal matters. Special attention shall be given to minimize all privileged communications.

IT IS FURTHER ORDERED that pursuant to 18 U.S.C. § 2518(5), in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the Government, will be under the direct supervision of a federal agent.

IT IS FURTHER ORDERED that an Assistant United States Attorney familiar with the facts of this case will provide this court with reports, after about the fifteenth day of the Interception Period, showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If a report should become due on a weekend or holiday, it is requested that such report shall become due on the next business day thereafter. If the court's Order is extended for a further period of interception, it is requested that the application for extension may serve as the report on or about the thirtieth day.

IT IS FURTHER ORDERED that Special Agents of the FBI and/or contractors acting under their supervision be authorized to enter the **Target Location** surreptitiously, covertly, and by breaking and entering, if necessary, to install, maintain, and remove the surveillance equipment used by the FBI to intercept and record oral communications occurring within the **Target Location**. The court will be notified of each surreptitious entry as soon as practicable.

IT IS FURTHER ORDERED that no inventory or return of the results of the foregoing interception need be made, other than the above-

required reports, before 90 days from the date of the expiration of this Order, or any extension of the Order, or at such time as the court in its discretion may require.

IT IS FURTHER ORDERED that, upon an ex parte showing of good cause to a judge of competent jurisdiction, the service of the above inventory or return may be postponed for a further reasonable period of time.

IT IS FURTHER ORDERED that the court's Order, the Application, Affidavit, and all interim reports filed with this court with regard to this matter be sealed until further order of this court, except that copies of the Order, in full or redacted form, may be served on the FBI as necessary to effectuate the court's Order.

June 6, 2023
DATE

FERNANDO L. AENLLE-ROCHA
United States District Judge

E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
AMY E. POMERANTZ (Cal. Bar No. 275691)
KEVIN J. BUTLER (Cal. Bar No. 329129)
Assistant United States Attorneys
Violent and Organized Crime Section
1300 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-0730/6495
Facsimile: (213) 894-3713
E-mail: amy.pomerantz@usdoj.gov
kevin.butler2@usdoj.gov

Attorneys for Applicant
UNITED STATES OF AMERICA

FILED
CLERK, U.S. DISTRICT COURT
06/06/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: TF DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INTERCEPTION OF ORAL COMMUNICATIONS AT 1613 WEST 134TH STREET, SUITE 3, GARDENA, CA 90249 | CR Misc. No. 2:22-cm-00221-FLA(D)<br><br>APPLICATION<br><br>**(UNDER SEAL PURSUANT TO 18 U.S.C. § 2518(8))** |

I, Kevin J. Butler, an attorney for the United States Department of Justice, declare and state:

**Authority to Make Application**

I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an attorney authorized by law to prosecute or participate in the prosecution of offenses enumerated in Section 2516 of Title 18, United States Code. I am also an attorney for the government as defined in Rule 1 of the Federal Rules of Criminal Procedure, and, therefore, pursuant to 18 U.S.C. § 2516(3), I may

Case 2:22-cr-00211-FLA Document 174-3 Filed 06/16/23 Page 10 of 90 Page ID #:1001

apply to a federal judge of competent jurisdiction for an order authorizing or approving the initial interception of oral communications.

Pursuant to Section 2516(1) of Title 18, United States Code, an appropriate official of the Criminal Division, United States Department of Justice, specifically, Jennifer A. H. Hodge, Deputy Assistant Attorney General, Criminal Division, having been specially designated by the Attorney General pursuant to Order Number 5000-2021, dated March 12, 2021, has authorized this application for an order approving the interception of oral communications. Attached to this application as Exhibit A, and incorporated by reference herein, is a copy of that order and the memorandum of authorization approving this application.

**Identification of Target Location**

This application seeks an Order authorizing, pursuant to 18 U.S.C. § 2518, the initial interception of oral communications of Target Communicators specified below occurring within the confines of an automotive repair shop called "Under the Hood Muscle Cars," located at 1613 West 134th Street, Suite 3, Gardena, CA 90249, aka "Bear Claw's Shop," aka "the Shop," aka "the Car Place" (the "**Target Location**"), that is operated by MARK MARTIN, also known as ("aka") "BEAR CLAW" ("MARTIN") and used by EUGENE HENLEY, JR., aka "BIG U," aka "DRAWS," aka "UNC" ("HENLEY"), and others to hold meetings where criminal activity is discussed.

**Statement of Application**

I have discussed the circumstances of the current investigation and this application with Federal Bureau of Investigation ("FBI")

Special Agent Andrew J. Roosa, who has assisted in conducting that investigation. I have examined the affidavit of Special Agent Andrew J. Roosa, attached to the application as Exhibit B and incorporated by reference herein, and determined that it alleges a full and complete statement of facts within the meaning of 18 U.S.C. § 2518 which (i) justifies our belief that the orders requested below should be issued and (ii) states the following:

a. The FBI is conducting an investigation into possible violations of offenses enumerated in 18 U.S.C. § 2516, to include the following: 18 U.S.C. § 1962 and 1963 (Racketeer Influenced and Corrupt Organizations ("RICO") offenses[1]); 18 U.S.C. § 1951 (interference with commerce by threats or violence), 18 U.S.C. § 922(g) (felon in possession of a firearm or ammunition), 18 U.S.C. § 924(c) (use of a firearm in furtherance of a crime of violence or drug trafficking crime), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1955 (conducting an illegal gambling business[2]), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1014 (false

---

[1] There is probable cause that the Target Communicators and their conspirators constitute an enterprise, that is, a group of individuals associated in fact. Members and associates of this enterprise are believed to have violated 18 U.S.C. § 1962(c) (RICO Substantive) and § 1962(d) (RICO conspiracy), which is punishable by 18 U.S.C. § 1963, by conducting and conspiring to conduct the affairs of an association-in-fact enterprise, which enterprise engaged in, and the activities of which affect, interstate or foreign commerce, through a pattern of racketeering activity consisting of acts involving extortion in violation of California state law and murder in violation of Nevada state law and acts indictable under Title 18, United States Code, Section 1952. The Target Communicators use the **Target Location** to arrange and coordinate the activities of this enterprise.

[2] 18 U.S.C. § 1955 defines "illegal gambling business" as a business which, among other things, is "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i). Here, there is probable cause to believe that the

*(footnote cont'd on next page)*

statements in loan applications), 18 U.S.C. § 1791 (providing contraband in prison[3]), 21 U.S.C. § 841 (a)(1) (distribution of a controlled substance), and 21 U.S.C. § 846 (conspiracy to distribute a controlled substance) (collectively, the "Target Offenses") by persons including HENLEY; SYLVESTER ROBINSON, aka "VEY," aka "V" ("ROBINSON"); MARTIN; ZIHIRR MITCHELL, aka "BRICC," aka "BIG SHITTY" ("MITCHELL"); DARRAL SCOTT ("SCOTT"); DEVONNE DOUGLAS, aka "DBO" ("DOUGLAS"); LAMARC SAUNDERS, aka "TINY DRAWS" ("SAUNDERS"); and others yet unknown (the "Target Communicators").

b. There is probable cause to believe that the Target Communicators, and other persons as yet unknown, have committed, are committing, and will continue to commit the Target Offenses described above.

c. There is probable cause to believe that particular oral communications of the Target Communicators, and other persons as yet unknown, concerning the Target Offenses will be obtained through the interception of oral communications occurring at the **Target Location.**

d. In particular, the communications to be intercepted will concern, and will provide evidence pertaining to, the goals of this investigation, including identifying and providing admissible evidence of the following: (a) acts taken in furtherance of the Target Offenses, including acts taken by co-conspirators of the

---

illegal gambling business contemplated by HENLEY, MITCHELL, and their associates will be in violation of Cal. Penal Code § 330 (prohibited games including "any banking or percentage game played with cards [or] dice…") and Cal. Penal Code § 332 (fraudulently obtaining money or property from another person).

[3] 18 U.S.C. § 1791 is not a predicate offense for the interception of communications under 18 U.S.C. § 2516.

Target Communicators involving racketeering acts such as murder, conspiracy to commit murder, extortion, robbery, and drug trafficking; (b) the knowledge and intent of the Target Communicators; (c) the identities and roles of Target Communicators' aiders and abettors and co-conspirators in the Target Offenses; (d) the manner in which the Target Communicators are committing the Target Offenses, including the nature, scope, dates, times, places, methods of operation, source of monies, and the methods by which the Target Communicators conceal such sources; (e) the administration, control, management and disposition of proceeds of the Target Offenses, including the manner which any proceeds are laundered; (f) the identification of shell companies and financial institutions used by the Target Communicators; (g) the existence of potential victims of the Target Offenses; (h) the existence and location of records concerning the Target Offenses; (i) the existence, location, and source of resources used to finance the illegal activities; and (j) attempts to conceal the Target Offenses (collectively, the "goals of the investigation").

e. Normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, as is described in further detail in the attached affidavit.

f. The attached affidavit contains a full and complete statement of the facts concerning all previous applications known to me and the authorizing individual made to any judge for authorization or approval of the interception of the wire, oral, or electronic

communications involving any of the same persons, facilities, or places specified in this application.

g. There is probable cause to believe that the **Target Location** has been, is being, and will continue to be used in connection with the commission of the Target Offenses.

WHEREFORE, IT IS HEREBY REQUESTED, based on the allegations set forth in this Application and on the attached affidavit, that this Court issue an Order, pursuant to Section 2518 of Title 18, United States Code, authorizing Special Agents of the Federal Bureau of Investigation ("FBI"), other duly authorized state and local law enforcement officers working under the supervision of the FBI, government personnel acting under the supervision of the FBI, and personnel acting under contract to and supervision of the FBI to intercept oral communications occurring within the **Target Location.**

IT IS FURTHER REQUESTED that such interceptions shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others conduct their illegal activities, but may continue until all communications are intercepted which fully reveal the manner in which the Target Communicators and others as yet unknown are committing the Target Offenses, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy, but not to exceed a period of thirty (30) days measured from the earlier of the day on which law enforcement officers first begin to conduct an interception under this Order or ten (10) days after the Order is entered.

Case 2:22-cr-00211-FLA Document 174-3 Filed 02/05/26 Page 15 of 90 Page ID #:5

IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 2518(3), interceptions will occur in the Central District of California, where communications within the **Target Location** will first be heard and minimized.

IT IS FURTHER REQUESTED that this Court direct that its Order be executed as soon as practicable after it is signed, and that all monitoring of oral communications be conducted in such a way as to minimize the interception and disclosure of communications not relevant to the investigation, or otherwise criminal in nature. Monitoring of interceptions must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, that none of the named Target Communicators or any of their confederates, when identified, are participants in the conversation, unless it is determined during a portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent may spot-check to determine if one of the named Target Communicators or their co-conspirators, when identified, is a participant, or if the conversation has turned to criminal matters. Special attention shall be given to minimize all privileged communications.

IT IS FURTHER REQUESTED that pursuant to 18 U.S.C. § 2518(5), in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may

Case 2:25-cr-00021-FLA Document 174-3 Filed 02/05/26 Page 16 of 90 Page ID #:1393

be accomplished as soon as practicable after such interception. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the Government, will be under the direct supervision of a federal agent.

IT IS FURTHER REQUESTED, that Special Agents of the FBI and/or contractors acting under their supervision be authorized to enter the Target Location surreptitiously, covertly, and by breaking and entering, if necessary, in order to install, maintain, and remove the surveillance equipment used by the FBI to intercept and record oral communications occurring within Target Location. The court will be notified of each surreptitious entry as soon as practicable.

IT IS FURTHER REQUESTED that the Court order an Assistant United States Attorney familiar with the facts of this case, to provide this Court with reports, after about the fifteenth day of the Interception Period, showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If a report should become due on a weekend or holiday, it is requested that such report shall become due on the next business day thereafter. If the Court's Order is extended for a further period of interception, it is requested that the application for extension may serve as the report on or about the thirtieth day.

IT IS FURTHER REQUESTED that no inventory or return of the results of the foregoing interception need be made, other than the above-required reports, before 90 days from the date of the expiration of this Order, or any extension of the Order, or at such time as the Court in its discretion may require.

IT IS FURTHER REQUESTED that, upon an ex parte showing of good cause to a judge of competent jurisdiction, the service of the above inventory or return may be postponed for a further reasonable period of time.

IT IS FURTHER REQUESTED that the Court's Order, the Application, Affidavit, and all interim reports filed with this Court with regard to this matter be sealed until further order of this Court, except that copies of the Order, in full or redacted form, may be served on the FBI as necessary to effectuate the Court's Order.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

EXECUTED at Los Angeles, California, on May 8, 2023.

KEVIN J. BUTLER
Assistant United States Attorney
Violent and Organized Crime Section

FILED
CLERK, U.S. DISTRICT COURT
06/06/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: TF DEPUTY

# AFFIDAVIT

I, Andrew James Roosa, being duly sworn, declare and state as follows:

## I. INTRODUCTION

### A. TRAINING AND EXPERIENCE

1. I am an investigative or law enforcement officer of the United States within the meaning 18 U.S.C. § 2510(7) who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. I am a Special Agent of the Federal Bureau of Investigation (the "FBI") and have been employed as such since September 2018. I am currently assigned to a Criminal Enterprise Squad at the Los Angeles Field Office of the FBI, where I am tasked with investigating violent gangs and organized criminal enterprises, in conjunction with the Los Angeles Metropolitan Task Force on Violent Gangs (the "LAMTFVG"), a multi-agency federal, state, and local gang task force and have been so assigned since March 2019. My experience as an SA with the FBI includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, working with informants, issuing subpoenas, analyzing pen register and trap and trace records, interviewing subjects and witnesses, consensually monitored meetings and telephone calls, and conducting court-authorized interception of wire communications. I have received training in the investigation of violations of federal law, including racketeering laws and federal drug conspiracy laws, and have personally participated in and assisted with several gang investigations involving racketeering and drug conspiracies.

3. I am currently one of the agents assigned to an investigation of EUGENE HENLEY JR., also known as ("aka") "BIG U," aka "DRAWS," aka "UNC" ("HENLEY"), and the Henley Racketeering Enterprise (the "Enterprise") occurring in Los Angeles, California. I have been participating in the investigation of the

Enterprise since March 2021. As shown and discussed in more detail below, HENLEY is widely regarded as the long-time leader of the Rollin 60's Neighborhood Crips Street Gang ("Rollin 60's") and the Enterprise, an organization distinct and separate from the Rollin 60's. During the investigation, the LAMTVG developed information that SYLVESTER ROBINSON, aka "VEY" ("ROBINSON"), collects extortion payments on behalf of HENLEY. With respect to extortion, the LAMTFVG developed information that some rap artists and professional athletes are required to pay HENLEY a fee when they visit Los Angeles. Based on my training, experience, and knowledge of the investigation, I believe the fees HENLEY collects from rap artists and professional athletes are extortion payments, which are required in exchange for HENLEY's protection from the gang violence that HENLEY would order if payments were not made. HENLEY, ROBINSON, and others are also engaged in other illegal activities in furtherance of the Enterprise. In 2021, the LAMTFVG developed information that members of the Enterprise travelled from Los Angeles, California to Las Vegas, Nevada and HENLEY murdered a rap artist working for HENLEY. Members of the Enterprise were then directed to cover up HENLEY's involvement in the murder.

4. This affidavit supports an application for an order authorizing, pursuant to 18 U.S.C. § 2518, the initial interception of oral communications and, pursuant to Rule 41 of the Federal Rules of Criminal Procedure and the All Writs Act, 28 U.S.C. § 1651, visual, non-verbal conduct of the Target Communicators specified below occurring within the confines of UNDER THE HOOD MUSCLE CARS, 1613 West 134th Street, Suite 3, Gardena, CA 90249, aka "Bear Claw's Shop," aka "the Shop," aka "the Car Place" (the "**TARGET LOCATION**"), further described below.

5. Based upon the investigation in this case, as set forth in detail below, there is probable cause to believe that HENLEY, ROBINSON, MARK MARTIN,

aka "BEAR CLAW" ("MARTIN"), DARRAL SCOTT, aka "FIVE," aka "FEEZY" ("SCOTT"), ZIHIRR MITCHELL, aka "BRICC," aka "BIG SHITTY" ("MITCHELL"), DEVONNE DOUGLAS, aka "DBO" ("DOUGLAS"), LAMARC SAUNDERS, aka "TINY DRAWS" ("SAUNDERS"), and others yet unknown (the "Targeted Communicators"), have committed, are committing, and will continue to commit violations of offenses enumerated in 18 U.S.C. § 2516.

6. I am familiar with the facts described in this affidavit based on involvement in this investigation, including:

a. my experience investigating complex criminal organizations and street gangs involved in extortion and the distribution of narcotics and firearms;

b. oral and written reports, and documents about this investigation I have received from members of the FBI, local law enforcement, and other federal law enforcement agencies;

c. discussions I have had personally concerning this investigation with experienced fraud, human trafficking, and money laundering investigators;

d. physical surveillance conducted by the FBI and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

e. public records;

f. telephone toll records, pen register and trap and trace information, and telephone subscriber information;

g. statements of confidential human sources ("CHS") and a Cooperating Witness ("CW");

h. intercepted recordings and telephone calls from the consensually monitored telephone of CHS-1;

Case 2:22-cr-00021-FL *SEALED* Document 174-3 Filed 06/26/23 Page 22 of 90 Page ID #:1022

i. intercepted telephone calls and electronic communications over one of HENLEY's telephones and intercepted calls over one of MARTIN's, ROBINSON's, and MITCHELL's telephones;

j. controlled extortion payments to HENLEY and ROBINSON;

k. consensually recorded meetings with HENLEY and ROBINSON;

l. financial statements and records.

7. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I have included summaries of conversations and text messages, which are subject to revision after further review and may represent only a portion of the exchanged information.

8. Based upon the investigation in this case as described below, there is probable cause to believe:

a. Targeted Communicators have committed, are committing, and will continue to commit the Target Offenses (as described below);

b. Investigators will obtain oral communications and visual, non-verbal conduct of the Targeted Communicators concerning the Target Offenses through the interception of the **TARGET LOCATION**, which Targeted Communicators are using in connection with the commission of the Target Offenses.

## II. PRIOR APPLICATIONS

9. On April 18, 2023, FBI Special Agent Ramesh Ganesh searched FBI electronic surveillance indices, as well as a search of the indices of ATF, ICE/HSI, DEA, USSS, and USPIS. I know of no other applications that have been made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same Targeted Communicators or the **TARGET LOCATION** specified in this affidavit, other than the following:

a. HENLEY was named as a principal in an FBI Los Angeles case 281C-LA0246605ELA, record number LA-CDCA 1033 on February 22, 2008, signed by United States District Judge John W. Walker in the Central District of California. This interception has terminated.

b. HENLEY was named as a principal in an FBI Los Angeles case 281D-LA-4612810, record number 16-CRIM-2311028 on August 18, 2016, and record number 16-CRIM-2021227 on July 20, 2016, both signed by United States District Judge Dolly M. Gee in the Central District of California. This interception has terminated.

c. On November 2, 2022, Judge Aenlle-Rocha signed an order in Case No. 2:22-CM-221-FLA authorizing the interception of wire and electronic communications; the installation and use of a pen register and trap and trace device; and the release of subscriber information and cell site information on Target Telephone #1, used by HENLEY, which ended on December 2, 2022 ("Prior Affidavit #1").

d. On December 20, 2022, Judge Aenlle-Rocha signed an order in Case No. 2:22-CM-221-FLA(A) authorizing the renewed interception of wire communications; the installation and use of a pen register and trap and trace device; and the release of subscriber information and cell site information on 323-251-9267 ("Target Telephone #1") used by HENLEY, which ended on January 19, 2023 ("Prior Affidavit #2").

e. On February 6, 2023, Judge Aenlle-Rocha signed an order in Case No. 2:22-CM-221-FLA(B) authorizing the renewed interception of wire communications; the installation and use of a pen register and trap and trace device; and the release of subscriber information and cell site information on Target Telephone #1, used by HENLEY; and the initial interception of wire communications; the installation and use of a pen register and trap and trace

device; and the release of subscriber information and cell site information on 657-966-8517 ("Target Telephone #2") and 470-620-8336 ("Target Telephone #3"), used by ROBINSON and MITCHELL, respectively, which ended on March 7, 2023 ("Prior Affidavit #3").

f. On March 24, 2023, Judge Aenlle-Rocha signed an order in Case No. 2:22-CM-221-FLA(C) authorizing the renewed interception of wire communications; the installation and use of a pen register and trap and trace device; and the release of subscriber information and cell site information on Target Telephone #1, used by HENLEY; Target Telephone #2, used by ROBINSON; and Target Telephone #3, used by MITCHELL; and the initial interception of wire communications; the installation and use of a pen register and trap and trace device; and the release of subscriber information and cell site information on 323-703-7362 ("Target Telephone #4"), used by MARTIN, which ended on April 25, 2023 ("Prior Affidavit #4").

g. The four affidavits that I submitted in support of interception are incorporated herein (collectively, with Prior Affidavit #1, #2, #3, and #4, the "Prior Affidavits").

## A. TARGETED COMMUNICATORS

10. This Affidavit shows that there is probable cause to believe that Targeted Communicators are using the **TARGET LOCATION** to commit the Target Offenses. I have reviewed public records, law enforcement databases, and criminal history records for the Targeted Communicators I was able to identify sufficiently. Based upon this review, the relevant criminal history and personal identifying information of the Targeted Communicators is as follows:

11. HENLEY, born November 29, 1966, lives at 4159 West 62nd Street, Los Angeles, California 90043. HENLEY is believed to discuss the Target Offenses inside of the **TARGET LOCATION**. He has a 1991 felony conviction for robbery

Case 2:25-cr-00021-FLA Document 38 Filed 06/25/23 Page 25 of 90 Page ID #:1025

that resulted in a 23-year prison sentence. HENLEY has been identified through source information, surveillance, financial records, and wire interception as being involved in the Target Offenses.

12. ROBINSON, born June 5, 1965, lives at 17720 Superior Street, Unit 111, Northridge, California 91325. ROBINSON has used multiple telephones in this investigation to commit the Target Offenses. ROBINSON has the access to discuss the Target Offenses inside of the **TARGET LOCATION**. ROBINSON defers to HENLEY's authority and completes all tasks assigned to him. During this investigation, HENLEY directed ROBINSON to collect cash representing extortion payments. ROBINSON has a pending case with the San Bernardino County Sheriff's Department for burglary. LAPD arrested ROBINSON on June 15, 2022, pursuant to that warrant, and seized a pistol from ROBINSON's vehicle during an inventory search.[1]

13. MARTIN, born December 2, 1974, lives at 5705 5th Avenue, Los Angeles, California 90043. Subpoena returns from Bank of America revealed that MARTIN is the Chief Financial Officer of DEVELOPING OPTIONS, a non-profit funded by the City of Los Angeles that purportedly provides gang violence reduction services.[2] He has a 1994 felony conviction for assaulting a person with a firearm that resulted in a seven-year prison sentence. Based on wire interceptions and review of pole camera footage, I believe that MARTIN operates the **TARGET LOCATION**. I have learned from wire interceptions over HENLEY's telephone that the **TARGET LOCATION** belongs to MARTIN. After reviewing multiple days of footage from the pole camera, I learned that MARTIN consistently opens and closes the **TARGET LOCATION** himself.

---

[1] The Los Angeles County District Attorney's Office rejected a prosecution of the case.

[2] HENLEY is the Chief Executive Officer of DEVELOPING OPTIONS.

14. SCOTT, born October 22, 1988, lives at 1242 South Norton Avenue, Apartment D, Los Angeles, California 90019. As set forth in more detail below, SCOTT tampered with evidence related to a homicide on behalf of HENLEY.

15. MITCHELL, born January 6, 1988, is a member of the Rollin 60's. MITCHELL conducts robberies for the Enterprise. He has a 2016 felony conviction for threatening crime with the intent to terrorize that resulted in a sentence of three years of probation and a 2020 felony conviction for robbery that resulted in a six-year prison sentence.

16. DOUGLAS, born May 18, 1974, lives at 1813 West 65th Street, Los Angeles, California 90043. Wire interception revealed that DOUGLAS stores firearms for members of the Enterprise. He has a criminal history that includes a 2015 felony conviction for firearms possession that resulted in a two-year prison sentence.

17. SAUNDERS, born August 30, 1985, lives at 1636 West 70th Street, Los Angeles, California 90047. As set forth in Prior Affidavit #3, Paragraphs 39 and 40, on March 3, 2023, SAUNDERS stored a firearm for HENLEY. While SAUNDERS is not a convicted felon, HENLEY is a convicted felon and prohibited from possessing firearms.

## B. TARGET LOCATION

18. This affidavit supports an application for an order authorizing, pursuant to 18 U.S.C. § 2518, the initial interception of oral communications and, pursuant to Rule 41 of the Federal Rules of Criminal Procedure and the All Writs Act, 28 U.S.C. § 1651, visual, non-verbal conduct of the Targeted Communicators occurring within the confines of UNDER THE HOOD MUSCLE CARS, 1613 West 134th Street, Suite 3, Gardena, CA 90249, aka "Bear Claw's Shop," aka "the Shop," aka "the Car Place" (the "**TARGET LOCATION**"), further described as follows:

a. The **TARGET LOCATION** is an automotive repair business located at 1613 West 134th Street, in an industrial park in the city of Gardena, California. The **TARGET LOCATION** is a single-story building in the industrial park between two other businesses. There is a parking lot immediately in the front of all the businesses in the industrial park, including the **TARGET LOCATION**. There is a garage-door entrance and a main entrance to the **TARGET LOCATION**. There is a security CCTV camera positioned on the wall above the garage door entrance to the **TARGET LOCATION**. On July 17, 2022, HENLEY posted on his Instagram account, which has a public profile, a video taken inside of the **TARGET LOCATION**. The inside of the **TARGET LOCATION** is accessible via a roll up gate. Based on my review of the video reel, there were at least six vehicles inside of the **TARGET LOCATION**. HENLEY and MARTIN were sitting next to vehicles. A standard door leading to an office was also visible in the video reel, as well as a basketball hoop attached to the wall and a poster, which read, "Under the Hood Muscle Cars."

*Figure 1*




*Figure 2*






USAO_040860

*Figure 3*




*Figure 4*



19. Additionally, it is requested that Special Agents of the FBI be authorized to enter the **TARGET LOCATION** surreptitiously, covertly, and by using force, if necessary, to install, maintain, and remove the Interception Devices[3] used by the FBI to intercept and record oral communications and visual, non-verbal conduct occurring within the **TARGET LOCATION**.

20. This Court has territorial jurisdiction to authorize the interception of oral communications and visual, non-verbal conduct sought in this application because the **TARGET LOCATION** is within the Central District of California, and all communications will therefore take place within the Central District of California.

21. As set forth in the Application, the FBI will execute the Order as soon as practicable after it is signed. All monitoring and recording of visual, non-verbal conduct conducted pursuant to this Court's Order will terminate upon the authorized objectives or, in any event, at the end of thirty (30) days measured from the date of the Court's order.

## C. TARGET OFFENSES

22. This Affidavit establishes that there is probable cause to believe the Targeted Communicators are using the **TARGET LOCATION** in connection with, and to facilitate the commission of, the following crimes: 18 U.S.C. § 1962 and 1963 (Racketeer Influenced and Corrupt Organizations ("RICO") offenses);[4] 18 U.S.C.

---

[3] The Interception Devices are audio and video transmitters/recorders that will be covertly affixed inside of the **TARGET LOCATION**.

[4] There is probable cause that the Targeted Communicators and their conspirators constitute an enterprise, that is, a group of individuals associated in fact. Members and associates of this enterprise are believed to have violated 18 U.S.C. § 1962(c) (RICO Substantive) and § 1962(d) (RICO conspiracy), which is punishable by 18 U.S.C. § 1963, by conducting and conspiring to conduct the affairs of an association-in-fact enterprise, which enterprise engaged in, and the activities of which affect, interstate or foreign commerce, through a pattern of racketeering activity consisting of acts involving extortion in violation of California state law and murder in violation of Nevada state law and acts indictable under Title 18, United

*(footnote cont'd on next page)*

Case 2:25-cr-00211-FLA Document 174-3 Filed 06/30/23 Page 30 of 90 Page ID #:1407

§ 1951 (interference with commerce by threats or violence), 18 U.S.C. § 922 (g) (felon in possession of a firearm or ammunition), 18 U.S.C. § 924(c) (use of a firearm in furtherance of a crime of violence or drug trafficking crime), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1955 (conducting an illegal gambling business[5]), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1014 (false statements in loan applications), 18 U.S.C. § 1791 (providing contraband in prison[6]), 21 U.S.C. § 841 (a)(1) (distribution of a controlled substance), 21 U.S.C. § 846 (conspiracy to distribute a controlled substance), 18 U.S.C. § 1952 (travel act unlawful activities), and California Penal Code § 187(a) (murder) (collectively, the "Target Offenses").

## III. GOALS OF THE INVESTIGATION

23. Based on my knowledge of the investigation, training and experience, I believe communications to be intercepted will identify and provide admissible evidence concerning:

a. the Target Offenses;

b. the knowledge and intent of the Targeted Communicators;

c. the identities and roles of Targeted Communicators' aiders and abettors and co-conspirators in the Target Offenses;

d. the acts taken in furtherance of the Target Offenses, including co-conspirators of the Targeted Communicators involved in extortion, robbery, drug

---

States Code, Section 1952. The Targeted Communicators use the **TARGET LOCATION** to arrange and coordinate the activities of this enterprise.

[5] 18 U.S.C. § 1955 defines "illegal gambling business" as a business which, among other things, is "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i). Here, there is probable cause to believe that the illegal gambling business contemplated by HENLEY, MITCHELL, and their associates will be in violation of Cal. Penal Code § 330 (prohibited games including "any banking or percentage game played with cards [or] dice...") and Cal. Penal Code § 332 (fraudulently obtaining money or property from another person).

[6] 18 U.S.C. § 1791 is not a predicate offense for the interception of wire communications under 18 U.S.C. § 2516.

Case 2:22-cr-00211-FLA Document 174-3 Filed 02/06/26 Page 6 of 90 Page ID #:1031

trafficking, firearms trafficking, human trafficking, money laundering and public corruption;

e. the manner in which the Targeted Communicators are committing the Target Offenses, including the nature, scope, dates, times, places, and methods of operation of the Target Offenses; the source of monies received by the Targeted Communicators and the methods by which they conceal these sources;

f. the administration, control, management and disposition of proceeds of the Target Offenses, including the manner which any proceeds are laundered;

g. the existence of potential victims of the Target Offenses;

h. the existence and location of records concerning the Target Offenses;

i. the acquisition and distribution of controlled substances and money by the Targeted Communicators and others unknown or unidentified;

j. the locations where controlled substances, records, money and contraband are stored;

k. the existence, location and source of resources used to finance the illegal activities;

l. attempts to conceal the Target Offenses; and

m. dismantling the Enterprise

(collectively, the "goals of the investigation").

24. As described in more detail below, although normal investigative procedures have been successful in initiating this investigation, those techniques have been tried and failed, or reasonably appear unlikely to succeed in achieving all of the objectives of this investigation or are too dangerous or too risky to employ or to continue to employ.

## IV. SUMMARY OF PROBABLE CAUSE

25. Since 2021, the FBI has been investigating HENLEY, MARTIN, and ROBINSON, the Targeted Communicators, and others, including members of the Rollin 60's street gang. As discussed below and in the Prior Affidavits, incorporated here by reference, authorized wire interceptions of telephones belonging to HENLEY, ROBINSON, and MARTIN have revealed that HENLEY and others are engaging in the Target Offenses. We also learned, as detailed below, that HENLEY is the lead suspect in a January 2021 homicide in Las Vegas, Nevada.

26. During the course of the investigation, the LAMTFVG learned that MARTIN operates the **TARGET LOCATION.** The LAMTFVG obtained a certified copy of the Grant Deed for 1613 W. 134th Street, Gardena, California 90249, where the **TARGET LOCATION** is located, from the Official Records Recorder's Office for Los Angeles County. The certified Grant Deed lists Halldale Partners LLC as the owner. According to information obtained from an FBI Undercover Employee on March 31, 2023, the **TARGET LOCATION** is known as UNDER THE HOOD MUSCLE CARS. According to information obtained from wire interceptions, HENLEY, ROBINSON, and MARTIN utilize the **TARGET LOCATION** as a base of operations to discuss the Target Offenses. Specifically, after Las Vegas detectives made inquiries about the 2021 homicide with Stacey Henley (S. Henley), HENLEY's wife, HENLEY immediately called MARTIN and directed him to meet him at the **TARGET LOCATION**. Based on my review of the intercepted communications and knowledge of the investigation, as set forth in more detail below, I believe HENLEY wanted to meet MARTIN at the **TARGET LOCATION** to discuss the homicide, thereby avoiding law enforcement interception. Surveillance of a pole camera revealed that HENLEY met with MARTIN for approximately six hours at the **TARGET LOCATION** following the call. Wire interception also revealed that

HENLEY directed ROBINSON to meet him at the **TARGET LOCATION** prior to an attempted extortion of an employee of a legal cannabis dispensary.

27. I anticipate that interception of the **TARGET LOCATION** is necessary for investigators to more fully identify the network of co-conspirators associated with the Targeted Communicators, including the true scope of operations of the Enterprise, the depth and breadth of the leadership structure of the Enterprise, the role played by the Rollin 60's, and key facilitation components, such as money launderers and others, who comprise the network operating in furtherance of the illegal activity described in the Target Offenses. Court-authorized wire interception, as set forth in more detail below, has revealed that HENLEY only discusses incriminating details related to various Targeted Offenses, such as RICO offenses, with other Targeted Communicators in person inside of the **TARGET LOCATION** in order to avoid law enforcement detection. I believe that the interception of oral communications and monitoring and recording of visual, non-verbal conduct will yield admissible evidence of these and the other goals of the investigation.

## V. STATEMENT OF PROBABLE CAUSE

### A. BACKGROUND OF THE ROLLIN 60's GANG AND THE HENLEY RACKETEERING ENTERPRISE

28. The Enterprise is comprised of associates of HENLEY, as well as members and associates of the Rollin 60's.[7] HENLEY is widely regarded as the long-time leader of the Rollin 60's. The Rollin 60's is a criminal street gang with approximately 1,600 documented members in South Los Angeles and multiple sets throughout the United States. While the Rollin 60's "territory" in Los Angeles has changed over time, it is generally understood to be contained from La Brea Avenue

[7] Although HENLEY uses his Rollin 60's affiliation for purposes of intimidation, the Henley Racketeering Enterprise is distinct from the Rollin 60's criminal street gang.

to the west, Arlington Avenue to the east, Florence Avenue to the South, and roughly Slauson Avenue to the north. Based on the strength of its numbers and its reputation for violence, the Rollin 60's gang controls drug trafficking, and other illegal activities within this territory. Rollin 60's members are commonly "jumped" into the gang, a process where a prospective member must fight multiple gang members at once. If Rollin 60's members were not jumped, they usually had familial ties to the gang or were vouched for by other Rollin 60's members.

29. In the television series Hip Hop Uncovered, which HENLEY executive produced, HENLEY explained the Rollin 60's was a large Crip gang known to instill fear in the community. In the 1980's, HENLEY rose to a prominent position in the Rollin 60's Los Angeles drug hierarchy. During this time, HENLEY earned a reputation as an "enforcer," or a person who intimidated through violence, for the Rollin 60's. Based on my training, experience, and knowledge of this investigation, I believe that HENLEY can extract extortion payments from victims because of a decades-long reputation he established as a member of the Rollin 60's. HENLEY is also the leader of the Enterprise, as further explained below. I submit that HENLEY is able to lead the Enterprise, an organization distinct and separate from the Rollin 60's, because of a decades-long reputation he established as a member of the Rollin 60's.

30. HENLEY is considered the boss, or "Unc," of the Enterprise, an organization that includes long-time confidants, lieutenants, or second tier level members that have proven trustworthy by HENLEY, and low-level members that conduct other criminal activities. Interceptions from the wiretaps, as set forth in more detail below, reveal that HENLEY surrounds himself with associates and individuals engaging in criminal activity on his behalf. Based on my knowledge of the totality of the investigation and my training and experience as an FBI SA, the following describes the structure of the Henley criminal enterprise. HENLEY is the

kingpin, or boss. He is commonly referred to as "Unc," "Big U," or "Draws" by other members of the Enterprise, confidential sources, Targeted Communicators, and other criminal elements and individuals in the Los Angeles area.

31. Several decades-old associates of HENLEY, or lieutenants, serve directly underneath HENLEY in the Enterprise. ROBINSON is considered the underboss, or second in charge. According to ROBINSON's statements during a consensually monitored meeting with CHS-1[8] on September 15, 2022, while ROBINSON is not a member of the Rollin 60's, he is aware that HENLEY was actively killing people and he is entrusted to collect money, or "tax," from businesses and individuals in the Los Angeles area, on behalf of the Enterprise. ROBINSON also plans robberies, or "plays," for HENLEY. ROBINSON has told CHS-1 that he often has to give HENLEY 90% of the proceeds of the robberies. On or about August 15, 2021 and August 16, 2021, CHS-1 conducted a consensually monitored meeting with ROBINSON and others. During the meeting, ROBINSON told CHS-1 that HENLEY is in charge, ROBINSON is second in command, and everybody else reports to them. ROBINSON also told CHS-1 during a consensually monitored telephone call that he only needs to report to HENLEY and nobody else. HENLEY told CHS-1 and others that he relies on ROBINSON to obtain supplies when threatening others, such as masks and tape. HENLEY, ROBINSON, and others are also engaged in other illegal activities.

32. MARTIN is considered to have a similar stature to ROBINSON in the Enterprise but, unlike ROBINSON, is a member of the Rollin 60's. MARTIN has

---

[8] CHS-1 has a criminal history that includes arrests for narcotics conspiracy and distribution, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), respectively, robbery, in violation of California Penal Code Section 211, as well as a felony conviction for human trafficking of a minor under the age of 18, in violation of California Penal Code Section 236.1(C). CHS-1 is receiving consideration in connection with a pending drug case from the United States Attorney's Office in the Southern District of Ohio for his/her cooperation with law enforcement.

been a confidant of HENLEY for decades, as he admits in the docuseries. On September 15, 2022, during a consensually monitored meeting between ROBINSON and CHS-1, ROBINSON told CHS-1 that ROBINSON and MARTIN know almost everything about HENLEY. According to financial records, MARTIN is also the chief financial officer of DEVELOPING OPTIONS. I have reviewed the financial records obtained throughout the investigation and believe that MARTIN is laundering money through DEVELOPING OPTIONS. MARTIN operates the **TARGET LOCATION** and is entrusted to take part in conversations about the Target Offenses.

33. DOUGLAS, SAUNDERS, SCOTT, and MITCHELL are considered lieutenants. Wire interception has revealed that DOUGLAS and SAUNDERS store firearms for HENLEY. SCOTT is also considered a lieutenant and, at HENLEY's direction, tampered with evidence several days after the homicide discussed below. According to wire interception, MITCHELL provides HENLEY with proceeds of various Target Offenses.

## B. HOMICIDE OF RAYSHAWN WILLIAMS AND IDENTIFICATION OF THE TARGET LOCATION

34. On the morning of January 25, 2021, North Las Vegas Police Department (NLVPD) detectives discovered the body of Rayshawn Williams ("Williams") lying in the desert near the Apex Landfill in North Las Vegas, Nevada. Williams had been shot multiple times and his body had been dragged and left in a ditch not far from Interstate 15. Hours before his homicide, Williams was seen at Jamal Rashid's ("Rashid") studio, located at 4311 East Oquendo Road, Las Vegas, Nevada 89120 ("the studio") with HENLEY. NLVPD investigation revealed that Williams was one of HENLEY's recording artists and was at the studio as a guest of

HENLEY. According to a witness ("Witness-1"),[9] HENLEY was one of the last people seen with Williams prior to the homicide. Witness-1 also stated that ROBINSON drove HENLEY to Las Vegas from Los Angeles in a dark grey Lexus.[10] NLVPD detectives obtained a court-ordered search warrant for AT&T records for two of HENLEY's telephones, Target Telephone #1 and 323-893-3652 ("Phone #2") (collectively, "HENLEY's phones"), for the week leading up to the homicide of Williams. According to Witness-1 and an analysis of HENLEY's phones, HENLEY and ROBINSON arrived in Las Vegas on January 23, 2021. On January 24, 2021, at approximately 7:04 p.m., HENLEY arrived at the studio. At approximately 8 p.m. or 9 p.m., Williams arrived at the studio and recorded a song from approximately 11 p.m. until midnight. On January 25, 2021, at approximately 12:37 a.m., HENLEY left the studio, and the dark grey Lexus was not at the studio. At approximately 12:58 a.m., HENLEY's phones were turned off in the vicinity of the studio. At approximately 1:13 a.m., surveillance footage of 5711 Roundrock Drive, Las Vegas, Nevada 89142, an Airbnb Williams was renting prior to the homicide ("the Airbnb"), revealed a dark grey or silver sedan arriving to the Airbnb. Williams exited the passenger side of the vehicle and entered the Airbnb. At approximately 1:20 a.m., Williams exited the Airbnb with a suitcase, put the suitcase in the trunk, and got in the dark grey or silver sedan, which departed. At

[9] Witness-1 is associated with the studio and has a criminal history that includes a 2020 misdemeanor arrest for soliciting prostitution. Witness-1 is not receiving any benefits for providing information about the homicide to NLVPD. Witness-1's information has been independently corroborated through interviews with family members of the victims and an analysis of historical cellular telephone tower data. Witness-1 did not know HENLEY well nor did Witness-1 ever meet SCOTT prior to the homicide. Witness-1 is motivated to cooperate with NLVPD because Witness-1 has a family member who works for law enforcement. For these reasons, I consider Witness-1 reliable.

[10] The Las Vegas Metropolitan Police Department's Forensic Laboratory compared DNA that the FBI surreptitiously collected from ROBINSON on February 17, 2022, and foreign DNA that was collected from the socks and shoes of Williams. The foreign DNA collected from Williams was not a match to ROBINSON's DNA.

approximately 2:15 a.m., both of HENLEY's phones were turned back on. Target Telephone #1 placed a call to ROBINSON, who Witness-1 reported was at the studio. At approximately 2:30 a.m. or 3 a.m., HENLEY returned to the studio alone in the dark grey Lexus and spoke with Witness-1. Williams body was found at approximately 9:00 a.m. One of the NLVPD detectives believed Williams died at that location after he observed the roadway contained a distinct patch of blood, which trailed down the hill from the roadway into the desert along with the drag marks. HENLEY's Phones departed Las Vegas to return to California at approximately 10:00 a.m.

35. On January 27, 2021, NLVPD detectives spoke with Williams' family and learned he lived in California and worked as a musician. The family explained Williams had recently been working with HENLEY and had previously lived at HENLEY's home for approximately four years. HENLEY arranged travel and living accommodations for Williams at the Airbnb in the Las Vegas area a few days earlier. NLVPD investigation revealed that Christian Archie, aka "Lucc" ("Archie"), a friend of Williams, spent the weekend in Las Vegas and visited Williams at the Airbnb. Archie told NLVPD detectives that HENLEY visited the Airbnb and asked Williams why he did not show up to the music studio to record on January 23, 2021. Archie also told them that Williams told HENLEY he did not have a ride to the studio, but HENLEY did not appear to be upset. Archie thought it was odd that HENLEY went to the Airbnb.

36. Witness-1 told NLVPD detectives that SCOTT removed video recording equipment from the studio a couple of days after the homicide. Witness-1 explained that three surveillance Digital Video Recording (DVR) devices had been removed from the studio and all security cameras were disabled. I spoke with Daniel Luca ("Luca") on April 7, 2021, who installed the DVR equipment at the recording studio. On January 31, 2021, Luca went to the studio to fix video cameras

Case 2:22-cr-00211-FLA Document 174-3 Filed 06/06/23 Page 40 of 90 Page ID #:1417

that were not working at the studio, after Rashid called Luca to fix them. Luca analyzed the equipment and concluded the DVR system was unplugged or turned off. Based on my training, experience, and knowledge of the investigation, I believe SCOTT tampered with the DVR system. I also believe that footage from the DVR system would have shown an altercation between HENLEY and Williams on the night of January 24, 2021.

37. During the course of the investigation, the LAMTFVG learned that MARTIN operates the **TARGET LOCATION**, which functions as an automotive repair shop. From February 14, 2023 to February 16, 2023, NLVPD detectives travelled to Los Angeles and attempted to interview HENLEY about the homicide. NLVPD detectives spoke with S. Henley, who told them HENLEY was not home. After the attempted interview, HENLEY met with MARTIN at the **TARGET LOCATION**.

## C. INTERCEPTION OF THE TARGETED COMMUNICATORS REVEAL MEETINGS AT THE TARGET LOCATION

38. On February 3, 2023, Judge Aenlle-Rocha authorized the renewed interception wire communications of Target Telephone #1, belonging to HENLEY, and the initial interception of wire communications of Target Telephone #2 and Target Telephone #3. The order was served, and interception began, on February 6, 2023. During interception, the LAMTFVG identified co-conspirators of the Target Offenses and, with the aid of GPS ping information and a pole camera, determined HENLEY, ROBINSON, and MARTIN met in person to discuss the Target Offenses at the **TARGET LOCATION**.

39. On or about February 14, 2023, at approximately 12:05 p.m., HENLEY, who was using Target Telephone #1, placed a call to MARTIN, who was using telephone number Target Telephone #4. During the call, HENLEY told MARTIN he wanted to meet with him at the **TARGET LOCATION** to discuss

HENLEY's involvement with the homicide. The following is a transcription of a portion of the conversation:

HENLEY: Uhh five detectives went by my house this morning. From uh Las Vegas. And uh said they wanted to talk to me. You hear me?

MARTIN: Yeah

HENLEY: [U/I] Umm probably let you know. [U/I] They was asking about Rayshawn and um told [static and call cuts out] um two year anniversary. Two year anniversary it was uhh they wanted to follow up and talk to everybody who was close and um where you at?

MARTIN: I'm at the shop

HENLEY: Alright I'm pulling up on you.

MARTIN: 'Ight.

40. Based on my training, experience, and knowledge of the investigation, I believe HENLEY directed MARTIN to speak with him in the **TARGET LOCATION** to avoid speaking with him about the homicide over the telephone. As discussed above, I know that NLVPD considers HENLEY to be the only suspect in the homicide and was the last person seen with Williams. When HENLEY said, "five detectives went by my house this morning. From uh Las Vegas. And uh said they wanted to talk to me," I believe HENLEY was telling MARTIN, one of his closest associates, that detectives from NLVPD wanted to speak with HENLEY about his involvement in the homicide. I also believe that HENLEY wanted to avoid speaking about the homicide over the phone and instead use the **TARGET LOCATION** as a platform to discuss his culpability related to the homicide. When HENLEY said, "they was asking about Rayshawn" and "they wanted to follow up and talk to everybody who was close," I believe HENLEY was informing MARTIN that the NLVPD specifically wanted to speak about HENLEY's involvement with the homicide of Williams. When HENLEY asked, "where you at?" and MARTIN

responded, "I'm at the shop," I believe MARTIN was telling HENLEY that he was at the **TARGET LOCATION**. Further, I believe HENLEY was trying to be discreet while using Target Telephone #1 to avoid divulging details related to the homicide until he met with MARTIN at the **TARGET LOCATION**. Based on my review of the intercepted calls throughout the investigation, I know that HENLEY believes the FBI is intercepting his telephone calls. When HENLEY said, "alright I'm pulling up on you," I believe HENLEY was telling MARTIN that he would meet with him inside of the **TARGET LOCATION** to discuss his involvement with the homicide to avoid such interception.

41. Following the call to MARTIN, HENLEY immediately placed multiple calls to SCOTT. The first few calls were not answered. On or about February 14, 2023, at approximately 12:05 p.m., HENLEY, who was using Target Telephone #1, placed a call to SCOTT, who was using telephone number 424-335-1090. During the call, HENLEY told SCOTT he needed to meet with him. The following is a transcription of a portion of the conversation:

HENLEY: Where you at?

SCOTT: At the house, ready to jump in the shower. What you on?

HENLEY: I need to pull up on you.

SCOTT: 'Ight I'm right here at the house.

HENLEY: 'Ight I gotta pull up on you and [UI]

SCOTT: How long you gonna be?

HENLEY: You ain't bout to go no where are you?

SCOTT: Nah I'm [UI]

HENLEY: Okay.

SCOTT: I'll just jump in the shower though just to be ready though

HENLEY: Okay

SCOTT: Alright for sure

42. Based on my training, experience, and knowledge of the investigation, I believe HENLEY needed to meet with SCOTT in person to discuss NLVPD's presence in Los Angeles and SCOTT's involvement as an accessory to the homicide. When HENLEY asked, "where you at," I believe he wanted to meet with SCOTT in person. When SCOTT asked, "what you on," I believe he wanted to know why HENLEY was calling him repeatedly. As discussed above, I know that SCOTT removed evidence of HENLEY and Williams' presence at the studio hours before the homicide. When HENLEY said, "I need to pull up on you" and asked, "you ain't bout to go no where are you," I believe he wanted to meet with SCOTT at SCOTT's residence as soon as possible to discuss SCOTT's involvement with the Target Offenses. Based on my review of follow-up wire interceptions and GPS ping data for Target Telephone #1, I believe HENLEY and SCOTT met inside of HENLEY's vehicle outside of SCOTT's residence.[11] I believe this behavior is consistent with the fact that HENLEY does not discuss facts related to the Williams Homicide over the phone, instead choosing to discuss such matters in person.

43. I reviewed pole camera footage of the **TARGET LOCATION** and GPS ping data for Target Telephone #1 for February 14, 2023. At approximately 12:34 p.m., HENLEY entered the **TARGET LOCATION**. Based on my review of the footage, MARTIN was at the **TARGET LOCATION** when HENLEY arrived. HENLEY and MARTIN did not leave the **TARGET LOCATION** until approximately 6 p.m. Based on my training, experience, and knowledge of the aforementioned wire interception, I believe HENLEY and MARTIN discussed HENLEY's involvement with the homicide inside of the **TARGET LOCATION**.

44. On or about February 14, 2023, at approximately 3:59 p.m., ROBINSON, who was using telephone number Target Telephone #2, made an outgoing call to HENLEY, who was using Target Telephone #1 and, based on my

[11] The LAMTFVG was unable to conduct surveillance of the meeting.

review of the pole camera footage and GPS pings, inside of the **TARGET LOCATION**. During the call, HENLEY directed ROBINSON to meet him at the **TARGET LOCATION** to discuss the financial extortion of an employee of the legal cannabis dispensary ERBA. The following is a transcription of a portion of the conversation:

HENLEY: What up bro?

ROBINSON: Y'all going to AG?

HENLEY: Nah, we at uh the car place.

ROBINSON: Oh yeah, well we can make that move.

HENLEY: Krita on um, at AG, waiting on him.

ROBINSON: Aight, well I'm on my way.

**45.** Based on my training, experience, and knowledge of the investigation, I believe HENLEY was directing ROBINSON to meet him to discuss the extortion of the ERBA employee. I know that MARTIN works on vehicles at the **TARGET LOCATION** and the **TARGET LOCATION** is referred to as the "Shop" and "Car Place." When ROBINSON asked, "y'all going to AG?" and HENLEY said, "nah, we at uh the car place," I believe HENLEY was telling ROBINSON that he was with MARTIN at the **TARGET LOCATION**. When ROBINSON said, "we can make that move," I believe he was using coded language to tell HENLEY that he would extort the ERBA employee for HENLEY. When ROBINSON said "I'm on my way," I believe he was telling HENLEY that he would meet with HENLEY at the **TARGET LOCATION** to further discuss their extortion activities in person, rather than using the telephone.[12]

**46.** On or about February 14, 2023, at approximately 5:34 p.m., HENLEY, who was using telephone number Target Telephone #4, a phone that I know is

---

[12] Based on my review of a GPS ping on Target Telephone #2 and the pole camera, I was not able to confirm whether ROBINSON met with HENLEY and MARTIN at the **TARGET LOCATION** following the call.

primarily used by MARTIN, made an outgoing call to ROBINSON, who was using Target Telephone #2. Based on my review of the pole camera footage, HENLEY, who arrived to the **TARGET LOCATION** a couple of hours earlier and was with MARTIN inside of the **TARGET LOCATION**, directed ROBINSON to go to ERBA and collect an extortion payment from an unidentified male ("Victim 4"). The following is a transcription of a portion of the conversation:

HENLEY: I smacked the Jew Boy again.

ROBINSON: We just left the first spot.

HENLEY: Yall find him?

ROBINSON: No, they said he wasn't there, so I asked for the manager and I gave him the spiel.

HENLEY: What'd he say?

ROBINSON: That nigga just like got nervous and start walking away, and like alright alright ok ok, so I'm going to the next one.

HENLEY: It's another spot.

ROBINSON: Yeah two of em.

HENLEY: I'ma tell him one was visited, (UI).

ROBINSON: Uh shit it don't matter, but fo sho one was visited fo sho, the one on um, Pico.

HENLEY: Yeah you visited the last one, go on and go, check out wifey.

ROBINSON: Alright.

HENLEY: We gonna let em think for a while, you told him he had to take care of that lady.

ROBINSON: Yeah I told him he owes two people money, he know who he owe and if he don't pay, we gonna let him make a payment plan, if he don't pay we gonna shut this mother fucker down. Walked out that mother fucker, but

the white boy walking away as I was talkin, he like ok ok ok, what's your last name, you don't need to know my last name motha fucka.

HENLEY: You should of gave him the lady name.

ROBINSON: Alright I will at this one, do we have it.

HENLEY: Yeah Krita got it written on the paper, give him the information, tell him he need to take care of that, he know what he needs to take care.

ROBINSON: Alright.

HENLEY: He got a hundred and something bucks from the lady, she possed to get invested in this woowoo shit right here, and then she gonna get her pay, some kinda pay UI or is gonna be a fuckin misunderstanding for the whole establishment.

ROBINSON: Alright, see I didn't know how much or none of that, and I didn't know Krita had the lady name, he was standing right there, alright I get the name on this one, I'll play the name.

HENLEY: Call me when yall get there so I can make sure, where yall, what area.

ROBINSON: Uh, the one was like, we going to UI right now, and that one was like West LA.

47. Based on my training, experience, and knowledge of the investigation, I believe HENLEY, who was using MARTIN's phone inside the **TARGET LOCATION** and directed ROBINSON to meet him at the **TARGET LOCATION**,[13]

---

[13] I am not always able to discern the faces of Targeted Communicators arriving to and/from the **TARGET LOCATION**. When I am reviewing already recorded data, I am unable to zoom in to accurately discern faces. While I'm watching live, I'm able to manipulate the camera and zoom in and out. During the time of this interception, HENLEY and ROBINSON were switching vehicles. Based on my training and experience, I believe it is possible ROBINSON could have visited the **TARGET LOCATION** in a different vehicle, other than the ones I am accustomed to observing ROBINSON driving. It is also possible ROBINSON did not go to the **TARGET LOCATION** and had a pre-briefing with HENLEY on different

*(footnote cont'd on next page)*

Case 2:22-cr-00211-FLA Document 174-3 Filed 06/06/23 Page 47 of 90 Page ID #:1047

and ROBINSON were planning to extort Victim 4, who is associated with the legal cannabis dispensary ERBA in west Los Angeles.[14] When ROBINSON said, "we just left the first spot" and "I'm going to the next one," I believe ROBINSON was discreetly referring to ERBA locations throughout Los Angeles to search for Victim 4, which HENLEY wanted to brief ROBINSON on inside of the **TARGET LOCATION**. When ROBINSON said, "he owes two people money, he know who he owe and if he don't pay, we gonna let him make a payment plan, if he don't pay we gonna shut this motherfucker down," I believe that if Victim 4 does not make a payment, ROBINSON and HENLEY will extort him and shut down the ERBA location he works at. When HENLEY said, "she gonna get her pay, some kinda pay (UI) or is gonna be a fuckin' misunderstanding for the whole establishment," I believe HENLEY is telling ROBINSON that if an unknown female (UF) does not receive her payment from Victim 4, the entire business will be subject to extortion. Further, I believe this call demonstrates that HENLEY uses the **TARGET LOCATION** as a platform to openly discuss the illegal activities of the Enterprise.

48. On or about February 15, 2023, at approximately 1:41 p.m., HENLEY, who was using Target Telephone #1, made an outgoing call to MARTIN, who was using telephone number Target Telephone #4. During the call, HENLEY directed MARTIN to meet him at the **TARGET LOCATION** to discuss one of the homicide witnesses. The following is a transcript of a portion of the conversation:

HENLEY: Did 'fat boy' call you?

---

phone or encrypted application. I know that HENLEY and ROBINSON use multiple devices and telephones, so it is possible, in spite of HENLEY and ROBINSON's plan to discuss the extortion at the TARGET LOCATION, ROBINSON decided to not visit the TARGET LOCATION following the call and prior to going to the ERBA locations. Based on my review of GPS ping data for Target Telephone #2, the next instances I was able to observe ROBINSON at the **TARGET LOCATION** were on February 17, 2023, and February 18, 2023.

[14] The LAMTFVG has not yet ascertained which ERBA location Victim 4 works at; we will make an effort to interview Victim 4 once I am able to identify him.

MARTIN: Nah uhhh (Long Pause)

HENLEY: Yeah. Yeah they went there.

MARTIN: Yeah

HENLEY: You know what I'm talking about.

MARTIN: No. I know what you talking about. Yeah yeah yeah yeah yeah yep.

HENLEY: Yeah. Yeah he said they showed him a a video. I'll pull up on you though.

MARTIN: Aight

49. Based on my training, experience, and knowledge of the investigation, I believe HENLEY directed MARTIN to meet with him inside of the **TARGET LOCATION** to discuss Christian Archie ("Archie"), a witness to the homicide. I further believe HENLEY wanted to discuss the witness at the **TARGET LOCATION** to avoid law enforcement wire interception. I know that NLVPD interviewed Nathan Martin ("N. Martin"), who is also known as "Fat Boy," in an effort to locate and speak with Archie, approximately one hour prior to this wire interception. When HENLEY said, "did 'fat boy' call you" and "they went there," I believe he was questioning whether MARTIN learned about NLVPD's interview of N. Martin. When HENLEY said, "you know what I'm talking about," I believe HENLEY was using code to remind MARTIN about previous conversations they had related to the homicide inside of the **TARGET LOCATION** and to avoid discussing the murder witness over the telephone. I also know that NLVPD showed N. Martin a video of Archie, his nephew, leaving the Airbnb one day before the homicide. When HENLEY said, "he said they showed him a a video," I believe he was telling MARTIN that N. Martin told HENLEY that NLVPD showed N. Martin the video of Archie leaving the Airbnb one day before the homicide. When HENLEY said, "I'll pull up on you though," I believe he was directing MARTIN to speak about

Archie, the witness, at the **TARGET LOCATION**, so that he could openly discuss his involvement with the homicide of Williams.

50. I reviewed pole camera footage of the **TARGET LOCATION** and GPS ping data for Target Telephone #1. At approximately 2:30 p.m. on February 15, 2023, HENLEY entered the **TARGET LOCATION**. Based on my review of the footage, MARTIN was at the **TARGET LOCATION** when HENLEY arrived. HENLEY and MARTIN did not leave the **TARGET LOCATION** until approximately 4 p.m. Based on my training, experience, and knowledge of the investigation, I believe HENLEY and MARTIN discussed Archie and HENLEY's involvement with the homicide inside of the **TARGET LOCATION**.

**D. RECENT ACTIVITY AT THE TARGET LOCATION**

51. The Targeted Communicators continue to utilize the **TARGET LOCATION** as a meeting location. During the period of March 27, 2023, to April 25, 2023, from my observations from the pole camera, GPS ping data, and physical surveillance, MARTIN has been observed at the **TARGET LOCATION** on 24 occasions. I observed MARTIN meeting with multiple unidentified individuals as they entered the **TARGET LOCATION**. During multiple surveillances and observations made on the pole camera, the LAMTFVG has observed MARTIN and MARTIN's vehicle at the **TARGET LOCATION** as recently as April 25, 2023, the date wire interception ended. An FBI Undercover Employee spoke with MARTIN as he/she was exiting the **TARGET LOCATION** on March 31, 2023.

52. During the past 21 days, HENLEY was either observed at the **TARGET LOCATION** or the GPS ping for Target Telephone #1 placed HENLEY's phone at the **TARGET LOCATION**. From my review of the pole camera and GPS ping data for Target Telephone #1 and Target Telephone #4 on April 15, 2023, I observed MARTIN and HENLEY meeting at the **TARGET LOCATION** at approximately 3:23 p.m. At that time, I also observed multiple unidentified males

meeting with MARTIN and HENLEY at the **TARGET LOCATION**. On March 31, 2023, April 7, 2023, April 8, 2023, and April 14, 2023, I observed the GPS ping for Target Telephone #1 near the **TARGET LOCATION**. The LAMTFVG did not intercept any wire communications setting up a meeting between MARTIN and HENLEY on that date. As such, based on my training, experience, and knowledge of the investigation, I believe that MARTIN and HENLEY are discussing more racketeering offenses at the **TARGET LOCATION** with unidentified co-conspirators, in addition to the 2021 homicide and extortion.

53. Based on my review of GPS ping data for Target Telephone #2, I observed ROBINSON at the **TARGET LOCATION** on five different dates of GPS tracking out of 60 total days of review, as recently as April 21, 2023. While GPS ping data was active on Target Telephone #2, I observed that ROBINSON routinely turned off Target Telephone #2 for hours at a time. Likewise, the large uncertainty of the GPS ping radius provided to me by the telephone provider for Target Telephone #2 made it frequently difficult to ascertain ROBINSON's location. Based on my review of GPS ping data for Target Telephone #3, I observed MITCHELL at the **TARGET LOCATION** on April 16, 2023.

54. I believe that the Targeted Communicators continue to use and will continue to use the **TARGET LOCATION** as a base of operations to discuss their racketeering activities, especially following LAMTFVG-planned interviews related to the homicide and extortion.

## VI. NECESSITY

55. Based upon my training and experience, as well as the experience of the other Special Agents of the FBI with whom I have spoken about this investigation, and based upon all of the facts set forth herein, I believe that the requested interception of oral communications and visual, non-verbal conduct is necessary to establish a reasonable likelihood of meeting the goals of the

Case 2:22-mj-04211-FLA Document 174-3 Filed 06/02/23 Page 52 Of 90 Page ID #:1052

investigation, which I have described above. As set forth below, normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if tried, and/or are too dangerous. For example, physical surveillance, mail covers, and trash covers alone will not aid in intercepting conspiratorial conversations that are in furtherance of the Target Offenses.

## A. PREVIOUSLY INTERCEPTED COMMUNICATIONS

### 1. The Instant Investigation

56. On November 2, 2022, the Honorable Fernando L. Aenlle-Rocha ("Judge Aenlle-Rocha"), a United States District Judge in the Central District of California, authorized the interception of wire and electronic communications of Target Telephone #1, used by HENLEY. The order was served, and interception occurred from November 3, 2022, to December 2, 2022. During interception, the LAMTFVG was able to identify potential victims of extortion, identify co-conspirators of the Target Offenses, identify potential links to elected public officials of Los Angeles, corroborate information provided by CHS-1, and conduct physical surveillance of HENLEY with the aid of GPS ping information. The LAMTFVG also determined that ROBINSON used telephone number 657-966-8517 and MITCHELL used 470-620-8337 in furtherance of the Target Offenses.

57. On December 20, 2022, Judge Aenlle-Rocha authorized the renewed interception of wire communications of Target Telephone #1. The order was served, and interception occurred from December 21, 2022, to January 19, 2023. During interception, the LAMTFVG identified additional co-conspirators of the Target Offenses and developed information about new Target Offenses.

58. On February 3, 2023, Judge Aenlle-Rocha authorized the renewed interception of wire communications of Target Telephone #1 and the initial interception of wire communications of telephone numbers 657-966-8517 and 470-620-8337. The order was served, and interception occurred from February 6, 2023,

to March 7, 2023. During interception, the LAMTFVG identified other potential victims of extortion and other co-conspirators of the Target Offenses and determined HENLEY, ROBINSON, and MARTIN use the **TARGET LOCATION** to discuss their involvement in the Target Offenses.

59. On March 24, 2023, Judge Aenlle-Rocha authorized the renewed interception of wire communications of Target Telephone #1 and telephone numbers 657-966-8517 and 470-620-8337, as well as the initial interception of telephone number Target Telephone #4. The order was served, and interception occurred from March 27, 2023, to April 25, 2023. During interception, the LAMTFVG has learned about HENLEY, ROBINSON, MITCHELL, MARTIN, and SCOTT's plans to rob and/or extort unknown persons. Interception is ongoing and will expire on April 25, 2023.

60. This affidavit seeks an initial order authorizing interception of oral communications and visual, non-verbal conduct of the Targeted Communicators' involvement in racketeering activity. From the wire interceptions, we have learned about the Targeted Communicators' racketeering enterprise. We also identified co-conspirators who were not previously identified. However, the wiretaps have not provided several pieces of key evidence that I expect to obtain upon installation of the requested audio and video surveillance in the **TARGET LOCATION**.

61. First, the wiretaps have not captured the full scope of the Targeted Communicators' commission of the Target Offenses, and the Targeted Communicators intentionally avoid discussing certain facts related to the Target Offenses over the phone. For example, as set forth above, on February 14, 2023, HENLEY met with MARTIN for several hours at the **TARGET LOCATION** to discuss his involvement in the homicide in person and to avoid law enforcement's interception of HENLEY's telephone. Second, following the meeting, the number of pertinent communications intercepted from HENLEY's telephone decreased

significantly. Based on my training and experience, I believe HENLEY and the other Targeted Communicators will speak more candidly in the **TARGET LOCATION**, where they would not suspect law enforcement interception. The audio and visual evidence of those interactions that would be recovered through the proposed interception is not something that would be obtained through additional wiretaps of the telephones of the Targeted Communicators. Third, the wiretaps have revealed continuations of conversations that have occurred either in-person or on encrypted messaging applications. Because many of the telephone calls are either coded or conversations continued at a later time, in-person, it is not possible to fully achieve the goals of the investigation without the combination of audio and video recording from within the **TARGET LOCATION**.

62. Finally, I believe the **TARGET LOCATION** is a location where the Targeted Communicators, specifically HENLEY, MARTIN, and ROBINSON, feel safe to discuss their actions related to racketeering conspiracy. In February 2023, the LAMTFVG and NLVPD signaled to the Targeted Communicators that they were being investigated for the homicide. Following every interview, HENLEY and MARTIN specifically chose to meet at the **TARGET LOCATION**. As such, I believe court-authorized surreptitious installation of video and audio interception devices within the **TARGET LOCATION** will address these gaps identified during the wiretaps related to the homicide and extortionate activities.

63. At the same time, though, wire interception in this investigation has provided significant value and evidence towards achieving the goals of this investigation. For this reason, I am continuing to seek wire interception of phones for HENLEY, ROBINSON, and MITCHELL, and the initial wire interception of a phone for SCOTT, in conjunction with surreptitious installation of video and audio interception devices at the **TARGET LOCATION**. The instant investigation has demonstrated that HENLEY and ROBINSON discuss the victims of their

extortionate activities over the telephone. However, the interceptions have not provided enough information to fully satisfy the goals of this investigation. With the concurrent interception of the **TARGET LOCATION**, Target Telephone #1, and Target Telephone #2, I believe the LAMTFVG will be able to fully satisfy the goals of this investigation related to extortion. I plan on conducting interviews of HENLEY and ROBINSON's victims during interception. I also plan on conducting an interview of ROBINSON. As a result of these interviews, with concurrent interception, I believe HENLEY and ROBINSON will discuss their criminal activity related to the LAMTFVG's investigation at the **TARGET LOCATION**, or over Target Telephone #1 and Target Telephone #2.

64. Wire interception has revealed that MITCHELL provides HENLEY with the proceeds of his racketeering activities, specifically robbery. As such, I plan on continuing interception of Target Telephone #3 to assist with interception at the **TARGET LOCATION**. I plan on conducting additional search warrants of MITCHELL while intercepting Target Telephone #3. I believe HENLEY will discuss MITCHELL's involvement in his racketeering conspiracy at the **TARGET LOCATION**. Wire interception and NLVPD's investigation has also revealed that SCOTT is involved with the homicide and provides HENLEY with firearms. I plan on conducting an interview of SCOTT, in conjunction with court-authorized interception of the **TARGET LOCATION** and one of his telephones ("Target Telephone #5"). Based on my interview of SCOTT, I anticipate that HENLEY and MARTIN will discuss SCOTT's involvement in the homicide at the **TARGET LOCATION**.

2. Telephones/Devices Intercepted in Other Investigations

65. HENLEY has been intercepted in prior Title III applications signed by the Honorable Dolly M. Gee, on July 20, 2016, and August 18, 2016, that have since expired. HENLEY was intercepted speaking with a narcotics trafficker, but was

not charged. HENLEY was also intercepted in a prior Title III application signed by an unknown United States District Judge in the Central District of California, on February 22, 2008. The previous wire and electronic interceptions did not capture any information related to HENLEY's role in the current investigation.

**B. PEN REGISTERS AND TELEPHONE RECORDS**

66. Courts have issued orders authorizing the installation and use of a pen register and trap and trace device on Target Telephone #1, Target Telephone #2, Target Telephone #3, Target Telephone #4, and other telephones used by HENLEY and ROBINSON related to this investigation. Investigators have also obtained toll records for telephones related to this investigation through the issuance of administrative subpoenas. We will continue to seek and use pen registers, trap and trace devices, and toll record analysis during this investigation. Pen register and toll information provide frequency and identifying information regarding calls made from a particular telephone. This technique, however, will only provide agents with a list of numbers called and will not establish the identities of all the persons called or the contents of the conversations, which take place in person at the **TARGET LOCATION**.

67. Moreover, based on my training and experience, I know that members of criminal enterprises often subscribe to telephones in fictitious names or use the names of family members and other associates when subscribing to phone service in an attempt to thwart law enforcement investigation of their illegal activities. In this investigation, I have issued administrative subpoenas for numbers used by the other Targeted Communicators and other associates.

68. A trap and trace device is simply a complement of a pen register device. It identifies the telephone number of any telephone that has dialed the target phone, but it is also subject to the same limitations of a pen register. For all the reasons stated above, pen register, trap and trace devices, and toll analysis are

Case 2:25-cr-00021-FLA Document 174-3 Filed 02/05/26 Page 56 of 90 Page ID #:1434

all valuable investigative tools, but will not by themselves achieve the goals of the government's investigation.

69. Review of the pen registers and telephone records has led to newly identified numbers believed to be used by some of HENLEY's extortion victims as well as co-conspirators of his drug distribution, firearm, human trafficking, and public corruption activity. While the results were helpful, the LAMTFVG heavily depended on wire communication interception to receive content from the communications.

## C. CONFIDENTIAL SOURCES

70. It is my experience that confidential sources provide significant value to investigations, but their information is normally limited, in that it is either furnished by a subject or learned secondhand from others. I believe that this information would not, without the evidence sought by this application, result in a successful prosecution of all Targeted Communicators.

71. In the present case, several confidential sources have been developed by the LAMTFVG. Although each confidential informant has been able to provide information in varying degrees regarding the Targeted Communicators and the Rollin 60's, the information, by itself, is insufficient to achieve the goals and objectives of this investigation for the following reasons.

### 1. CHS-1

72. In the present case, CHS-1 provided information on several Targeted Communicators operating on behalf of HENLEY since July 2021. CHS-1 has provided information about the activities of HENLEY, ROBINSON, MARTIN, DOUGLAS, and MITCHELL. CHS-1 has positively identified these individuals from their California driver's license photographs. CHS-1 was limited to providing information obtained from consensually monitored recordings of HENLEY and ROBINSON. CHS-1 has the ability to continue to consensually record telephone

calls and meetings with HENLEY and ROBINSON. However, CHS-1 is limited in his/her ability to record conversations with HENLEY and ROBINSON and is not able to meet with HENLEY, ROBINSON, or other Targeted Communicators at the **TARGET LOCATION**. CHS-1 is not a trusted insider and has been victimized by both HENLEY and ROBINSON. CHS-1 also has not been able to obtain more data regarding other victims of HENLEY's extortion activities. This is because CHS-1 is afraid of HENLEY and ROBINSON. CHS-1 is able to testify in spite of his/her fear of retaliatory acts of HENLEY, ROBINSON, and the other Targeted Communicators.

73. CHS-1's criminal history, pending charges, and benefits are described above.[15] CHS-1's information concerning HENLEYand ROBINSON has been corroborated by CHS-2, physical surveillance, video-recorded controlled extortion payments, and consensually recorded meetings and phone calls that CHS-1 has had with HENLEY and ROBINSON. CHS-1's information about HENLEY and ROBINSON has never been found to be false or misleading.

74. CHS-1 is involved with the sale of marijuana at a dispensary. In November 2021, HENLEY demanded CHS-1 operate a marijuana dispensary on his behalf. HENLEY expected CHS-1 to find a location for a marijuana dispensary, pay for the lease of space, and identify clients interested in marijuana products. CHS-1 is not expected to procure the marijuana from suppliers or manage the distribution of the marijuana products. Since the FBI obtained authorization for CHS-1 to participate in the illegal activity, the FBI has complied with precautionary measures to ensure CHS-1's participation is closely monitored. From CHS-1's

[15] On January 15, 2023, the LAPD arrested CHS-1 for pandering. The court case is still pending.

participation in the illegal activity, the FBI has obtained consensually recorded meetings related to HENLEY and ROBINSON's illegal activities.[16]

2. CHS-2

75. CHS-2 has provided information on HENLEY and other associates of HENLEY. CHS-2 was limited to providing information he/she received from an acquaintance of HENLEY. CHS-2 does not have the ability to consensually record conversations with HENLEY nor the ability to meet with Targeted Communicators at the **TARGET LOCATION**. While CHS-2 does have the ability to consensually record conversations with one of HENLEY's associates, CHS-2 fears for his/her safety if he/she were to develop a closer relationship with him. CHS-2 has been providing information to the FBI since October 2020. CHS-2 has provided information on HENLEY's involvement in human trafficking activities. However, the LAMTFVG has not yet been able to corroborate the information. CHS-2 does not live in Los Angeles and does not have immediate access to HENLEY.

76. CHS-2 has a criminal history that includes possession of a controlled substance and public lewdness. CHS-2 has received monetary compensation in return for his/her information and assistance on other FBI investigations. CHS-2 has not received any monetary compensation or other benefits in return for his/her information related to HENLEY. CHS-2's information has been corroborated through debriefs of CHS-1 and consensually recorded meetings and telephone calls made by CHS-1. CHS-2's information has never been found to be false or misleading

3. CHS-3

77. CHS-3 does not have access to the Targeted Communicators or **TARGET LOCATION** and has limited access to Rollin 60's gang members involved in narcotics distribution. Although CHS-3 was able to make multiple controlled

[16] CHS-1 is no longer working at the illegal marijuana dispensary.

Case 2:25-cr-00021-FLA Document 174-3 Filed 06/06/23 Page 60 of 90 Page ID #:1437

narcotics purchases from a Rollin 60's gang member, the LAMTFVG is unable to use CHS-3 anymore for this investigation. This is because CHS-3 provided extensive assistance for another FBI investigation since June 2019 and his/her assistance is widely suspected amongst multiple gangs in the Los Angeles area. CHS-3 is able to testify about the information he/she has already provided on the Rollin 60's.

78. CHS-3 has received parole benefits and monetary compensation for his/her assistance with another FBI investigation. CHS-3 has also received monetary compensation for his/her assistance with the FBI's investigation into the Rollin 60's. CHS-3 has a criminal history that includes stalking, possession of controlled substances for sale, and domestic violence. CHS-3 has also provided information to the California Department of Corrections and Rehabilitation and Riverside Police Department. I have discussed the reliability of CHS-3 with the handling Agents and Officers from each of the other law enforcement agencies. Through these discussions, I have learned of no instances where the information provided by CHS-3 to the other law enforcement Agents and Officers has been false or misleading. Furthermore, CHS-3's information has been corroborated by other confidential sources, physical surveillance, and through controlled drug purchases and consensually-recorded conversations and phone calls. CHS-3's information has never been found to be false or misleading

4. CHS-4

79. CHS-4 does not have access to the Targeted Communicators or the **TARGET LOCATION** but has routine access to Rollin 60's gang members involved in narcotics and firearms distribution. CHS-4 regarded HENLEY as an Original Gangster, or "OG", of the Rollin 60's who only spent time with a tight-knit circle of Rollin 60's from his generation. Since January 2021, CHS-4 has been able to purchase methamphetamine and firearms from several Rollin 60's gang members

Case 2:25-cr-00021-FLA Document 174-3 Filed 06/06/23 Page 61 of 90 Page ID #:1061

and their suppliers. However, CHS-4 does not have access to Rollin 60's members with connections to the Targeted Communicators. CHS-4 is not a member of the Rollin 60's. CHS-4 has told me that he/she cannot realistically ingratiate him/herself well enough with the Targeted Communicators because he/she was previously associated with another gang.

80. CHS-4 has a criminal history that includes arrests for burglary and a firearms violation. CHS-4 has received monetary compensation and probation benefits in return for this information and assistance. I know that CHS-4 has also provided information to the LAPD. I have discussed the reliability of CHS-4 with the LAPD officers who worked with me on these matters. Through these discussions, I have learned of no instances where the information provided by CHS-4 to LAPD has been false or misleading. Furthermore, CHS-4's information concerning the Rollin 60's has been corroborated through physical surveillance, controlled drug and firearms purchases, and consensually-recorded conversations and phone calls that CHS-4 has had with Rollin 60's gang members. CHS-4's information has never been found to be false or misleading.

5. <u>CHS-5</u>

81. CHS-5 does not have access to or know any of the Targeted Communicators or the **TARGET LOCATION** but has occasional access to Tiyon T. Jones ("T. Jones"), a Rollin 60's gang member involved in firearms distribution. CHS-5 has been able to purchase Glock machine gun switches from T. Jones. The nature of CHS-5 and T. Jones' relationship is strictly related to legitimate business transactions and controlled firearms transactions. CHS-5 has told me that he/she cannot build a deeper relationship with T. Jones because he/she fears T. Jones and anyone who associates with the Rollin 60's.

82. CHS-5 has not yet received any benefits from the FBI related to his/her assistance conducting a controlled purchase from T. Jones. CHS-5 is

providing assistance to the FBI's investigation of the Rollin 60's because of his/her desire to avoid federal indictment related to possible charges related to felon in possession of a firearm. CHS-5 has a criminal history that includes convictions for robbery, theft, possession of a controlled substance in prison, and using false identification.

83. CHS-5 has not provided information to any other law enforcement agency. I have learned of no instances where the information provided by CHS-5 to the FBI has been false or misleading. Furthermore, CHS-5's information has been corroborated by CHS-4, physical surveillance, and through consensually recorded conversations and phone calls. CHS-5's information has never been found to be false or misleading.

6. CHS-6

84. On December 6, 2022, I learned that the LAPD operated a CHS who had access to HENLEY in approximately the 2019 to 2020 timeframe. I also learned that the investigation may have been worked with either the Drug Enforcement Administration or FBI. I also learned that the investigation had a nexus to public corruption matters but was not litigated and did not result in any wire interceptions of any telephones used by HENLEY. I have not yet ascertained any details regarding the investigation or the CHS' reporting related to HENLEY.

7. The CW

85. The CW has a criminal history that includes convictions for possession for sales of narcotics in 2009 and 2003, in violation of California Health and Safety Code Section 11350(A) and 11351.5, respectively, as well as shooting into an inhabited dwelling in 2003, in violation of California Penal Code Section 246. The CW is receiving consideration in connection with a pending drug conspiracy case, alleging violation of Title 21, United States Code, Section 846, from the United States Attorney's Office in the Central District of California, for his/her cooperation

with law enforcement. The CW is motivated to cooperate with the FBI in the investigation of HENLEY with the hopes of receiving leniency from the Central District of California. The CW's information concerning HENLEY was corroborated during a consensually recorded meeting between HENLEY and CHS-1 from April 14, 2022, to April 15, 2022. For these reasons, I consider the CW's information about HENLEY to be reliable.

86. The CW does not have current access to HENLEY or any of the Targeted Communicators or **TARGET LOCATION**. The CW advised a large buy-in dice game occurred in Los Angeles in 2019. The game involved professional athletes. According to the CW, one of the professional athletes fixed the game and cheated other professional athletes out of millions of dollars using "teased" dice. Following the incident, HENLEY asked the CW and others to "rough up" the professional athlete and get the money back from him on behalf of the cheated professional athletes. Before the CW went to the professional athlete's hotel to confront him, though, as planned by HENLEY, five or six members of the Rollin 60's arrived to do the job of putting pressure on the professional athlete instead. The CW told me that HENLEY was involved with the incident because HENLEY was involved and/or would approve of any dice games or similar events involving large sums of money in Los Angeles. The CW also advised professional athletes were required to seek approval in advance from HENLEY to assure their safety at events while in Los Angeles. The CW told me if professional athletes did not seek and/or pay for HENLEY's protection and approval, they would face retaliation from gang members.

87. The CW has not yet received any benefits from the FBI related to the information he/she provided. The CW is providing assistance to the FBI's investigation of HENLEY because of his/her desire to prosecutorial consideration, as described above.

88. The CW provided information to the FBI in the early aughts. The FBI closed the CW after discovering narcotics in his/her car during a search warrant. The CW's statements have been corroborated from victim interviews and an April 2022 consensually monitored conversation between CHS-1 and HENLEY.

## D. UNDERCOVER AGENTS

89. On December 6, 2022, the LAMTFVG attempted to have CHS-1 introduce two undercover law enforcement agents, "UCs," to HENLEY and ROBINSON. The goal of the introduction was to assess whether HENLEY will be amenable to future interactions with the UCs. However, the introduction was not possible because of a report of multiple shots fired at the venue where the LAMTVG planned the introduction.[17] The LAMTFVG discontinued the operation in progress due to safety considerations of the UCs.

90. On March 31, 2023, an FBI Undercover Employee established contact with MARTIN and "Chuck" at the **TARGET LOCATION**. During the operation, which was audio and video recorded, Chuck gave the FBI Undercover Employee a tour of the **TARGET LOCATION**, provided the suite number for the **TARGET LOCATION**, and provided information about the business name and its activities. However, the interaction between Chuck, MARTIN, and the FBI Undercover Employee was limited to a one-time encounter. I believe that future interactions between the FBI Undercover Employee or the Targeted Communicators at the **TARGET LOCATION** would jeopardize his/her safety.

91. I do not believe that the use of the UCs alone, however, can achieve the goals of this investigation, unless used in conjunction with court-authorized interception of the **TARGET LOCATION**. Based on my knowledge of street gangs, and my training and experience, as well as the training and experience of other

[17] The LAMTFVG has not yet ascertained who fired the shots, but confirmed that HENLEY, ROBINSON, and the other Targeted Communicators were not present during the incident.

investigators consulted during the course of this investigation, it will likely take several months for a UC to develop a relationship with any of the Targeted Communicators. Even if a UC were able to develop such a relationship, I believe it is highly unlikely the UC could partake in conversations inside the **TARGET LOCATION**. Some of the Targeted Communicators, such as HENLEY, ROBINSON, MARTIN, and DOUGLAS, have known each other for several decades and some are members of the Rollin 60's. Based on my training, experience, and knowledge of the investigation, I believe that members of the Rollin 60's would not associate with individuals other than their long-term associates, in a manner in which they would allow those individuals to learn about the complete scope of their criminal activities. CHS-1 has told me, though, that HENLEY, ROBINSON, and MARTIN have extorted several businesses and individuals in the Los Angeles area. I believe that CHS-1 introducing a UC at this time as a potential victim for HENLEY to extort will comprise the UC's safety, especially if such an operation is conducted without simultaneous court-authorized interception of the **TARGET LOCATION**.

## E. SEEKING COOPERATION OF TARGETED COMMUNICATORS

92. As a result of this investigation, I learned of one time when HENLEY provided a voluntary statement to LAPD. On June 10, 2022, LAPD arrested HENLEY for 12.21(a) LAMC (illegal land use) when he hosted a "hood day" party for the Rollin 60's. One of the LAPD officers interviewed HENLEY. HENLEY told the LAPD officer that he was in charge of the event and that it was a photoshoot. HENLEY told the LAPD officer that he worked with the City Attorney, but was unable to provide the LAPD officer with a name or reason why he had mentioned the City Attorney. From my review of CHS-1's consensually monitored telephone, I learned that HENLEY told CHS-1 that the purpose of the event was to throw a "hood day" party for the Rollin 60's, not a photo shoot, as HENLEY had told the

LAPD officer. Seeking HENLEY's, or any other Targeted Communicator's, cooperation in this investigation at this stage would likely expose the FBI's interest in HENLEY's conspiracy and would decrease the likelihood of future cooperation of co-conspirators. For example, on June 5, 2022, during a consensually monitored telephone call, HENLEY threatened CHS-1 for doing business with C. Jones, who HENLEY viewed as a "rat," or informant, for law enforcement.

93. I also learned NLVPD detectives interviewed Daiyan Henley ("D. Henley"), HENLEY's son, about the homicide on February 21, 2023. The NLVPD detectives spoke with D. Henley because Williams lived with D. Henley when they were both in high school. Hours after the interview, the LAMTFVG intercepted a wire communication where HENLEY directed D. Henley to never "talk to them [the NLVPD detectives] again." HENLEY also told D. Henley "I aint talkin to em." Based on my training, experience, and knowledge of the investigation, I believe additional attempts to interview HENLEY will be met with resistance and lead to him meeting with other Targeted Communicators at the **TARGET LOCATION**.

## F. WITNESS INTERVIEWS AND ARRESTS

94. Interviews have been conducted during the investigation that have been effective in gathering information about HENLEY's involvement with the homicide. They have also been effective in gathering information related to HENLEY's collection of extortion payments. Some of the interviews have also led to the recruitment of a few of the aforementioned confidential sources who have been used during this case. However, as described above, those confidential sources have taken this investigation as far as it can go, and short of meeting its prosecutorial goals and objectives. Additionally, in my conversations with CHS-1, CHS-2, and other law enforcement officers, I have learned that HENLEY associates with a tight-knit circle of people who have known each other for decades. Continued interviews without court-authorized interception of the **TARGET LOCATION**

could unnecessarily alert the Targeted Communicators to the interest of law enforcement in their illegal activity.

95. The interviews would also have the effect of alerting the Targeted Communicators and others, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence. Additionally, if the Targeted Communicators are alerted to the government's investigation, they may flee the jurisdiction in order to avoid apprehension and prosecution. For example, in late July 2022, the FBI Houston Division conducted a telephone interview of Cash Jones, aka "Wack 100" ("C. Jones") about his interactions with a subject of their investigation. The FBI Houston Division believes C. Jones recorded the interview because the entirety of the interview was posted to YouTube the following day. Based on my training, experience, and knowledge of the investigation, I believe additional interviews of associates of the Targeted Communicators will not stay private and alert them to the LAMTFVG's investigation of the Enterprise. For example, NLVPD made attempts to interview HENLEY, which were unsuccessful in both 2021 and 2023. HENLEY also learned about NLVPD's interviews with recent interviews of Williams' family and friends. Therefore, I believe that only interviews done in conjunction with interception of the **TARGET LOCATION** will achieve the goals of this investigation.

96. The LAMTFVG has developed information that HENLEY is victimizing professional athletes. CHS-1 and the CW have both advised that HENLEY is extorting professional athletes. The FBI Houston Division has interviewed multiple professional athletes who the LAMTFVG believes are victims of the extortion. Some of the victims have provided information about HENLEY's involvement with charity work in Los Angeles. However, based on my review of the information, I have not ascertained whether HENLEY is victimizing the professional athletes FBI Houston Division interviewed. In my review of the pen

register and trap and trace device on HENLEY's phone, there were multiple calls and texts to and from those victims following the interviews.

97. The LAMTFVG has developed information about other victims of HENLEY's extortion activities. The LAMTFVG plans to interview those victims, once they are fully identified. Based on my training, experience, and knowledge of the investigation, I believe that additional interviews of victims, without court-authorized interception of the **TARGET LOCATION** to monitor whether the Targeted Communicators are aware of such interviews, will jeopardize the investigation.

98. Similarly, based on my training and experience, I believe that arrests would not be successful in achieving the goals of the investigation at this time. NLVPD's investigation into Williams' murder is not yet complete. As such, arresting HENLEY or SCOTT for their involvement with either the murder or covering up the murder would be premature. For example, if one of the Targeted Communicators was arrested, the discovery provided to that arrestee would expose the larger racketeering investigation.

## G. GRAND JURY SUBPOENAS FOR TESTIMONY AND GRANTS OF IMMUNITY

99. Based upon my training and experience, I do not believe subpoenaing witnesses to testify before the grand jury would be successful for multiple reasons:

a. Based on my training and experience, subjects and targets of investigations are informed of their rights before testifying in the grand jury. This ordinarily results in individuals with criminal exposure invoking their Fifth Amendment privileges and refusing to testify. It would be unwise to seek any kind of immunity for these persons, because the granting of such immunity might foreclose prosecution of those members of the conspiracy and could not ensure that such immunized witnesses would provide truthful testimony. Additionally, the

service of Grand Jury subpoenas would only alert the Targeted Communicators to the existence of this investigation, causing them to become more cautious in their activities, possibly destroy evidence, coordinate their stories, or otherwise compromise the investigation.

b. Currently, I am not aware of any person who could be subpoenaed before the Grand Jury or interviewed who I believe would provide significant and truthful evidence to prove the Target Offenses against all of the Targeted Communicators and meet the goals of the investigation.

100. Thus, I believe that these techniques, in particular, are likely to impede the government's investigative objectives at this time.

**H. PHYSICAL SURVEILLANCE OF LOCATIONS AND PEOPLE**

101. Surveillance, in and of itself, even if highly successful, rarely succeeds in gathering evidence of the criminal activities under investigation. It is an investigative technique that is used to confirm meetings and other suspected, criminal activity between alleged participants but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and other activity.

102. Physical surveillance has been used throughout the investigation to identify associates of the Targeted Communicators and co-conspirators in the criminal enterprise; however, no evidence of illegal activity has been observed or confirmed. Physical surveillance has been conducted of the Targeted Communicators on approximately 63 occasions. Physical surveillance has also been conducted at the **TARGET LOCATION**. Surveillance was recently conducted at the **TARGET LOCATION** on March 31, 2023. During surveillance, the LAMTFVG saw MARTIN entering the **TARGET LOCATION**.

103. The LAMTFVG has conducted physical surveillance of the Targeted Communicators on multiple occasions since wire and electronic interception began. There were three instances of physical surveillance that was conducted from

November 5, 2022, to November 6, 2022, in Houston, Texas. On November 5, 2022, at approximately 5:30 P.M., the LAMTFVG conducted surveillance of HENLEY at The Royal Sonesta Houston Galleria, 2222 W. Loop S., Houston, Texas 77027. During surveillance, I surreptitiously collected a discarded water bottle from HENLEY.[18]. On November 6, 2022, at approximately 10:30 A.M., LAMTFVG was able to identify two vehicles registered to associates of HENLEY. On November 6, 2022, at approximately 11:35 A.M., LAMTFVG was able to identify the residence of JAMES PRINCE SR., an FBI Houston Division subject, whom HENLEY met at his condominium complex.

104. In Los Angeles, California, surveillance of residences associated with HENLEY, specifically 4159 West 62nd Street, Los Angeles, California 90043, 512 Bay St., Santa Monica, CA 90405, and 5847 Arlington Ave., Los Angeles, CA 90043, failed to identify any possible co-conspirators associated with the criminal enterprise. On multiple occasions, though, ROBINSON and/or HENLEY collected extortion payments from CHS-1 at 5847 Arlington Ave., Los Angeles, CA 90043. For example, on October 5, 2022, the LAMTFVG conducted surveillance at this address. During surveillance, the LAMTFVG observed a known vehicle for ROBINSON in the driveway. Surveillance of 5444 Crenshaw Blvd., Los Angeles, CA 90043, a location associated with HENLEY's businesses, UNEEK Music and DEVELOPING OPTIONS, has confirmed association between HENLEY, ROBINSON, MARTIN, and possible co-conspirators. On multiple occasions, the FBI observed HENLEY, MARTIN, and ROBINSON entering and exiting the businesses. However, the LAMTFVG is unable to conduct surveillance inside of UNEEK Music and DEVELOPING OPTIONS and does not have a CHS with access

[18] The Las Vegas Metropolitan Police Department's Forensic Laboratory compared DNA that the FBI surreptitiously collected from HENLEY on November 5, 2022, and foreign DNA that was collected from the socks and shoes of Williams. The foreign DNA collected from Williams was an inconclusive match to HENLEY's DNA.

to meetings between the Targeted Communicators in this space. ROBINSON's residence, 17720 Superior St., Apt. 111, Northridge, CA 91325, is located inside of a gated community, which makes it difficult for the LAMTFVG to conduct surveillance. Surveillance was conducted on at this address and the LAMTFVG did not observe other Targeted Communicators meeting with ROBINSON. Surveillance of addresses for the other Targeted Communicators yielded negative results.

105. Surveillance of the Targeted Communicators in Los Angeles, California and surrounding areas has been ongoing, in conjunction with court-authorized wire interception. On the morning of December 1, 2022, LAMTFVG conducted physical surveillance at a known residence of HENLEY. During surveillance, the LAMTFVG observed HENLEY, MARTIN, and three UMs meeting at the residence. On December 2, 2022, the LAMTFVG conducted surveillance at a Tal's Café location at 2701 West Florence Ave. in Los Angeles, CA. During surveillance, the LAMTFVG observed HENLEY and MARTIN meeting. However, the LAMTFVG was not able to observe HENLEY or MARTIN while they were inside of the restaurant.

106. Surveillance was conducted of MITCHELL on January 19, 2023, and February 16, 2023 in Los Angeles. During surveillance, the LAMTFVG identified possible vehicles and an address associated with MITCHELL. However, the LAMTFVG was not able to observe MITCHELL or any of the other Targeted Communicators during surveillance.

107. Surveillance was conducted of ROBINSON on February 15, 2023, while ROBINSON met with CHS-1. During the meeting, which was audio and video recorded, ROBINSON was driving a vehicle associated with HENLEY and S. HENLEY.

108. Surveillance was conducted of MARTIN's residence on February 24, 2023. During the surveillance, the LAMTFVG identified possible vehicles and an address associated with MARTIN. However, the LAMTFVG was not able to observe MARTIN or any of the other Targeted Communicators during surveillance.

109. The LAMTFVG intends to continue conducting physical surveillance of the **TARGET LOCATION** in order to positively identify additional associates of HENLEY, ROBINSON, MARTIN, and the other Targeted Communicators. I believe that continued surveillance done in conjunction with interception of oral communications and visual, non-verbal conduct will achieve these objectives. When surveillance can be planned and conducted with prior knowledge of the Targeted Communicators whereabouts and intentions, tactics can be employed to minimize their awareness of surveillance and therefore be more productive. At the same time, though, the LAMTFVG has intercepted wire communications in February 2023, where HENLEY discussed exchanging vehicles with ROBINSON and renting other vehicles. Based on my training, experience, and knowledge of the investigation, I believe HENLEY and other Targeted Communicators are aware of LAMTFVG surveillance and attempting to obfuscate their criminal activities. On March 29, 2023, while the LAMTFVG was conducting surveillance of a controlled payment by CHS-1 to ROBINSON, I observed ROBINSON meeting with CHS-1.

110. Even if physical surveillance was possible without risks and even if highly successful in terms of actually observing Targeted Communicators, it is not reasonably likely to succeed in gathering sufficient evidence to meet the goals of the investigation. It is unlikely that physical surveillance will result in agents overhearing the conversations between the Targeted Communicators, which is vital in this investigation. This is unlike a bank robbery investigation in which the mere robbery, if able to be observed, will go a long way toward proving the crime. With the intent requirements of extortion and money laundering crimes being

Case 2:25-cr-00021-FLA Document 174-3 Filed 02/05/26 Page 74 of 90 Page ID #:1074

investigated, what the Targeted Communicators say matters significantly. And the Targeted Communicators have shown that they are careful in their communications over the intercepted telephones. Therefore, any in-person communications of import are unlikely to occur in public and are more likely to occur in discreet private locations, such as the **TARGET LOCATION**. That said, we will continue to consider physical surveillance in conjunction with the interception of oral communications and visual, non-verbal conduct.

111. Continued physical surveillance used in conjunction with court-authorized interception of wire communications, will allow the purpose of meetings to take on a new significance and may constitute admissible, persuasive evidence of criminal activity.

## I. MOBILE TRACKING DEVICES, CELL-SITE DATA, AND GPS

112. GPS location information and historical tracking information are useful techniques to provide real-time/historical locations for known individuals, and is extremely helpful when trying to locate a subject whose whereabouts may be unknown. For example, on February 16, 2022, the Honorable Paul L. Abrams, United States Magistrate Judge, authorized the disclosure of GPS and cell-site information concerning Target Telephone #1 and one of ROBINSON's telephones. From my review of this data, I was able to determine locations where HENLEY and ROBINSON frequented that corroborated other information learned during this investigation, such as home addresses and frequently visited addresses. In conjunction with court-authorized wire interception, I was also able to determine and corroborate HENLEY's location while he was travelling to Houston, Texas, Las Vegas, Nevada, Pullman, Washington, Tucson, Arizona, and San Francisco, California.

113. I do not believe, however, that using GPS location data will be sufficient to achieve the goals of the investigation. GPS will provide information

about where Targeted Communicators are located but will not provide the significance of the location. Further, it does not reveal the presence or absence of contraband or illegal activity, nor the context needed to determine the reasons why a Targeted Communicator travelled to a given location. Thus, while the GPS data will be gathered and reviewed, it is not sufficient to achieve the goals of the investigation.

**J. STATIONARY CAMERAS**

**114.** A pole camera has been placed at 5444 Crenshaw Blvd., Los Angeles, CA 90043. The LAMTFVG has learned that HENLEY, MARTIN, S. HENLEY, and other associates frequent this address. Based on my review of financial statements, I have learned that this address is associated with both UNEEK Music and DEVELOPING OPTIONS. As discussed above, multiple Targeted Communicators have been observed meeting at this location. From the location of the pole camera, the LAMTFVG is able to capture license plates and individuals that arrive to and depart from this address.

**115.** As set forth above, a pole camera has been placed at the **TARGET LOCATION**. Based on wire and electronic interception and GPS location information, the LAMTFVG has observed that this is a meeting location for HENLEY, MARTIN, ROBINSON, and possibly other Targeted Communicators. The LAMTFVG plans to use the pole camera to establish additional associations between the Targeted Communicators and other associates.

**116.** The pole cameras have proven beneficial in identifying individuals who visit both meeting locations, especially at the **TARGET LOCATION**. For example, I was able to use the pole camera at the **TARGET LOCATION** to corroborate wire interceptions. However, this information will not enable law enforcement to achieve all of the goals of this investigation. For example, a pole camera typically does not provide specific information about the individuals observed on the camera,

including why they are there, or to what extent those subjects are involved in the organization. A pole camera is also limited to the location that is being recorded and, more specifically, to the outside of that location; the cameras cannot capture any activities once the subjects go inside. A pole camera also will not record the many important members of the conspiracy who would not likely make appearances at a particular location. Additionally, a pole camera does not capture what is being said at the location. Law enforcement could only speculate about the activity that was being observed while viewing the surveillance video footage. Likewise, the pole camera at the **TARGET LOCATION** does not always clearly capture the faces of people entering. Thus, I believe interception of visual, non-verbal conduct will also be necessary to determine who is speaking in the intercepted communications at the **TARGET LOCATION.** Therefore, the pole camera video footage will not, on its own, achieve the goals and objectives of this investigation.

## K. SEARCH WARRANTS, CONSENT SEARCHES, PAROLE/PROBATION SEARCHES

117. Search warrants have not been executed in this investigation in relation to the Targeted Communicators. Due to the ongoing and covert nature of this investigation, I believe the execution of search warrants at this time may disrupt law enforcement's ability to achieve the goals of the investigation. As set forth above, HENLEY met with MARTIN at the **TARGET LOCATION** to discuss the Target Offenses, instead of over the telephone. Based on my training, experience, and knowledge of the investigation, I believe HENLEY made that decision because of NLVPD interest in HENLEY. While I do believe that search warrants may produce some evidence of isolated criminal and/or narcotics-related activity by certain members of the criminal enterprise, search warrants would not be effective at achieving the larger goals of this investigation and, instead, force HENLEY to use the **TARGET LOCATION** as the exclusive base of operations to

discuss the Target Offenses. Moreover, the complexity of HENLEY's criminal enterprise limits the effectiveness of search warrants in addressing the enterprise as a whole.

118. In any case, it is unlikely that the use of search warrants, in and of themselves, would meet the goals and objectives of this investigation. Evidence seized would likely only implicate the individual directly associated with it, and not the entire organization. Finally, in order to achieve maximum effectiveness, a search warrant must be coordinated with information concerning the immediate whereabouts of the sought-after evidence. This is best achieved with the interception of oral communications and visual, non-verbal conduct. Intercepted communications can inform investigators of the immediate presence of documents, drugs, weapons, or other contraband in a timely manner. A search warrant could then follow. The use of these two techniques in conjunction with one another is the most effective way to seize contraband, secure evidence, and ultimately provide evidence against the criminal enterprise, which will disrupt or dismantle their criminal organization.

## L. SOCIAL MEDIA

119. The LAMTFVG has monitored the social media accounts of HENLEY, Williams, and MITCHELL, but are not aware of social media accounts for ROBINSON, MARTIN, or the other Targeted Communicators. I am aware that HENLEY uses the Instagram account "@bigu1." I have reviewed data from the account, which is publicly available. HENLEY has used the Instagram account to promote his various businesses. While the data from HENLEY's Instagram account has corroborated statements about his past criminal activity, the LAMTFVG has not discovered information that HENLEY is using the account to commit the Target Offenses. NLVPD also obtained a search warrant for HENLEY and Williams' social media accounts. Based on their review of the data, they did not learn any

additional information about the homicide. I am also aware that MITCHELL uses the Instagram account "@briccbaby." I have reviewed data from the account. MITCHELL has recently used the Instagram account to post an image documenting his possession of rifle ammunition. As set forth in Prior Affidavit #1, MITCHELL is a convicted felon and is prohibited from possession firearm ammunition. We will continue monitoring social media accounts to aid in this investigation.

**M. TRASH SEARCHES**

120. In my experience, trash searches provide limited evidentiary value to this type of investigation and also risk jeopardizing the covert nature of the investigation. A trash search of HENLEY's residence, or the residences of other Targeted Communicators, may produce evidence of illegal activity, however the evidence would be unlikely to produce evidence sufficient for prosecution and the trash would need to be searched on a frequent basis to gather substantial evidence, increasing the likelihood of detection. ROBINSON lives in a multi-unit apartment complex with a shared dumpster. As such, law enforcement will not be able to discern ROBINSON's trash from the trash of other residents in the building. HENLEY's residences either use communal trash dumpsters or are in neighborhoods with a known presence of Rollin 60's gang members. The LAMTFVG considered a trash search of the address associated with Developing Options and UNEEK Music, due to association of the Targeted Communicators at the business; however, after review of surveillance reports and pole camera footage, I learned that the trash dumpster for the business is in a gated area and is shared with multiple businesses. The LAMTFVG has not observed MARTIN at his residence at this point of the investigation, but plans on evaluating whether a trash search is feasible at his residence in the future. Furthermore, trash searches are not effective in fully identifying the participants and scope of a criminal enterprise. Although trash searches may reveal the phone numbers and monikers of some conspirators, they

Case 2:22-mj-00021-FLA Document 174-3 Filed 06/06/23 Page 80 of 90 Page ID #:1080

will not fulfill the goals of this investigation. For these reasons, along with the aforementioned complications associated with the locations where HENLEY, ROBINSON, or MARTIN work and reside, a trash search was not attempted.

## N. MAIL COVER

121. I have considered requesting that the United States Postal Service provide a "mail cover," or a list of all sender and receiver names and addresses on each piece of mail received at the Targeted Communicator's known residences and businesses. A mail cover does not allow law enforcement access to the content of the pieces of mail. I have not discovered information that leads me to believe that a mail cover at the residence/business of HENLEY, ROBINSON, or MARTIN would achieve all of the goals of this investigation, or provide any evidence of criminal conduct. There is no indication from any source of this investigation that HENLEY, ROBINSON, or MARTIN are using the mail themselves to conduct criminal business. Further, I am not certain that the mail carrier could be relied upon to perform this task without compromising the investigation (unwittingly or otherwise) and alerting HENLEY, ROBINSON, and MARTIN that they are being watched or investigated. Therefore, the risks of pursuing this investigative technique far outweigh the value.

## O. FINANCIAL INVESTIGATION

122. I have been examining recent bank account records for HENLEY, S. HENLEY, DEVELOPING OPTIONS, and other related records from 2017 to 2023. The LAMTFVG is working a joint investigation with the Internal Revenue Service ("IRS") and focusing on those bank accounts. The LAMTFVG has issued 26 Grand Jury subpoenas to financial institutions for bank accounts associated with HENLEY and his businesses and nonprofits, such as DEVELOPING OPTIONS, as well as S. HENLEY and BLANTON. For example, multiple wire transactions and cash deposits of $10,000 to $100,000 at a time were discovered. The information the

FBI has obtained from these account records has been useful in my investigation in that it has helped corroborate statements made by the CW and CHS-1. Based on my review of subpoenaed bank statements, I noted wire transfers between professional athletes, who I believe are victims of extortion and fraudulent activities, and HENLEY. The LAMTFVG also issued a subpoena to and interviewed Hasani Ellis ("Ellis"), the accountant for DEVELOPING OPTIONS. Following the interview, Ellis immediately placed a call to HENLEY and informed him about the subpoena. While the LAMTFVG obtained useful evidence in several wire interceptions thereafter, I do not believe the goals and objectives of the investigation will be accomplished without further court-authorized wire interception, in conjunction with subpoenas. From my review of financial records and HENLEY's own statements, I know that one of his businesses is the non-profit organization DEVELOPING OPTIONS, which receives hundreds of thousands of dollars in funding from the City of Los Angeles. Although the financial records have been useful—and review of the subpoena returns is ongoing—and I plan to continue using them as well as additional grand jury subpoenas to financial institutions for ROBINSON, MARTIN, and in investigating the mortgage fraud scheme, I do not believe that they will allow me to meet all of the goals of the investigation. I believe the court-authorized wire interception, used in conjunction with financial analysis, will provide evidence into the method and means HENLEY uses to launder money and collect extortion payments.

## VII. <u>DURATION OF INTERCEPTION</u>

**123.** This affidavit is in support of an application to intercept oral communications and visual, non-verbal conduct within the **TARGET LOCATION** for a period not to exceed 30 days. As demonstrated by the facts contained in this affidavit, the racketeering conspiracy is ongoing in nature and involves the Targeted Communicators and unknown co-conspirators. It is the goal of this

Case 2:25-cr-00021-FLA Document 174-3 Filed 06/06/26 Page 82 of 90 Page ID #:1082

investigation to prove the full scope, membership, and methods of operation of the conspiracy. Therefore, I request that interception not be terminated upon the first interception regarding racketeering activity but be allowed to continue until the full scope of the conspiracy, and the persons involved and their respective roles are determined, or for 30 days, whichever comes first. Interceptions shall be monitored at the FBI office in Los Angeles, California, as the **TARGET LOCATION** is within the Central District of California where interceptions will first be heard and minimized.

## VIII. <u>MINIMIZATION</u>

124. All interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code. Interceptions conducted pursuant to this Court's Order will terminate upon the authorized objectives or, in any event, at the end of 30 days, measured from the day on which law enforcement officers first begin to conduct an interception under the Court's Order, or ten days after the Order is entered. Monitoring of conversations, or review of video images, will terminate immediately when it is determined that the conversation or conduct is unrelated to communications or conduct subject to interception under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately when it is determined through voice or visual identification, physical surveillance, or otherwise, that none of the Targeted Communicators or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation or conduct already overheard or seen that the conversation or conduct is criminal in nature. If an interception has been minimized, the monitoring agents will spot check to ensure that the conversation or interaction has not turned to criminal matters. Before any initial interception of oral communication or video conduct within the **TARGET LOCATION**, a memorandum regarding minimization and a copy of the Court's

Order will be provided to all monitors and posted at the listening site. Before a monitor begins to intercept communications or conduct, he or she will sign a form indicating that the officer has read the affidavit, the Court's Order, and the minimization memorandum, and is familiar with the contents of the documents, and will intercept oral communications and visual, non-verbal conduct in compliance with the Court's Order and the other documents. If a monitor determines that a conversation or conduct is not criminal in nature, is privileged, does not relate to the investigation, or does not involve the Targeted Communicators or other co-conspirators identified through the interception process, the interception will be minimized. Even if a conversation or conduct is minimized, "spot" monitoring will be conducted to ascertain whether the conversation or conduct has become criminal in nature or is no longer privileged. The monitoring location will be kept secure and access will be available only to persons authorized to be involved with this investigation.

125. It is anticipated that the majority of the conversations intercepted will be in English. If conversations are intercepted in any language other than English, and personnel who speak that language are not reasonably available, the entirety of those conversations will be intercepted and recorded and minimization will be accomplished as soon as is practical after the interception.

126. All intercepted oral communications and video recordings will be recorded and all recordings will be securely preserved. Logs will be prepared regarding the date and time of recordings, the persons involved, and if and when minimization occurred.

127. Because officers, detectives, and investigators from other law enforcement agencies work closely with the FBI, and their further participation would aid this investigation, it is requested that they be authorized to assist investigative and law enforcement officers of the United States in conducting this

wire surveillance, including monitoring and receiving disclosure of intercepted communications. These participating officers, detectives, and investigators may be deputized by the FBI to make arrests for offenses enumerated in Title 18, Section 2516, pursuant to Title 18, Section 2510(7). The custody of the tapes, once sealed, will be maintained by the FBI.

128. Pursuant to 18 U.S.C. 2518(5), it is requested that, if necessary, government personnel or other individuals operating under a contract with the government (e.g., interpreters) and acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception, be authorized to assist in conducting this surveillance and to receive disclosure of intercepted communications.

## IX. SURREPTITIOUS ENTRY

129. IT IS FURTHER REQUESTED that Special Agents of the FBI and/or contractors acting under their supervision be authorized to enter the TARGET LOCATION surreptitiously, covertly, and by breaking and entering, if necessary, in order to install, maintain, and remove the surveillance equipment used by the FBI to intercept and record oral communications occurring within the TARGET LOCATION. The court will be notified of each surreptitious entry as soon as practicable.

## X. GROUNDS FOR DELAYED NOTIFICATION

130. Based on my training and experience, and knowledge of the investigation, I believe that reasonable cause exists to delay notification of any order authorizing the interception of visual, non-verbal conduct in the **TARGET LOCATION**. I believe that providing immediate notification of interception is likely to have the adverse result of placing the investigation in serious jeopardy. The investigation is ongoing, and disclosure of interception will compromise the

investigation. Specifically, the Targeted Communicators may alter their methods of operation, flee the area, or temporarily cease drug trafficking activities

131. Following the installation, the LAMTFVG and NLVPD plan to conduct interviews of various Targeted Communicators related to the homicide. As described above, I believe HENLEY and MARTIN discussed HENLEY's involvement in the homicide following interviews on February 14, 2023 and February 15, 2023. The LAMTFVG and NLVPD will attempt to contact HENLEY about the homicide after the installation for the purposes of stimulating conversation about the homicide at the **TARGET LOCATION**.

## XI. CONCLUSION

132. Based on the facts related above and my experience as a law enforcement officer, I believe that the Targeted Communicators have committed, are committing, and are about to commit offenses enumerated in Section 2516 of Title 18, United States Code, and that particular oral communications and visual, non-verbal conduct that occur within the **TARGET LOCATION** concerning these offenses will be obtained through the interception order applied for herein.

Dated: June 6, 2023

Andrew James Roosa
Special Agent
FBI

Subscribed to and sworn before:

FERNANDO L. AENLLE-ROCHA
United States District Judge

# Exhibit A

# Office of the Attorney General
Washington, D. C. 20530

ORDER NO. 5000-2021

SPECIAL DESIGNATION OF CERTAIN OFFICIALS OF THE CRIMINAL DIVISION AND NATIONAL SECURITY DIVISION TO AUTHORIZE APPLICATIONS FOR COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS

By virtue of the authority vested in me as the Attorney General, including 28 U.S.C. § 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in order to preclude any contention that the designations by the prior Attorney General have lapsed, the following officials are hereby specially designated to exercise the power conferred by Section 2516(1) of Title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire and oral communications by the Federal Bureau of Investigation or a Federal agency having responsibility for the investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any of the offenses specified in Section 2516 of Title 18, United States Code:

1. The Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division;

2. The Assistant Attorney General for National Security, any Acting Assistant Attorney General for National Security, any Deputy Assistant Attorney General for National Security, and any Acting Deputy Assistant Attorney General for National Security, with respect to those matters delegated to the supervision and responsibility of the Assistant Attorney General for National Security. These officials of the National Security Division shall exercise this authority through, and in full coordination with, the Office of Enforcement Operations within the Criminal Division.

Attorney General Order No. 4417-2019 of March 25, 2019, is revoked effective at 11:59 p.m. of the day following the date of this order.

3/12/2021
Date

Merrick B. Garland
Attorney General

U.S. Department of Justice

Criminal Division

*Office of Enforcement Operations* *Washington, D.C. 20530*

## Title III Implementation Information

With regard to the attached authorization of your request to apply for a court order authorizing an interception pursuant to Title III, please be advised of the following:

**Review Authorization Memorandum** - It is the final responsibility of the applicant to review the Authorization Memorandum to ensure accuracy. The Authorization Memorandum must be ATTACHED when submitting your application for court authorization. In particular, please verify that the target facility identifiers, statutory violations, and target subjects are accurate and consistent with the affidavit, application, and order you submitted for review to OEO.

**Pending Charges / Privileged Communications** - Monitoring personnel must exercise care to avoid intercepting communications involving a recognized privilege or communications of persons under indictment that may pertain to the strategy that they contemplate employing as a defense. If such a communication is overheard inadvertently, monitoring personnel are to make notation of the incident in the intercept log and make an immediate report to the attorney who is supervising the interception.

**Sealing** - It is the obligation of the supervising attorney to ensure that recordings of intercepted conversations are protected adequately, and are sealed by the court on a regular basis. This should occur at the end of each 30-day period, preferably even if the interception is authorized to continue beyond the initial 30-day period. If there is a break in the interception period, the supervising attorney should ensure that recordings are sealed by the court as soon as practicable thereafter.

**Computation of the 30-Day Period** - Because of conflicting court decisions regarding the counting of the 30-day period for purposes of Title III interceptions, the supervising attorney should ensure that the method of computing time complies with District precedent and practice. Monitoring personnel should be alerted to the date interceptions must be discontinued absent an extension by court order authorizing continued interceptions.

**Extensions** - All extensions MUST be approved by the Criminal Division before they are filed with the court.

**Reporting** - Section 2519 of Title 18, United States Code, requires that the Attorney General make an annual report to the Administrative Office of the United States Courts (AOUSC) each year regarding electronic surveillance by a federal agency under Title III. The statute requires you, through your investigative agency, to report specific post surveillance information, i.e., the number of resulting trials, the number of motions to suppress, whether the motions were granted or denied, and the number of convictions. These reports are compiled by AOUSC and provided to Congress and the public.

**Contact and Submission** - OEO's Electronic Surveillance Unit (ESU) can be reached at (202) 514-6809. The ESU duty attorney can be reached at (202) 353-5265. Requests for surveillance authorized under T-III must be submitted to ESU by email through ESU.Requests@usdoj.gov or through our FAX-to-email server on (803) 726-2180.

**U.S. Department of Justice**

Criminal Division

Washington, D.C. 20530

May 4, 2023

**MEMORANDUM**

TO: Ashley Dugger, Acting Director
Office of Enforcement Operations
Criminal Division

ATTN: Amy Pomerantz

FROM: Kenneth A. Polite, Jr.
Assistant Attorney General
Criminal Division

SUBJECT: Authorization for Interception Order Application

This is with regard to your recommendation that an appropriately designated official of the Criminal Division authorize an application to a federal judge of competent jurisdiction for an order under Title 18, United States Code, Section 2518, authorizing for a thirty (30) day period the initial interception of oral communications occurring within Under the Hood Muscle Cars, 1613 West 134th Street, Suite 3, Gardena, CA, in connection with an investigation into possible violations of Title 18, United States Code, Sections 922, 924, 1014, 1341, 1343, 1344, 1951, 1952, 1955, 1962, 1963, and 1791, and Title 21, United States Code, Sections 841 and 846, by Eugene Henley, Jr., Sylvester Robinson, Mark Martin, Zihirr Mitchell, Darral Scott, Devonne Douglas, Lamarc Saunders, and others as yet unknown.

By virtue of the authority vested in the Attorney General of the United States by Section 2516 of Title 18, United States Code, the Attorney General has by Order Number 5000-2021, dated March 12, 2021, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communications. As a duly designated official in the Criminal Division, this power is exercisable by the undersigned. WHEREFORE, acting under this

Case 2:22-cr-00211-FLA *SEALED* Document 174-3 *SEALED* Filed 06/06/23 Page 90 of 90 Page ID #:1090

delegated power, the appropriately designated official authorizes the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The application should include a request that the order providing for the interception specifically authorize surreptitious entry for the purpose of installing, maintaining, and removing any electronic interception devices to be utilized in accomplishing the oral interception.

JENNIFER HODGE

Digitally signed by JENNIFER HODGE
Date: 2023.05.04 13:10:10 -04'00'

______________________________
Jennifer A. H. Hodge
Deputy Assistant Attorney General
Criminal Division

May 4, 2023
______________________________
Date